**Stephen F. English**, OSB No. 730843
SEnglish@perkinscoie.com
**Erick J. Haynie**, OSB No. 982482
EHaynie@perkinscoie.com
**Joanna T. Perini-Abbott**, OSB No. 141394
JPeriniAbbott@perkinscoie.com
Perkins Coie LLP
1120 N.W. Couch Street, Tenth Floor
Portland, OR  97209-4128
Telephone:  503.727.2000
Facsimile:  503.727.2222

Attorneys for Plaintiff
Vesta Corporation

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| VESTA CORPORATION,<br><br>                Plaintiff,<br><br>    v.<br><br>AMDOCS MANAGEMENT LIMITED; AMDOCS, INC.,<br><br>                Defendants. | No. 3:14-cv-01142-HZ<br><br>**FIRST AMENDED COMPLAINT**<br><br>(Breach of Contract, Misappropriation of Trade Secrets; Antitrust Violations)<br><br>**JURY TRIAL DEMANDED** |

For its complaint in this action against Amdocs Management Limited ("AML") and Amdocs, Inc. ("AMI") (collectively, "Defendants" or "Amdocs"), plaintiff Vesta Corporation ("Vesta") alleges as follows:

### INTRODUCTION

Vesta is an electronic payments and fraud prevention technology company based in Portland, Oregon.  Defendants are telephone billing software and services companies

doing business in Oregon and around the globe. This action seeks redress for two fundamental wrongs by Defendants.

First, Defendants stole highly confidential and proprietary information belonging to Plaintiff. The stolen information relates generally to proprietary software and fraud prevention technologies, consumer behavior analyses and service techniques created by Vesta and used to provide its electronic payment services to the national and international mobile phone industry. Plaintiff shared this information with Defendants under strict contractual limitations, and Defendants used and relied upon the information improperly to create, price and sell a competing product in order to increase its profits. Second, Defendants have engaged in predatory, anticompetitive and exclusionary conduct in an unlawful effort to acquire and maintain monopoly power in the marketplace.

In this action, Plaintiff pursues claims against Defendants for breach of contract and trade secret misappropriation. In addition, Plaintiff asserts claims under the Sherman Act for monopoly leveraging, attempted monopolization and monopolization. Plaintiff seeks recovery for its damages, Defendants' unjust enrichment, and Plaintiff's antitrust injuries, as set forth below.

## PARTIES

1.    Vesta is an Oregon corporation licensed to do business in the State of Oregon. Vesta's headquarters and principal place of business are located at 11950 SW Garden Place in Portland (Washington County), Oregon.

2.    AML is a corporation organized under the laws of England. On information and belief, AML is headquartered in London, England. AML is present and doing business in the State of Oregon.

**Perkins Coie** LLP
1120 N.W. Couch Street, Tenth Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

3.      AMI is a Delaware corporation with its stated principal place of business in Chesterfield, Missouri.  AMI is registered to do business in Oregon and is present and doing business in the State of Oregon.

4.      AML and AMI are part of the Amdocs group of companies (collectively, "Amdocs").  Amdocs is an international corporate conglomerate with ultimate headquarters in Tel Aviv, Israel and with offices and facilities throughout the United States, including a facility in Hillsboro, Oregon.

## JURISDICTION AND VENUE

5.      The antitrust claims at issue in this action arise under the laws of the United States.  The Court has subject matter jurisdiction over this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, Section 2 of the Sherman Act, 15 U.S.C. § 2, and 28 U.S.C. §§ 1331 and 1337.  Venue is proper in this judicial district under Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391.

6.      The Court also has subject matter jurisdiction over the state law claims at issue in this action under 28 U.S.C. § 1332 because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different States.  Plaintiff Vesta is a citizen of the State of Oregon.  Defendant AML is a citizen of England and Wales.  Defendant AMI is a citizen of the States of Delaware and Missouri.  This action was originally filed by Plaintiff in the Washington County Circuit Court for the State of Oregon, and was removed to this Court by Defendants.

7.      Venue is proper under 28 U.S.C. § 1391 because a substantial part of the wrongful conduct alleged herein occurred in this judicial district, including that AML and AMI purposefully engaged in acquisition discussions and collaborative projects with Vesta, which is located and doing business in Washington County, requiring meetings at Vesta headquarters, access to proprietary information stored at Vesta headquarters, and

**Perkins Coie** LLP
1120 N.W. Couch Street, Tenth Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

ultimately harm to Vesta based on the allegations herein.  AMI also maintains an office in Oregon.

## TRADE AND COMMERCE

8.      The unlawful conduct of Amdocs described herein affects interstate commerce in the United States and has an intended and substantial adverse effect on competition within the United States, including harming Vesta's ability to compete in interstate commerce in the United States.

## ALLEGATIONS COMMON TO ALL CLAIMS
### Background of Vesta and Amdocs

9.      Vesta is an innovator and worldwide leader in client-branded electronic payment solutions through a variety of e-commerce channels, including the Internet, mobile phones, and industry-leading mobile commerce applications.  A primary focus of Vesta's business is providing e-commerce solutions for the payment of prepaid mobile phone and long-distance telephone charges.  Vesta's primary customers are national and international mobile network operators ("MNO's").  MNO's, sometime also called wireless service providers, are providers of wireless communication services who own or control all the various elements necessary to sell and deliver services to an end-user including, among other things, a wireless network infrastructure.  Vesta's solutions allow MNO's to receive and process payments for prepaid mobile phone and long distance charges domestically and internationally.

10.     Amdocs is a provider of billing platform solutions to MNO's.  Amdocs provides MNO's with billing platform solutions in both the prepaid and post-paid (contract) mobile phone markets.

4-   FIRST AMENDED COMPLAINT

**Perkins Coie** LLP
1120 N.W. Couch Street, Tenth Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

35302-0026/LEGAL124938796.16

11.     Billing platforms and payment solutions are distinct in the MNO support services marketplace.  A billing platform, such as that provided by Amdocs, maintains account status and account information for the benefit of the MNO and its customers (i.e., the end-users of mobile devices).  By contrast, a payment solution, such as that provided by Vesta, facilitates an MNO's receipt of payments from the end-users of mobile devices, often by electronically-communicated credit or debit card information.

12.     Until recently, Amdocs has never been a provider of payment solutions.

### Amdocs and Vesta Form Strategic Relationship

13.     Because MNO's generally require both a billing platform and a payment solution to serve their end-users, Vesta and Amdocs have over the years shared many of the same customers.  Given their shared customer base, and the need for billing platforms and payment solutions to work together in tandem, Vesta and Amdocs began collaborating with one another.  Vesta and Amdocs first began collaborating with one another in 2006 in connection with one of their shared MNO customers, Sprint.

14.     Beginning in 2009, Amdocs and Vesta's relationship became more strategic in nature.  In 2009, Amdocs and Vesta began working together to integrate their services and platforms to provide improved marketing opportunities for both parties and increased value to joint customers.  Since 2009, the parties have, on numerous occasions, worked together to jointly market their respective services to MNO's.  In addition, since 2010 Amdocs has twice approached Vesta about the possibility of Amdocs acquiring Vesta. On each such occasion, Amdocs engaged in extensive due diligence.

### Amdocs and Vesta Execute Broad NDA's

15.     In order to collaborate and integrate their services for their joint customers, it was necessary for both Vesta and Amdocs to share detailed technical information with the other.  This was necessary because, in order to integrate their respective platforms,

5-   FIRST AMENDED COMPLAINT

**Perkins Coie** LLP
1120 N.W. Couch Street, Tenth Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

each platform needed to be able to communicate with the other in a seamless and scalable fashion within the client's software and hardware environments. Given the proprietary nature of each party's various routines, methodologies and processes, Amdocs and Vesta entered into a series of confidentiality and non-disclosure agreements (the "NDA's") in order to protect each party's proprietary information from use or disclosure by the other.

16.    The first such NDA was signed on or about October 18, 2006. Additional NDA's were entered into on June 24, 2009, March 31, 2010, and July 3, 2012.

17.    From Vesta's perspective, its NDA's with Amdocs served two basic purposes. First, the NDA's allowed Amdocs to receive proprietary information about Vesta's payment solution for collaboration purposes while at the same time ensuring that Amdocs would not use that information to compete with Vesta. Second, the NDA's allowed Amdocs to receive confidential and proprietary business and financial information in connection with Amdocs' stated interest in acquiring Vesta, while again ensuring that Amdocs would not use that information to compete with Vesta.

18.    The NDA's specifically prohibit Amdocs from using for its own benefit or otherwise disclosing confidential information received from Vesta. For example, under Section 2 of the June 24, 2009 NDA (the "2009 NDA"), Amdocs agreed to "hold in confidence the disclosing party's Proprietary Information". In addition, under Section 3 of the 2009 NDA, Amdocs agreed "not to use the Proprietary Information" of Vesta "for any purpose" other than collaborating with Vesta. In addition, in that same section, Amdocs agreed "not to sell, grant . . . or otherwise allow the use" of Vesta's information "by any third party, directly or indirectly, except as expressly permitted herein." In addition, in Section 4 of the 2009 NDA, Amdocs agreed not to use any "derivatives" of Vesta's proprietary information for the purpose of selling "any software systems, or . . .

6-    FIRST AMENDED COMPLAINT

services . . . to any third parties" or "develop[ing] . . . any software systems, for itself or any third parties."

19.    Since October 18, 2006 there has always been at least one comprehensive NDA in effect between Vesta and Amdocs.  The 2009 NDA in particular served, and continues to serve, as an umbrella confidentiality agreement governing all of the parties' communications.  The 2009 NDA represents a fundamental understanding and premise between the parties that all of their meetings and discussions after June 24, 2009 would remain confidential and would not be used or disclosed by the other party, regardless of the purpose or intention of any meeting or discussion in particular.

20.    In addition to the various NDA's, every time an Amdocs employee came to Vesta's Portland headquarters, and as a condition for entry, he or she personally signed, acknowledged and agreed that all of the information learned while inside the premises at Vesta was confidential and proprietary to Vesta (the "Sign-In NDA's").

21.    Since 2009, numerous Amdocs employees have come into Vesta's headquarters for confidential meetings and discussions regarding both joint marketing and potential acquisition.

### Vesta Shares Proprietary Information with Amdocs

#### *Collaboration Projects*

22.    Since 2006, and pursuant to the terms of the various NDA's and the Sign-In NDA's, Vesta has shared extensive proprietary information with Amdocs about Vesta's proprietary payment solutions.  This information has included detailed information about the architecture and design of the solutions, including proprietary payment routines, methodologies and processes (the "Confidential Solution Methods").  The Confidential Solution Methods were shared via emails and other documents and numerous face-to-

**Perkins Coie** LLP
1120 N.W. Couch Street, Tenth Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

face meetings at Vesta's offices in Oregon and Amdocs' various offices throughout the United States and the world, including Texas, New Jersey, England and Israel.

23.     A substantial portion of the confidential information provided to Amdocs by Vesta was provided in connection with joint projects for specific MNO customers shared by Amdocs and Vesta, such as MetroPCS (as discussed further below).

### *Acquisition Courtships*

24.     Collaboration was not the only context in which Vesta shared confidential and proprietary information with Amdocs.  In 2010 and again in 2012, Amdocs approached Vesta to ask Vesta to consider allowing Amdocs to purchase Vesta.

25.     As part of these acquisition discussions, Amdocs made repeated trips to Vesta's Portland offices.  In connection with these discussions, Vesta shared proprietary information, including detailed financial, pricing and profitability data that had not been previously shared and which Vesta would have had no reason to share with Amdocs other than in the context of an acquisition discussion.

26.     In connection with the acquisition discussions, Amdocs led Vesta to believe that Amdocs' desire to purchase Vesta was sincere.

27.     The first round of acquisition discussions culminated in an invitation to Vesta to come to Amdocs' headquarters in Tel Aviv, Israel in early April 2010 for an immediate face-to-face discussion at the highest levels of the companies.  Vesta's Chief Executive Officer, Douglas Fieldhouse, accepted this invitation and immediately travelled to Tel Aviv.  At the Tel Aviv meeting, Amdocs' then-Chief Executive Officer, Dov Baharav, suddenly announced that Amdocs, in fact, had no interest in acquiring Vesta. This was a complete surprise to Mr. Fieldhouse, who had been led to believe that Amdocs was interested in purchasing Vesta and who had disclosed highly confidential information based on that belief.

8-   FIRST AMENDED COMPLAINT

**Perkins Coie** LLP
1120 N.W. Couch Street, Tenth Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

## The Metro-PCS Project

28.     Although the initial acquisition attempt fell apart in early April 2010, many of Mr. Baharav's subordinates continued to encourage a continued business relationship with Vesta.  These subordinates apologized for Mr. Baharav's decision and continued to pursue a collaborative relationship with Vesta which involved continued sharing of Vesta's confidential and proprietary information.

29.     Following the Tel Aviv meeting, Amdocs reached out to Vesta again.  At this point, the discussions did not concern any further acquisition effort, as that opportunity appeared dead at that time.  Rather, Amdocs was now proposing that the parties work together to jointly pitch a Vesta-based payment solution proposal for MetroPCS.  MetroPCS is a large MNO, now affiliated with T-Mobile.  At this point in time (late April of 2010), MetroPCS had recently moved to an Amdocs billing platform, but MetroPCS's payment solution was old and poorly implemented.

30.     Amdocs stood to gain by Vesta's involvement with MetroPCS.  As Amdocs was aware, Vesta's payment solution included optimization tools that would stabilize and increase MetroPCS's customer base.  A more stabilized and increased customer base would, in turn, reduce customer churn and ultimately increase the revenues Amdocs would earn for the billing platform services it provided.  Amdocs was also aware at the time that, if it could develop its own payments platform similar to that of Vesta, it could achieve these same goals while also receiving yet additional revenues by providing payment services.

31.     In response to Amdocs' inquiry, and not knowing that Amdocs intended to develop a competing payments platform, Vesta agreed to work cooperatively with Amdocs to present a joint proposal to MetroPCS.  The joint proposal contemplated that Vesta would provide a payments solution that would be integrated into Amdocs' billing

9-   FIRST AMENDED COMPLAINT

**Perkins Coie** LLP
1120 N.W. Couch Street, Tenth Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

platform on a coordinated basis. In connection with these discussions, Vesta and Amdocs each remained bound by the 2009 NDA.

32.    In connection with the MetroPCS pitch work, representatives of Amdocs and Vesta met on numerous occasions to prepare pitch materials and otherwise collaborate on the project. In connection with those discussions, Vesta provided Amdocs with detailed information about its most updated Confidential Solution Methods and best practices. These updated Confidential Solution Methods and best practices included, among other things, detailed architectural drawings and sequence flow diagrams that depicted, on a step-by-step basis, how Vesta would design and implement its payment solution for MetroPCS. These Confidential Solution Methods also included detailed information about how Vesta implements its system of direct customer notifications to optimize payments and customer retention, including detailed information about Vesta's proprietary "Text-to-Pay" system. These Confidential Solution Methods also included detailed information about Vesta's best practices for how a payment system should identify and handle difficult or "edge" transactions with end-users. The Confidential Solution Methods also included detailed information about Vesta's customer relationship management tools, and how those tools serve to optimize customer loyalty and MNO revenues.

33.    As evidenced by the continuous and multiple NDA's, Vesta shared this information with Amdocs not to allow Amdocs to steal it, but to facilitate collaboration so that the two companies could integrate their respective systems for their mutual benefit in connection with MetroPCS.

34.    Vesta spent over 1,000 man-hours (i.e., the equivalent of one person working full time for over six-months) with Amdocs' business and technical representatives discussing and explaining these matters. Vesta's Confidential Solution

10-  FIRST AMENDED COMPLAINT

**Perkins Coie** LLP
1120 N.W. Couch Street, Tenth Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

Methods and best practices were and remain key to Vesta's core business and form the basis of virtually all its revenue from existing customers.

35.    Ultimately, the joint pitch to MetroPCS by Vesta and Amdocs was not successful in adding Vesta's payment solution.

36.    As discussed further below, Vesta would learn later, in the summer of 2013, that, either during, or shortly after the failed joint pitch to MetroPCS in 2012, Amdocs successfully sold MetroPCS an integrated Amdocs-only payment solution and billing platform.  Amdocs' sale of a payments solution to MetroPCS completely excluded Vesta.

37.    Amdocs' MetroPCS payment system was the first payment solution ever launched by Amdocs.  Having had no prior experience as a payments solution provider, Amdocs could not have built a payments solution for MetroPCS in the short time frame that it did so without using some significant portion of the confidential information provided to Amdocs by Vesta in connection with the MetroPCS collaboration project.

**The Second Acquisition Attempt**

38.    In the spring of 2012, and in response to acquisition inquiries from other interested buyers, Vesta engaged an investment banking firm, Credit Suisse, to assist with a renewed possibility of a sale of Vesta.

39.    Amdocs learned of the possible sale of Vesta and promptly approached Credit Suisse about Amdocs participating in the bidding process.  Since the time of the previous acquisition discussions in 2010, Amdocs had terminated its relationship with Mr. Baharav, the Chief Executive Officer who had ended the 2010 acquisition discussion with Vesta.  Despite Vesta's expressed concern regarding the sincerity of this renewed approach, Amdocs assured Vesta that its renewed interest in acquiring Vesta was sincere.

**Perkins Coie** LLP
1120 N.W. Couch Street, Tenth Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

40.     In reliance on Amdocs' assurances of sincerity, Vesta (through Credit Suisse) again provided detailed confidential and proprietary information to Amdocs, both in writing and orally.  This access included, among other things, providing Amdocs with direct access to Vesta's "virtual data room" for prospective purchasers where volumes of highly sensitive information were kept. Vesta also provided Amdocs with a confidential information memorandum.

41.     Although the parties at all times remained bound by the 2009 NDA, as a precaution Vesta insisted that Amdocs execute a further NDA in connection with the Credit Suisse discussions.  Amdocs agreed and executed a further NDA dated July 3, 2012.  The 2012 NDA did not supersede the 2009 NDA, which remained in place.

42.     On July 16, 2012, Amdocs and Vesta executives participated in a four-hour management presentation at Credit Suisse's offices.  Vesta's CEO and CFO participated in the presentation in person along with a number of other Amdocs employees.  A number of Amdocs representatives participated from Israel using an e-video conference connection.  In connection with this management presentation, Vesta provided Amdocs with detailed information about its business plan, pricing strategies and products.  On the video conference, Vesta also responded to detailed questions from Amdocs executives on each of these and other issues.

43.     Amdocs did not acquire Vesta as a result of the Credit Suisse discussions or otherwise.  On August 13, 2012, Amdocs made a written offer to purchase Vesta that was substantially under the fair market value of Vesta.

44.     On information and belief, Amdocs was not sincere in its stated interest in 2012 to pursue an acquisition of Vesta.  Amdocs made its "lowball" offer knowing it would be rejected by Vesta in order to end the acquisition discussion.  Amdocs used the 2012 acquisition discussion as a pretext to steal updated proprietary business and

12-  FIRST AMENDED COMPLAINT

**Perkins Coie** LLP
1120 N.W. Couch Street, Tenth Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

35302-0026/LEGAL124938796.16

technical information from Vesta.  As alleged below, Amdocs stole two categories of proprietary and confidential information from Vesta.  First, Amdocs stole Vesta's proprietary software technology to enable Amdocs to assemble a payment solution that would copy Vesta's payment solution and best practices and undercut Vesta's pricing. Second, Amdocs stole proprietary market and financial information from Vesta in order to inform its decision about entering the payment solution marketplace.  Ultimately, Amdocs did in fact steal Vesta's proprietary information by using that information to replicate Vesta's payment solution and then sell that copycat system to MetroPCS, as discussed below.

### Theft of Confidential Solution Methods by Amdocs

45.     In July 2013, Vesta discovered for the first time that Amdocs had used Vesta's proprietary information to create a copycat payments solution.  Vesta also learned in July 2013 that Amdocs had, in fact, sold that payments solution to MetroPCS. According to its website, Amdocs had named its payment solution "Amdocs Mobile Payments."  On information and belief, Amdocs executed a contract to sell its payment solution to MetroPCS towards the end of 2012.  On information and belief, the Amdocs payment solution went live at MetroPCS in January 2014.

46.     Vesta has spent nearly 20 years, and over $60 million dollars, to develop its payment solution.

47.     Prior to the sale of its payment solution to MetroPCS, Amdocs had no experience in the payment solution marketplace.  Yet Amdocs entered the marketplace for the first time by selling its purportedly home-grown payment solution to MetroPCS in 2012.  This occurred shortly after Vesta jointly pitched this same work alongside Amdocs and disclosed to Amdocs the inner-workings of Vesta's payments solution.

13-  FIRST AMENDED COMPLAINT

**Perkins Coie** LLP
1120 N.W. Couch Street, Tenth Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

48.     On information and belief, Amdocs used the ideas and information provided by Vesta to substantially reduce its time to market and to substantially lower its costs to bring a payments solution to market.  But for its theft of the Confidential Solution Methods, Amdocs would not have been able to develop, sell and launch its own payment solution for MetroPCS on the timeline required by MetroPCS or at the price bargained for with MetroPCS.

49.     Vesta would never have provided confidential information to Amdocs had it known that Amdocs was going to use this information to develop a competing product for sale to MetroPCS and, potentially, other actual or prospective customers of Vesta.

50.     Amdocs is actively marketing its copycat payment solution to other potential buyers.

## Theft of Confidential Risk Information by Amdocs

51.     In addition to Amdocs' theft of the Confidential Solution Methods, Amdocs also used proprietary information belonging to Vesta to make its decision to enter the payments market in the first place.  This proprietary information included, among other things, detailed statistical information about:  (a) the prevalence of fraudulent payment transactions in the prepaid mobile device marketplace; and (b) how Vesta uses fraud data to price its payment solutions (the "Confidential Risk Information").  The Confidential Risk Information is highly proprietary and was developed by Vesta using fraud detection algorithms and software technologies that Vesta has spent nearly 20 years developing. The Confidential Risk Information would be highly valuable to any party attempting to market or sell payment solution services in the MNO marketplace.

52.     Vesta would never have provided the Confidential Risk Information to Amdocs without the various NDA's in place.

14- FIRST AMENDED COMPLAINT

**Perkins Coie** LLP
1120 N.W. Couch Street, Tenth Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

35302-0026/LEGAL124938796.16

## Amdocs Hires Away Key Executive Personnel

53.    On or about April 28, 2014, Amdocs hired away Neil Webzell, a key member of Vesta's executive sales staff.  Mr. Webzell had been Vesta's Vice President of Sales for Europe, the Middle East and Asia ("EMEA") since 2011.  As such, Mr. Webzell was Vesta's highest ranking sales executive for international sales.

54.    Mr. Webzell is in possession of the Confidential Risk Information.

55.    Mr. Webzell is now serving in a leadership capacity on Amdocs' executive sales staff.

56.    It is inevitable that Mr. Webzell will disclose and make use of the Confidential Risk Information as a senior member of Amdocs' executive sales team.

## Monopolization by Amdocs

### *Relevant Markets*

57.    This is a case about not only the theft by Amdocs of highly confidential and proprietary information belonging to Vesta, but also Amdocs's use of its dominant position in the market for billing platforms to block competition and attempt to eliminate Vesta as a competitor in the market for payment processing solutions.

58.    It is essential for MNO's that offer prepaid wireless services to use both a billing platform and a payment processing solution in order to conduct their day-to-day operations.  Rather than compete on the merits by investing the time and expense necessary to obtain the assets and know-how to develop its own payment processing solution for prepaid wireless MNO's, Amdocs used stolen Vesta trade secrets to offer prepaid wireless MNO's its own solution, as alleged above.  Furthermore, as alleged below, Amdocs then used predatory pricing, informed by the Confidential Risk Information stolen from Vesta, to weaken Vesta's ability to compete against Amdocs.

**Perkins Coie** LLP
1120 N.W. Couch Street, Tenth Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

59.     Amdocs's plan all along has been to drive Vesta out of the payment processing market in order to ensure that Amdocs can maintain its monopoly power and lock up the more-lucrative billing platform market for good.

60.     Amdocs and Vesta are the only significant competitors that provide payment processing solutions to prepaid wireless MNO's.  If Amdocs is successful in eliminating Vesta as a rival by means of its unlawful conduct, it will monopolize the market.  Then after Vesta is gone, nothing will stop Amdocs from charging supracompetitive prices for payment processing services to the detriment of prepaid wireless MNO's and their end-users who inevitably will be forced to pay higher prices. The prepaid wireless MNO's will be at Amdocs's mercy because extricating themselves from Amdocs's technology stranglehold will cause them to incur significant costs and extended disruption of their day-to-day business operations.

61.     There are two relevant product markets in which to analyze the adverse effects of Amdocs's anticompetitive conduct.

62.     The first relevant product market, also referred to herein as the primary market, is the market for billing platform solutions that are purchased by MNO's that provide prepaid mobile phone and long distance telephone (also referred to herein as "prepaid wireless") services in the United States (the "Prepaid Mobile Phone Billing Platform Market").  The billing platform is recognized as a distinct product by prepaid wireless MNO's.

63.     The second relevant product market, also referred to herein as the secondary market, is the market for client-branded, e-commerce payment processing solutions that are purchased by prepaid wireless MNO's and which allow MNO's to receive and process payments for prepaid mobile phone and long-distance telephone charges in the United States (the "Prepaid Mobile Phone Payment Processing Market").

16- FIRST AMENDED COMPLAINT

**Perkins Coie** LLP
1120 N.W. Couch Street, Tenth Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

The payment processing solution is recognized as a distinct product by prepaid wireless MNO's.

### The Prepaid Mobile Phone Billing Platform Market

64.    Generally, a billing platform designed for prepaid wireless MNO's maintains account status and account information for the benefit of the MNO and its subscribers (i.e., end-users of mobile devices who purchase prepaid mobile phone and long-distance telephone services).  MNO's in the Prepaid Mobile Phone Billing Platform Market have unique customer needs for billing platform solutions.

65.    Billing platform solutions for MNO's in the Prepaid Mobile Phone Billing Platform Market are highly customized and require extensive customer-specific programming by software engineers.  A billing platform is composed of a series of independent applications that, when run together, constitute the billing platform, and, generally speaking, will typically include, but not be limited to, the following functionalities:  Customer-interface Management (i.e., handling customer-initiated contact, overseeing outbound customer contact, and managing the contact life cycle); Order Management (i.e., capturing product and service orders, managing the order-entry life cycle, and overseeing the order-completion life cycle); Rate Plans and Rating (i.e., managing a variety of products and services, and different rate plans associated with those products and services); Discounting (i.e., providing various types of discounts on different usages); and Invoicing (i.e., performing billing inquiries, generating bills, processing deposits, performing account administration, and maintaining tax and fee information).  The billing platform solution also requires a dedicated "stack" of servers for each prepaid wireless MNO that the solution provider does not share with any other customer.

**Perkins Coie** LLP
1120 N.W. Couch Street, Tenth Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

66.    Prepaid wireless MNO's require billing platforms that contemplate, facilitate, and streamline billing tasks that are specific to the prepaid wireless business. Such specialized requirements include, for example, the ability to:  conduct real-time rating of CDR's (Call Detail Records) and Data Usage to ensure the prepaid customer only gets the quantity of minutes for which the customer has paid; facilitate WLNP (Wireless Number Portability); facilitate emergency services such as 911 even when phones are in excess of the prepaid plan; and display and charge for industry specific regulated changes such as e911 and other telecom specific taxes.  Billing platforms for prepaid wireless MNO's also need to work in conjunction with the elements of the MNO's network that facilitate wireless calling and to integrate with the enterprise "middleware," which varies from MNO to MNO.

67.    On information and belief, Amdocs provides different billing platforms for prepaid wireless accounts than for postpaid wireless accounts.  Billing platforms for prepaid accounts require functionality that permits real-time rating of calls and the ability to shut off prepaid phones when the minutes expire.  The technology infrastructure and pricing for billing platforms for prepaid wireless accounts is different from the technology infrastructure and pricing for billing platforms for postpaid wireless accounts.

68.    Prior to replacing an existing billing platform, MNO's engage in a lengthy vendor selection process where potential suppliers expend significant (in some cases non-recoverable) resources demonstrating the functionality and reliability of their proposed systems.  The contracting process can range from 6 to 18 months, after which a vendor is selected and awarded an exclusive contract that typically ranges from 5 to 7 years. Design and implementation of the billing platform also takes several additional months. After a system is installed, a supplier provides on-going service, maintenance, and upgrades.

18-  FIRST AMENDED COMPLAINT

69.     The Prepaid Mobile Phone Billing Platform Market is characterized by a small number of customers with entrenched preferences.  There are only a handful of MNO's offering prepaid wireless services.  Prepaid wireless MNO's require vendors to have demonstrable experience designing and maintaining billing platform solutions for prepaid wireless MNO's.  Few firms have the demonstrated ability to reliably convert each connection of the MNO's network to a charge and then connect the compilation of charges under varying terms of sale.  These entrenched customer preferences discourage new firms from offering billing platform solutions to MNO's.  The opportunity to bid for customers' business is limited even further by the multi-year, exclusive contracts that Amdocs has used to lock-up the Prepaid Mobile Phone Billing Platform Market.

70.     Billing platform solutions designed for non-MNO's are not close substitutes for, and not reasonably interchangeable with, billing platform solutions designed for prepaid wireless MNO's.  Billing systems for prepaid wireless MNO's must be flexible enough to allow for continuous network usage and changes in customers, services, and pricing specific to the pre-paid mobile phone industry.  Industry neutral or generic billing platforms are not adequate substitutes for billing platforms in the Prepaid Mobile Phone Billing Platform Market because they are not designed to process the specific types of data, and ultimately the charges, that are unique and integral to providing prepaid wireless services.

71.     The United States is the relevant geographic market within which to analyze the effects of Amdocs's anticompetitive conduct.  Prepaid wireless MNO's operating in the United States have unique customer needs for billing platforms, and they request proposals and enter into contracts for those services that specify the United States as the territory for which services will be provided.

19-  FIRST AMENDED COMPLAINT

**Perkins Coie** LLP
1120 N.W. Couch Street, Tenth Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

72.    On information and belief, prepaid wireless MNO's that operate in the United States do not solicit proposals that rely on systems designed for billing platforms in foreign markets.

73.    Usage, pricing, and other transaction terms in foreign markets are different from those in the prepaid wireless MNO market in the United States.  As a result, billing platform solutions used in foreign markets are not sufficiently adaptable to the United States market to serve as a competitive constraint on systems designed for prepaid wireless MNO's that operate in the United States.

74.    Thus, billing platforms for MNO's that are not operating in the United States are not close substitutes for, and not interchangeable with, billing platforms for MNO's operating in the United States.

75.    The Prepaid Mobile Phone Billing Platform Market is also characterized by significant barriers to entry.  Billing platform solutions used for other applications (e.g., mass market consumer product retailers, financial institutions, etc.) are not readily adaptable to use by prepaid wireless MNO's.  Likewise, the specialized functions of prepaid MNO billing systems require assets and know-how that are not readily transferable to other applications because they involve a specialized understanding of the prepaid wireless services provided by MNO's and their requirements for the billing of those services.  The sunk costs to develop those assets and know-how are a recognized barrier to entry.

76.    The limited number of customers reduces potential points for entry.  In addition, the use of long-term contracts creates infrequent demand.  In short, the Prepaid Mobile Phone Billing Platform Market requires specialized costs potentially applied to limited customers who purchase systems infrequently.

**Perkins Coie** LLP
1120 N.W. Couch Street, Tenth Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

77.     The Prepaid Mobile Phone Billing Payment Market has certain characteristics that tend to make it more susceptible to monopolization.  The Prepaid Mobile Phone Billing Platform Market is highly concentrated, with very few buyers and sellers.  Amdocs is, by far, the dominant supplier of billing platform solutions to prepaid wireless MNO's.  The only other significant competitors in the Prepaid Mobile Phone Billing Platform Market are Ericsson[1] and Alcatel-Lucent.[2]  On information and belief, no supplier has entered the Prepaid Mobile Phone Billing Platform Market since 2006.

78.     There are only six MNO's operating in the United States that offer prepaid wireless services.  This number also includes mobile virtual network operators ("MVNOs").  An MVNO is a wireless provider that sells mobile phone service by making use of another provider's existing network infrastructure.  An MVNO will have its own rates and calling plan features, its own billing systems, and its own customer service departments.

79.     Each of these MNO's and MVNO's provide prepaid wireless services under different brands, with each brand generally having a distinct billing and payment system:  (1) AT&T, which includes the "GoPhone"[3] and "Cricket"[4] brands; (2) Sprint, which includes the "Sprint Prepaid,"[5] "boostmobile,"[6] and "Virgin Mobile"[7] brands;

---

[1] http://www.ericsson.com/ourportfolio/telecom-operators/billing-and-revenue-management?nav=marketcategory007

[2] http://www.alcatel-lucent.com/products/surepay

[3] http://www.att.com/shop/wireless/gophone.html

[4] https://www.cricketwireless.com/

[5] http://sprint.com/landings/prepaid/modals/?INTCID=TSC:PhoneWallTB:Prepaid: 031414

[6] http://www.boostmobile.com/

[7] http://www.virginmobileusa.com/

21-  FIRST AMENDED COMPLAINT

**Perkins Coie** LLP
1120 N.W. Couch Street, Tenth Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

(3) T-Mobile USA ("T-Mobile"),[8] which includes the "MetroPCS"[9] brand; (4) "TracFone Wireless," which includes the "TracFone," "Net10," "Straight Talk," and "SafeLink Wireless" brands ("TracFone");[10] (5) Verizon Wireless ("Verizon");[11] and (6) U.S. Cellular.[12]  Each of the foregoing are MNO's, except for TracFone, which is an MVNO, and U.S. Cellular, which is a "hybrid" MNO and MVNO because it partly sells service provided on its own network but also buys service from other networks and resells it to end-users.

80.     On information and belief, Amdocs has entered into multi-year, exclusive contracts with five of the MNO brands, and one of the MVNO's, in the Prepaid Mobile Phone Billing Platform Market.  On information and belief:  the Amdocs-Cricket exclusive contract has a duration of three years; the Amdocs-Sprint Prepaid exclusive contract has a duration of five years or more; the Amdocs-boostmobile exclusive contract has a duration of five years or more; the Amdocs-Virgin mobile exclusive contract has a duration of five years or more; the Amdocs-MetroPCS exclusive contract has a duration of five years or more; and the Amdocs-U.S. Cellular exclusive contract has an unknown duration.

81.     On information and belief, Ericsson provides the billing platform for the prepaid services of AT&T's GoPhone brand and T-Mobile, and Alcatel-Lucent provides a billing platform for Verizon Wireless.

---

[8] http://explore.t-mobile.com/unlimited-prepaid-plans

[9] https://www.metropcs.com/why.html

[10] http://www.tracfone.com/

[11] http://www.verizonwireless.com/wcms/consumer/shop/prepaid.html

[12] http://www.uscellular.com/uscellular/plans/showPlans.jsp?plan-selector-type=prepaid&type=plans

22-  FIRST AMENDED COMPLAINT

**Perkins Coie** LLP
1120 N.W. Couch Street, Tenth Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

82.    The following table identifies the current suppliers of billing platforms to prepaid MNO and MVNO brands in the Prepaid Mobile Phone Billing Platform Market, and the number of monthly bills for each of the indicated MNO/MVNOs, using year-end 2013 data that was obtained from regulatory filings and other public sources:

**Market Share:  Prepaid Mobile Phone Billing Platform Market**

| MNO/MVNO Brand | Billing Platform Provider | Number of Monthly Bills (in millions) |
|---|---|---|
| AT&T/GoPhone | Ericsson | 2,685 |
| AT&T/Cricket | **Amdocs** | 1,672 |
| Sprint Prepaid | **Amdocs** | 5,680 |
| Sprint/boostmobile | **Amdocs** | (included in Sprint Prepaid) |
| Sprint/Virgin mobile | **Amdocs** | (included in Sprint Prepaid) |
| T-Mobile | Ericsson | 2,238 |
| T-Mobile/MetroPCS | **Amdocs** | 3,242 |
| U.S. Cellular | **Amdocs** | 1,806 |
| Verizon | Alcatel-Lucent | 2,198 |
| Total | | 19,521 |

83.    Firms that outsource functions that their competitors internalize are characterized as consumers in the merchant market.  Generally, analyzing the prospect that the merchant market (here, MNO's that purchase prepaid mobile billing platforms), is a cognizable antitrust market, involves the same type of closeness of substitution analysis applied in defining the boundaries of any product or service market.  The design, testing, implementation, and maintenance of a prepaid wireless MNO billing platform is a time-consuming and costly endeavor.  MNO's that currently provide some or all of their prepaid mobile billing platforms themselves are distinguished from those that outsource

23- FIRST AMENDED COMPLAINT

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

35302-0026/LEGAL124938796.16

their billing platforms to third-party providers, by their unique requirements, related assets and expertise, and history of self-sourcing.

84.    A self-sourced billing platform for prepaid wireless services is not a reasonably interchangeable substitute in the Prepaid Mobile Phone Billing Platform Market because a small but significant, non-transitory increase in price would not cause wireless prepaid MNO's to switch to self-sourcing.  This is because that small increase in price would not be sufficient to offset the significantly higher costs of hiring IT personnel, purchasing hardware, developing the software to integrate the billing platform and many other IT systems with the payment processing solution, migrating data, and managing and maintaining the necessary infrastructure that would be required for an MNO to self-source its billing platform.

85.    Consequently, TracFone (including its associated prepaid wireless brands) is not properly included as a customer in the Prepaid Mobile Phone Billing Platform Market, because it self-supplies and does not outsource its billing platform requirements.

86.    One way to measure market share in the Prepaid Mobile Phone Billing Platform Market is to identify the percentage of the prepaid wireless MNO's and MVNO's that are under contract to each supplier.  Amdocs has a dominant share of the Prepaid Mobile Phone Billing Platform Market.  Amdocs provides the billing platform for six of the nine, or 67%, of the MNO and MVNO prepaid wireless brands that outsource their billing platform requirements:  Cricket; Sprint Prepaid; boostmobile; Virgin mobile; MetroPCS; and U.S. Cellular.

87.    Another way to measure the market share in the Prepaid Mobile Phone Billing Platform Market is to identify the percentage of subscribers whose bills are being processed by each supplier.

**Perkins Coie** LLP
1120 N.W. Couch Street, Tenth Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

88.    As of year-end 2013, Cricket, Sprint Prepaid, boostmobile, Virgin mobile, MetroPCS, and U.S. Cellular accounted for 63.5% of the bills sent to prepaid wireless subscribers by the MNO's and MVNO's in the Prepaid Mobile Phone Billing Platform Market.  Therefore, Amdocs's share of the Prepaid Mobile Phone Billing Platform Market is not less than 63.5%.

## The Prepaid Mobile Phone Payment Processing Market

89.    Generally, a payment processing solution for a prepaid wireless MNO supports the real-time fulfillment of products and services (including mobile devices and airtime) that are purchased by the MNO's customers and paid for with debit or credit cards.

90.    MNO's in the Prepaid Mobile Phone Payment Processing Market have unique customer needs for payment processing solutions.

91.    Industry neutral or generic payment processing solutions are inadequate substitutes for payment processing solutions in the Prepaid Mobile Phone Payment Processing Market because they are not designed to process the specific types of data that are unique and integral to providing prepaid wireless services.

92.    Prepaid wireless MNO's require payment processing solutions that contemplate, facilitate, and streamline payment processing tasks that are specific to the prepaid wireless business.

93.    Payment processing solutions for MNO's in the Prepaid Mobile Phone Payment Processing Market are highly customized and require extensive customer-specific programming by software engineers.

94.    Such specialized requirements include, but are not limited to:  integration with the MNO's internal IT systems and applications to obtain information about the MNO's products and plans, the customer and the account status, and in some cases to

25-  FIRST AMENDED COMPLAINT

**Perkins Coie** LLP
1120 N.W. Couch Street, Tenth Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

alter the status of the account (i.e., to suspend, activate, or renew the account); mitigation of the special fraud risks created by anonymous subscribers; management of recurring payments; and, enablement of gifting (multiple payment devices per mobile phone number).

95.    Prepaid wireless MNO's require payment processing solutions vendors to have demonstrable, industry-specific experience designing and maintaining such solutions for prepaid wireless MNO's.  In particular, they require vendors to have experience with payment reconciliation, the prevalence of fraud in the marketplace, and in some cases, that the vendor be willing to serve as the Merchant of Record for each transaction.

96.    In addition, MNO's require an end-to-end solution that includes developing, hosting, and integrating payment services for an MNO's website, interactive voice response (IVR) systems, a live operator call center, and any other consumer payment channels offered by the MNO.  The payment processing solution also requires integration with the billing platform to query and increment the consumer's prepaid mobile account in real time and integration with acquiring banks to send and receive payment transaction data and remit funds.  The solution is hosted on a dedicated "stack" of servers for each MNO that the solution provider does not share with any other customer.

97.    These unique customer needs, especially the requirement that the payment processor have the requisite industry-specific experience and knowledge of the prevalence of fraud in the marketplace, discourage new firms from offering payment processing solutions to prepaid wireless MNO's and constitute a significant barrier to entry.  New firms are further discouraged from trying to enter the Prepaid Mobile Phone

**Perkins Coie** LLP
1120 N.W. Couch Street, Tenth Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

Payment Processing Market by the fact there are only a handful of MNO's offering prepaid wireless that outsource their payment processing services.

98.    As a result, payment processing solutions designed for non-MNO's and for postpaid wireless MNO's are not close substitutes for, and not reasonably interchangeable with, payment processing solutions designed for prepaid wireless MNO's.

99.    The United States is the relevant geographic market within which to analyze the effects of Amdocs's anticompetitive conduct.  Prepaid wireless MNO's operating in the United States have unique customer needs for payment processing solutions, and they request proposals and enter into contracts for those services that specify the United States as the territory for which services will be provided.

100.    Prepaid wireless MNO's that operate in the United States do not solicit proposals that rely on systems designed for payment processing solutions in foreign markets.

101.    Usage, pricing, and other transaction terms in foreign markets are different from those in the prepaid wireless MNO market in the United States.   As a result, payment processing solutions used in foreign markets are not sufficiently adaptable to serve as a competitive constraint on payment processing solutions designed for prepaid wireless MNO's that operate in the United States.

102.    Thus, payment processing solutions for MNO's that are not operating in the United States are not close substitutes for, and not interchangeable with, payment processing solutions for MNO's that are operating in the United States.

103.    The Prepaid Mobile Phone Payment Processing Market has certain characteristics that tend to make it more susceptible to monopolization.  The Prepaid Mobile Phone Payment Processing Market is characterized as having significant barriers

**Perkins Coie** LLP
1120 N.W. Couch Street, Tenth Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

to entry. Payment processing solutions used for other applications (e.g., mass market consumer product retailers, financial institutions, etc.) are not readily adaptable to use by prepaid wireless MNO's.

104.    Likewise, the specialized functions of prepaid MNO payment processing solutions require assets and know-how that are not readily transferable to other applications because they involve a specialized understanding of the prepaid wireless services provided by MNO's, and their requirements for payment processing of prepaid wireless services, including communications and data transfer between the MNO, the subscriber, the subscriber's financial institution (issuer), and the merchant's financial institution (acquirer). The payment processing solution for an MNO must fully integrate with the MNO's customer relationship management (CRM) system and its billing platform, handle fulfillment of the MNO's services and application of any business rules, provide fraud decisions in real time, and have sufficient flexibility to provide this solution in an environment where the MNO's prepaid plans and features are constantly changing. The payment processing vendor must also have sufficient knowledge and experience to understand the changes and rules associated with these plans, including geographically based taxes, fees, and surcharges, in order to correctly process payments for the plans. The more knowledgeable the payment processor, the more seamless the changes to the payment processing service, and the more likely the MNO will be to retain end-users and lower turnover. The sunk costs to develop all of those assets and know-how are a recognized barrier to entry.

105.    The limited number of customers reduces potential points for entry. In addition, the use of long-term contracts creates infrequent demand. In short, the Prepaid Mobile Phone Payment Processing Market requires specialized costs potentially applied to limited customers who purchase systems infrequently.

28-  FIRST AMENDED COMPLAINT

**Perkins Coie** LLP
1120 N.W. Couch Street, Tenth Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

106.    The Prepaid Mobile Phone Payment Processing Market is highly concentrated.  There are very few buyers and sellers.  Amdocs and Vesta are the only significant competitors in the Prepaid Mobile Phone Payment Processing Market.

107.    Using year-end 2013 data that was obtained from regulatory filings and other public sources, the following table identifies the suppliers of payment processing solutions to prepaid wireless brands in the Prepaid Mobile Phone Payment Processing Market, and the number of subscribers for each of the indicated MNOs, after April 2015 when, on information an belief, unless it ceases its anticompetitive conduct, Amdocs is likely to displace Vesta and take over payment processing services for all of Sprint's prepaid brands (Sprint, boostmobile, and Virgin mobile):

**Market Share:  The Prepaid Mobile Phone Payment Processing Market**

| MNO/MVNO Brand | Payment Processing Provider | Number of Subscribers (in millions) |
|---|---|---|
| AT&T/GoPhone | Vesta | 7,384 |
| Sprint Prepaid | **Amdocs** | 15,622 |
| Sprint/boostmobile | **Amdocs** | (included in Sprint Prepaid) |
| Sprint/Virgin mobile | **Amdocs** | (included in Sprint Prepaid) |
| T-Mobile | Vesta | 6,154 |
| T-Mobile/MetroPCS | **Amdocs** | 8,918 |
| Total | | 38,078 |

108.    Firms that outsource functions that their competitors internalize are characterized as consumers in the merchant market.  Generally, analyzing the prospect that the merchant market (here, MNO's that purchase prepaid mobile payment processing solutions from Vesta or Amdocs), is a cognizable antitrust market, involves the same type of closeness of substitution analysis applied in defining the boundaries of any product or

**Perkins Coie** LLP
1120 N.W. Couch Street, Tenth Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

service market.  The design, testing, implementation, and maintenance of a prepaid wireless MNO payment processing solution is a time-consuming and costly endeavor, involving one of an MNO's core functions.  MNO's that currently provide some or all of their prepaid mobile payment processing solutions themselves are distinguished from those that outsource their solutions to third-party providers (Vesta or Amdocs) by their unique requirements, related assets and expertise, and history of self-sourcing.

109.    A self-sourced payment processing solution is not a reasonably interchangeable substitute in the Prepaid Mobile Phone Payment Processing Market because a small but significant, non-transitory increase in price would not cause wireless prepaid MNO's that currently purchase their solutions from third-party vendors to switch to self-sourcing.  This is because that small increase in price would not be sufficient to offset the significantly higher costs of hiring IT personnel, purchasing hardware, developing the software to integrate the payment processing solution with the billing platform and many other IT systems, migrating data, and managing and maintaining the necessary infrastructure that would be required for an MNO to self-source its payment processing solution.

110.    Consequently, the following prepaid wireless MNO's and MVNO's are not properly included in the Prepaid Mobile Phone Payment Processing Market, because they currently self-supply and do not outsource their payment processing requirements: AT&T/Cricket; TracFone, U.S. Cellular, and Verizon.

111.    One way to measure market share in the Prepaid Mobile Phone Payment Processing Market is to identify the percentage of the prepaid wireless MNO's that are under contract to each supplier.  Using that measure, Amdocs has a dominant share of the Prepaid Mobile Phone Payment Processing Market.  As of April 2015, unless it ceases its anticompetitive conduct, it is likely that Amdocs will be providing the payment

30-  FIRST AMENDED COMPLAINT

**Perkins Coie** LLP
1120 N.W. Couch Street, Tenth Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

processing solution for four of the six, or 67%, of the MNO prepaid wireless providers that outsource their payment processing services: boostmobile; Sprint Prepaid; Virgin Mobile; and MetroPCS.

112.    Another way to measure the market share in the Prepaid Mobile Phone Payment Processing Market is to identify the percentage of subscribers whose payments are being processed by each supplier. As of year-end 2013, boostmobile, Sprint Prepaid, Virgin Mobile, and MetroPCS accounted for 64.4% of the prepaid wireless subscribers of the MNO's in the Prepaid Mobile Phone Payment Processing Market. Therefore, Amdocs's share of the Prepaid Mobile Phone Payment Processing Market is not less than 64.4%.

## MONOPOLY POWER IN THE PRIMARY MARKET

113.    Amdocs is a behemoth by any measure. According to its website,[13] Amdocs is "a global company (NASDAQ:DOX) with revenue of $3.6 billion in fiscal 2014" with a "workforce of more than 22,000 [that] serves customers in over 80 countries worldwide." On information and belief, Amdocs's gross margins for billing platforms provided to prepaid wireless MNO's are approximately 75%.

114.    According to its 2014 annual report, Amdocs reported annual earnings of over $400 million and cash balances net of short-term debt of more than $1.2 billion.

115.    Antitrust principles recognize that in differentiated product markets, like the Prepaid Mobile Phone Billing Platform Market, more than one measure of market share may be appropriate for assessing relative market power. Amdocs and its competitors compete for long-term contracts of individual MNO's, whose customers (number and composition) can vary substantially over the life of a given contract. Given the limited and declining number of MNO's and therefore declining number of contracts

---

[13] http://www.amdocs.com/about/pages/default.aspx

31-  FIRST AMENDED COMPLAINT

**Perkins Coie** LLP
1120 N.W. Couch Street, Tenth Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

35302-0026/LEGAL124938796.16

in the market, a measure of market share on the basis of customers (MNO contracts) suggests the prospect for dominance and therefore abuse of dominance if, as is the case here, a single supplier has locked up the majority of MNO customers, allowing little opportunity for expansion by rivals.

116.    For this reason, the combination of both Amdocs' share of MNOs and its share of MNO's customers (subscribers, accounts, bills) indicate its position in the market and the likelihood that its rivals can impede its ability to exercise market power. In this case, Amdocs' share of MNO's (67%) is largely the equivalent of its share of MNO network customers (63.5%), suggesting that Amdocs faces fringe competitors at best in the Prepaid Mobile Phone Billing Platform Market.

117.    As explained above, Amdocs has a dominant share of, and the power to control prices and exclude competition in, the Prepaid Mobile Phone Billing Platform Market.  As a result of Amdocs's greater than 50% market share, the significant barriers to entry, the structure of each relevant market and other factors, Amdocs has monopoly power in both the Prepaid Mobile Phone Billing Platform Market and the Prepaid Mobile Phone Payment Processing Market.  As shown by Amdocs's exclusion of competition and refusal to compete on the merits, for example, on price and service, Amdocs has maintained its monopoly power in these markets by improper means, rather than by superior products, business intellect, or historic accident.

118.    Switching costs in the Prepaid Mobile Phone Billing Platform Market are high because the solutions are so customized and tailored to each MNO.  As a result, the MNO's decision to purchase a billing platform is very "sticky," and the MNO is likely to maintain the same billing platform for many years.  This creates a barrier to entry and discourages other potential competitors from entering the Prepaid Mobile Phone Billing

32-  FIRST AMENDED COMPLAINT

**Perkins Coie** LLP
1120 N.W. Couch Street, Tenth Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

Platform Market.  Taking advantage of these factors, Amdocs has locked up the Prepaid Mobile Phone Billing Platform Market.

119.    The disruption of day-to-day business operations attendant to realigning IT systems and transferring data can be significant.  Migrating from one billing platform to another is very complex, can take up to two years, and may involve the need for (and expense of) numerous internal and external development resources for changes to an MNO's products, functions, and infrastructure.

120.    The structure and characteristics of the Prepaid Mobile Phone Billing Platform Market further demonstrate that Amdocs possesses monopoly power in this market.  There are very few competitors, and no other firm has any significant share of the market.  Demand is infrequent and inelastic because prepaid wireless MNO's must have a billing payment platform and do not regularly switch systems.  In addition, Amdocs's share of the market has been stable or increasing consistently over time.

## MONOPOLY LEVERAGING IN THE SECONDARY MARKET

121.    Until recently, Vesta and Amdocs were not competitors because Vesta does not offer billing platforms, and until late 2012, Amdocs had not sold a payment processing solution for the prepaid wireless services of an MNO operating in the United States.  Since entering the Prepaid Mobile Phone Payment Processing Market, Amdocs has leveraged its monopoly power in the Prepaid Mobile Phone Billing Platform Market with the intent and purpose to monopolize this secondary market.

122.    Once a prepaid wireless MNO has combined its billing platform and payment processing solution into an integrated system provided by a single company, the cost of switching to an independent payment processing solution (such as Vesta's) is likely to be far higher.  Once an MNO's billing platform and payment processing solutions have been combined into a service provided by a single company, dividing

**Perkins Coie** LLP
1120 N.W. Couch Street, Tenth Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

these systems and going back to having each solution provided by a different company presents numerous business continuity challenges that must be managed by the development team.  Such challenges include but are not limited to:  customer account management, financial system integration (including back office and accounting), financial reporting and business intelligence, risk decision and risk management, customer care data and systems, data privacy and security, payment card industry (PCI) compliance, regulatory compliance, order management and fulfillment, interaction and payment channels, IT systems (including infrastructure, networking, and data retention), transaction data, operational reporting, and business analytics.

123.    By creating, in effect, a tie between the billing platform and payment processing solution, Amdocs is attempting not only to monopolize the Prepaid Mobile Phone Payment Processing Market, but also to lock-in customers and protect its monopoly power in the far more lucrative Prepaid Mobile Phone Billing Platform Market.  Linking the billing platform and payment processing solution allows Amdocs to increase MNO's switching costs by making "untangling" even more expensive and difficult, and prevent Amdocs's rivals from entering either market.  Thus, by offering an integrated solution, which it was able to do after misappropriating Vesta's trade secrets, Amdocs has maintained, or is attempting to maintain, its monopoly power in both the Prepaid Mobile Phone Payment Processing and Billing Platform Markets, and is thereby preventing competitors and potential competitors from entering, or competing against Amdocs in either market.

124.    At the same time Amdocs has acquired, or attempted to acquire, a monopoly in the Prepaid Mobile Phone Payment Processing Market and leverage its position in this market to protect its position in the Prepaid Mobile Phone Billing Platform Market, Amdocs has engaged in unlawful and anticompetitive conduct designed

34-  FIRST AMENDED COMPLAINT

**Perkins Coie** LLP
1120 N.W. Couch Street, Tenth Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

to foreclose Vesta and other rivals from the Prepaid Mobile Phone Payment Processing Market. This conduct includes: misappropriation of trade secrets, bundled discounts, predatory pricing, and exclusive contracts.

### Amdocs's Predatory Pricing To Exclude Vesta From MetroPCS

125.    The first prepaid wireless MNO to install an Amdocs integrated billing platform and payment processing solution was MetroPCS. At the time of its proposed pricing to MetroPCS, therefore, Amdocs had no other payment processing prepaid wireless MNO customers for which it could allocate a portion of common system development costs and had no near-term knowledge that it would necessarily gain other payment processing customers from which to recover its dedicated costs.

126.    As explained above, Amdocs supplies both the billing platform and payment processing solutions for MetroPCS's prepaid wireless services. On information and belief, Amdocs priced the solutions as an integrated bundle, and Amdocs used its misappropriation of trade secrets, bundled discounts, and predatory pricing to enter into an exclusive contract, which does not expire until 2017, to become the provider of the payment processing solution for the prepaid wireless services of MetroPCS.

127.    On information and belief, and based on Vesta's knowledge of its own costs and the bids that Amdocs submitted to MetroPCS and other MNO's, Amdocs is providing payment processing services to MetroPCS below its average variable costs. However, the costs of lawfully acquiring the know-how to build the payment processing solutions that Amdocs stole from Vesta must be taken into account when calculating Amdocs's costs. On information and belief, when the costs that Amdocs avoided through its misappropriation are imputed to Amdocs for purposes of determining whether it has engaged in predatory pricing, it is especially clear that Amdocs is providing payment processing services to MetroPCS below its average variable costs.

35- FIRST AMENDED COMPLAINT

**Perkins Coie** LLP
1120 N.W. Couch Street, Tenth Floor
Portland, OR 97209-4128
Phone: 503.727.2000
Fax: 503.727.2222

### Amdocs's Predatory Pricing to Exclude Vesta from Sprint

128.    Vesta and Sprint have been successful business partners for more than fifteen years.  The relationship began when Sprint selected Vesta to support Sprint's long distance prepaid calling card products.  In 2008, the relationship was expanded when Sprint chose Vesta to provide prepaid wireless payment processing services for boostmobile.  The Vesta-Sprint partnership was expanded further in 2012 when Vesta was selected to provide prepaid wireless payment processing services for Virgin mobile.

129.    In or about March and April 2014, Sprint indicated to Vesta that Sprint was considering migrating its prepaid wireless payment processing solution from Vesta to a system that Sprint would develop and support in-house without any outside vendor.  However, in or about June 2014, Vesta learned from Sprint that Sprint had changed its decision and, instead, selected Amdocs to replace Vesta as Sprint's vendor for prepaid wireless payment processing

130.    As explained above, Amdocs supplies both the billing platform and payment processing solutions for MetroPCS's prepaid wireless services.  On information and belief, Amdocs priced the solutions as an integrated bundle, and Amdocs used its misappropriation of trade secrets, bundled discounts, and predatory pricing, and, unless it ceases its anticompetitive conduct, after April 2015, Amdocs is likely to displace Vesta and take over payment processing services for all of Sprint's prepaid brands (Sprint, boostmobile, and Virgin mobile).

131.    On information and belief, and based on Vesta's knowledge of its own costs and the bids that Amdocs submitted to MetroPCS and other MNO's, Amdocs is providing payment processing services to Sprint below its average variable costs.  However, the costs of lawfully acquiring the know-how to build the payment processing solutions that Amdocs stole from Vesta must be taken into account when calculating Amdocs's costs.  On information and belief, when the costs that Amdocs avoided through

36-  FIRST AMENDED COMPLAINT

**Perkins Coie** LLP
1120 N.W. Couch Street, Tenth Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

its misappropriation are imputed to Amdocs for purposes of determining whether it has engaged in predatory pricing, it is especially clear that Amdocs is providing payment processing services to Sprint, boostmobile, and Virgin mobile below its average variable costs.

132.    Alternatively, or in addition, on information and belief, Amdocs has provided discounts to Sprint, boostmobile, and Virgin mobile for purchasing both billing platform and payment processing services as a bundle.  This bundled discount was predatory or exclusionary because after allocating the entire discount to the purchase of payment processing services, Amdocs sold payment processing services below its average variable cost of producing them.

**Amdocs's Predatory Pricing to Attempt to Exclude Vesta from T-Mobile**

133.    Ericsson provides the billing payment system for T-Mobile's prepaid wireless services.  During the latter half of 2014, T-Mobile requested proposals to provide a single payment processing solution for all of T-Mobile's wireless services, including both prepaid and non-prepaid.

134.    Vesta was informed that T-Mobile had selected Amdocs and Vesta as the two final responsive bidders.  On information and belief, Amdocs used its misappropriation of trade secrets and predatory pricing to attempt to displace Vesta as the provider of the payment processing solution for T-Mobile's prepaid wireless service (not including MetroPCS).  On information and belief, and based on Vesta's knowledge of its own costs and its knowledge of the bids that Amdocs submitted to MetroPCS, Amdocs submitted proposals to T-Mobile that would have resulted in Amdocs providing payment processing services to T-Mobile below its average variable costs.  However, the costs of lawfully acquiring the know-how to build the payment processing solutions that Amdocs stole from Vesta must be taken into account when calculating Amdocs's costs.  When the

**Perkins Coie** LLP
1120 N.W. Couch Street, Tenth Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

costs that Amdocs avoided through its misappropriation are imputed to Amdocs for purposes of determining whether it has engaged in predatory pricing, it is clear that the proposals Amdocs submitted to T-Mobile would have resulted in Amdocs providing payment processing services to T-Mobile below its average variable costs.

135.    Eventually, in order to avoid being foreclosed further from Prepaid Mobile Phone Payment Processing Market, Vesta agreed to match Amdocs's below-cost bid for the provision of a payment processing solution for T-Mobile's prepaid wireless services. If Vesta had not agreed to match Amdocs's below-cost bid, T-Mobile would have given the business to Amdocs, and Vesta might have been well on its way to exiting the Prepaid Mobile Phone Payment Processing Market.  Had Vesta refused to meet Amdocs's predatory pricing, Vesta's only customer would be AT&T's Go Phone, and Amdocs would have further secured its monopoly position in the market as supplier for every other MNO that purchases payment processing services from third-party providers.

136.    However, Vesta cannot sustainably continue to match Amdocs's predatory pricing.  If Amdocs continues to submit bids at or below its costs for prepaid wireless MNO payment processing services, Vesta will no longer be a viable competitor. Obviously, if Amdocs is able to eliminate Vesta as a rival in the Prepaid Mobile Phone Payment Processing Market through the predatory pricing and other exclusionary conduct described above, then Amdocs will have no competitors at all, and there is a dangerous probability that Amdocs will be able to monopolize the Prepaid Mobile Phone Payment Processing Market, if it has not done so already.

137.    If Amdocs is successful in achieving and maintaining its monopoly in the Prepaid Mobile Phone Payment Processing Market, it will be able to charge supracompetitive prices for billing payment platforms, payment processing solutions, or both, and recoup the profits it has foregone in the meantime.  As noted above, there are

**Perkins Coie** LLP
1120 N.W. Couch Street, Tenth Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

significant barriers to entry in the Prepaid Mobile Phone Payment Processing Market. Amdocs's willingness to engage in predatory conduct to eliminate its only competitor constitutes an additional barrier to entry. Because MNOs that currently outsource their payment processing solutions are unlikely to internalize such functions in the face of the type of price increase(s) that Amdocs would require to recoup its predatory losses, especially when faced with the costs to migrate to self-sourcing as described above, there will be no meaningful restraint on Amdocs's power to control the Prepaid Mobile Phone Payment Processing Market.

**ANTITRUST INJURY**

138.    Amdocs was able to enter the Prepaid Mobile Phone Payment Processing Market because it misappropriated trade secrets and other confidential and proprietary information from Vesta. Having stolen this information from Vesta, Amdocs has now used that information, and engaged in other unlawful conduct, to foreclose competition and exclude Vesta, from the Prepaid Mobile Phone Payment Processing Market. Amdocs's predatory, anticompetitive, and exclusionary conduct has weakened Vesta's ability to compete with Amdocs, and has injured and foreclosed competition in the Prepaid Mobile Phone Payment Processing Market. Since Amdocs entered this secondary market, began leveraging its monopoly power in the primary Prepaid Mobile Phone Billing Platform Market, and began engaging in predatory pricing and other anticompetitive conduct, no new firms have entered the Prepaid Mobile Phone Payment Processing Market to compete with Amdocs and Vesta.

139.    Amdocs's integration of the billing platform and payment processing solutions for prepaid wireless MNO's will create further barriers to entry because once the integrated system is implemented, it will be far more difficult and expensive for an MNO to switch from Amdocs to another provider.

39-  FIRST AMENDED COMPLAINT

35302-0026/LEGAL124938796.16

140.    Without Vesta as a strong rival to constrain its behavior, Amdocs will be the only provider of payment processing solutions in the Prepaid Mobile Phone Payment Processing Market.  Amdocs will then be able to exercise its monopoly power unchecked.  It will be able to recoup its losses by charging supracompetitive prices and realizing excess profits, which will further injure competition.  In addition to paying higher prices, prepaid wireless MNO's and, ultimately consumers to whom higher prices are likely to be passed on, will suffer because they will have fewer choices for payment processing solutions. Without competition from Vesta or others, innovation will decline and the quality of the available prepaid wireless payment processing solutions will likely diminish.

141.    Amdocs's predatory, anticompetitive, and exclusionary conduct is a material and substantial cause of injury to Vesta.  Vesta's injuries, including but not limited to lost revenue and lost profits, flow from this conduct.

## FIRST CLAIM FOR RELIEF

### (Breach of Contract)

### Allegations Common to All Counts

142.    Vesta repeats and realleges each of the allegations in the preceding paragraphs as if fully set forth herein.

143.    Vesta has entered into at least three NDAs directly with Amdocs.  On October 18, 2006, Vesta entered into an NDA with Amdocs in order to facilitate discussions regarding the possibility of a collaboration project.  In this 2006 NDA, Amdocs agreed not to make competitive use of any of Vesta's proprietary information. The parties agreed that the 2006 NDA would be in force for seven years.

144.    In 2009, and before the expiration of the 2006 NDA, Vesta entered into another NDA with Amdocs.  Like those of the 2006 NDA, the terms of the 2009 NDA

40-  FIRST AMENDED COMPLAINT

**Perkins Coie** LLP
1120 N.W. Couch Street, Tenth Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

were broad.  For example, and as alleged above, as part of the 2009 NDA, Amdocs agreed not to use, directly or indirectly, the proprietary information of Vesta or any derivative thereof in any form for purposes of the sale or licensing of any software system, or the provision of services to any third parties, or the development of any software systems, whether for itself or any third parties.

145.    In the 2009 NDA, the parties agreed that the 2009 NDA superseded and replaced the 2006 NDA.  The parties further agreed that the 2009 NDA would be in force for seven years (i.e., until 2016).

146.    The 2009 NDA, by its terms, contemplated that Vesta and Amdocs would enter into future dealings with joint MNO customers.  The parties agreed in the 2009 NDA that the confidentiality and non-disclosure provisions of the 2009 NDA would govern the parties with respect to future dealings and joint MNO customer projects.

147.    In September 2010, the parties agreed to work together to jointly pitch the MetroPCS project.

148.    On July 3, 2012, Amdocs and Vesta entered into a further Confidentiality/Nondisclosure Agreement in connection with a potential acquisition of Vesta by Amdocs.  In the 2012 NDA, Amdocs agreed that the information shared by Vesta would be used solely for the purpose of evaluating a negotiated transaction between the parties and would not be used or disclosed for any other purpose.  See, for example, page 2, ¶ 2 of the 2012 NDA.

149.    The 2012 NDA did not supersede the 2009 NDA which was, and remains, in place.

41-  FIRST AMENDED COMPLAINT

**Perkins Coie** LLP
1120 N.W. Couch Street, Tenth Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

**Count 1:  Unauthorized Use of Confidential Solution Methods**

150.    Vesta would not have disclosed the Confidential Solution Methods to Amdocs had an NDA not been in place.  This information is not known to the public or Vesta's competitors.

151.    Amdocs breached the express or implied terms of its NDA's with Vesta in one or more of the following particulars:

> a.    Amdocs has used the Confidential Solution Methods that it learned from Vesta to develop and sell a competing product, in direct breach of the 2009 NDA and/or the 2012 NDA;
>
> b.    Amdocs breached the covenant of good faith and fair dealing by using its collaborative and acquisition discussions with Vesta to gain access to Vesta's confidential information and use that information to the competitive disadvantage of Vesta;
>
> c.    Amdocs employees used or disclosed information learned while at Vesta's facility, in breach of the Sign-in NDA's.
>
> d.    Amdocs hired away key employees of Vesta, including Neil Webzell, who will inevitably use and disclose, for the benefit of Amdocs, confidential and proprietary information belonging to Vesta.

152.    Vesta has performed all of its obligations required for Amdocs to perform its obligations under the various NDA's.

153.    As a result of Amdocs' breach of its express or implied contractual obligations, Vesta has suffered lost profits and royalties on various accounts.  Vesta's damages total no less than $270,340,752 and are in such exact amount as will be proven at trial.

**Perkins Coie** LLP
1120 N.W. Couch Street, Tenth Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

154. Amdocs, acting in bad faith, used the various NDAs to gain confidential information from Vesta that it has since exploited to provide the same services as Vesta for a reduced price.

155. Vesta is entitled to an award of prejudgment interest on this claim at the statutory rate of 9% per annum.

156. As the prevailing party, and because Amdocs's breach of the 2012 NDA was intentional, Vesta is entitled to an award of its attorney fees pursuant to the terms of the 2012 NDA (Page 4, last paragraph).

## Count 2: Unauthorized Use of Confidential Risk Information

157. Vesta would not have disclosed the Confidential Risk Information to Amdocs had an NDA not been place. This information is not known to the public or Vesta's competitors.

158. Amdocs breached the express or implied terms of its NDA's with Vesta in one or more of the following particulars:

    a. Amdocs used the Confidential Risk Information to aid its decision to enter the payments marketplace, in direct breach of the 2009 NDA and/or the 2012 NDA;

    b. Amdocs further used the Confidential Risk Information to determine a price point for its payment solution platform that would undercut Vesta's price point and unfairly compete with Vesta;

    c. Amdocs employees used or disclosed information learned while at Vesta's facility, in breach of the Sign-in NDA's.

    d. Amdocs hired away key employees of Vesta, including Neil Webzell, who will inevitably use and disclose, for the benefit of

43-  FIRST AMENDED COMPLAINT

**Perkins Coie** LLP
1120 N.W. Couch Street, Tenth Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

35302-0026/LEGAL124938796.16

Amdocs, confidential and proprietary information belonging to
Vesta.

159.    Vesta has performed all of its obligations required for Amdocs to perform its obligations under the various NDA's.

160.    As a result of Amdocs' breach of its express or implied contractual obligations, Vesta has suffered lost profits and royalties on various accounts.  Vesta's damages total no less than $270,340,752 and are in such exact amount as will be proven at trial.

161.    Amdocs, acting in bad faith, used the various NDAs to gain confidential information from Vesta that it has since exploited to provide the same services as Vesta for a reduced price.

162.    Vesta is entitled to an award of prejudgment interest on this claim at the statutory rate of 9% per annum.

163.    As the prevailing party, and because Amdocs's breach of the 2012 NDA was intentional, Vesta is entitled to an award of its attorney fees pursuant to the terms of the 2012 NDA (Page 4, last paragraph).

## SECOND CLAIM FOR RELIEF

### (Theft of Trade Secrets)

### Count 1: Theft of Compilation

164.    Vesta repeats and realleges each of the allegations in the preceding paragraphs as if fully set forth herein.

165.    The manner in which Vesta combines its Confidential Solution Methods into its payment solution for MNO's is not generally known to the public or other entities in the mobile device payment industry.  Vesta has an economic advantage in the

44-  FIRST AMENDED COMPLAINT

**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

35302-0026/LEGAL124938796.16

marketplace by virtue of the manner in which it assembles the various components of its payment solution.

166.    Vesta has taken significant steps to protect this information from public disclosure.  For example, Vesta maintains locked facilities, computers and networks. Vesta also requires all visitors to sign-in and be escorted while present at the facilities. Vesta also requires all visitors to sign a non-disclosure agreement as a condition to entry into the headquarter premises.  In addition, Vesta strictly enforces access and badge policies to ensure that its trade secret information is protected from public disclosure.

167.    Amdocs gained access to the Confidential Solution Methods only after entering into NDA's with Vesta and solely because it was necessary for Vesta to share the information for the purposes of collaboration or related to acquisition discussions.  As described above, Vesta intended for this information to remain confidential and to not be used by Amdocs to the competitive disadvantage of Vesta.

168.    Amdocs has committed a theft of Vesta's trade secrets by taking the Confidential Solution Methods and the Confidential Risk Information and using that information to develop, market, price and sell a competing payment solutions platform.

169.    Under ORS 646.465, a plaintiff is generally entitled to recover damages adequate to compensate for misappropriation.  Damages may include both the actual loss caused by misappropriation, and the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss, but shall not be less than a reasonable royalty for the unauthorized disclosure or use of a trade secret.

170.    As a result of Amdocs' theft of Vesta's trade secrets, Vesta has suffered actual losses.  Vesta's losses total no less than $270,340,752 and are in such exact amount as will be proven at trial.

**Perkins Coie** LLP
1120 N.W. Couch Street, Tenth Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

171.    Apart from Vesta's actual losses, Amdocs has also been unjustly enriched by an amount that will be proven at trial.

172.    Vesta is entitled to an award of prejudgment interest on this count at the statutory rate of 9% per annum.

173.    As the prevailing party on this count, Vesta is entitled to an award of its attorney fees pursuant to ORS 646.467 or, alternatively, any other attorney fee provision under the Uniform Trade Secrets Act deemed applicable to this case.

### Count 2: Theft of Confidential Risk Information

174.    Vesta repeats and realleges each of the allegations in the preceding paragraphs as if fully set forth herein.

175.    Vesta has spent nearly 20 years and millions of dollars to refine its fraud detection and protection algorithms.  Vesta's fraud detection and protection algorithms are highly confidential and give Vesta a significant advantage in the payment solution marketplace.  A key part of the fraud detection and protection algorithms are tracking instances of fraud in the marketplace.  As a result of Vesta's proprietary systems, Vesta is able to assess and anticipate the costs and risks that fraud imposes on MNO's in connection with prepaid subscriptions.  Vesta uses its algorithms and processes to derive data about the prevalence of fraud in the prepaid mobile device marketplace (defined above as the "Confidential Risk Information").  Vesta then uses this Confidential Risk Information to assist in the process of pricing the amount it charges for its MNO payment solution.

176.    The Confidential Risk Information is not generally known to the public or other entities in the mobile device payment industry.

177.    Vesta takes active steps to protect its Confidential Risk Information from public disclosure.  For example, it maintains the Confidential Risk Information in locked

46-  FIRST AMENDED COMPLAINT

**Perkins Coie** LLP
1120 N.W. Couch Street, Tenth Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

35302-0026/LEGAL124938796.16

facilities, requires all visitors to sign-in and be escorted throughout the facilities, and requires all visitors to sign a non-disclosure agreement.  In addition, Vesta strictly enforces access and badge policies to ensure that its trade secret information is protected from public disclosure.

178.   Amdocs gained access to the Confidential Risk Information only after entering into NDA's with Vesta.  As described above, Vesta intended for this information to remain confidential and to not be used by Amdocs to the competitive disadvantage of Vesta.

179.   Amdocs has used the Confidential Risk Information to price its services in a way to competitively and unfairly advantage Amdocs.

180.   Amdocs used the Confidential Risk Information in its decision-making to offer to sell, and to sell, a payments solution to MetroPCS.

181.   Under ORS 646.465, a plaintiff is generally entitled to recover damages adequate to compensate for misappropriation.  Damages may include both the actual loss caused by misappropriation, and the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss, but shall not be less than a reasonable royalty for the unauthorized disclosure or use of a trade secret.

182.   As a result of Amdocs' theft of Vesta's trade secrets, Vesta has suffered actual losses.  Vesta's losses total no less than $270,340,752 and are in such exact amount as will be proven at trial.

183.   Apart from Vesta's actual losses, Amdocs has also been unjustly enriched by an amount that will be proven at trial.

184.   Vesta is entitled to an award of prejudgment interest on this count at the statutory rate of 9% per annum.

47-  FIRST AMENDED COMPLAINT

**Perkins Coie** LLP
1120 N.W. Couch Street, Tenth Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

35302-0026/LEGAL124938796.16

185.    As the prevailing party on this count, Vesta is entitled to an award of its attorney fees pursuant to ORS 646.467 or, alternatively, any other attorney fee provision under the Uniform Trade Secrets Act deemed applicable to this case.

### THIRD CLAIM FOR RELIEF
### MONOPOLY LEVERAGING:  SHERMAN ACT SECTION 2

186.    Vesta repeats and realleges each of the allegations in the preceding paragraphs as if fully set forth herein.

187.    Amdocs possesses monopoly power in the Prepaid Mobile Phone Billing Platform Market.

188.    Amdocs has leveraged its monopoly power in the Prepaid Mobile Phone Billing Platform Market for the purpose and with the specific intent to acquire a monopoly in the Prepaid Mobile Phone Payment Processing Market.

189.    Amdocs has acquired, or is attempting to acquire, a monopoly in the Prepaid Mobile Phone Payment Processing Market, in order to enhance and maintain its monopoly in the Prepaid Mobile Phone Billing Platform Market.

190.    Amdocs's conduct has had a direct adverse effect on competition, as evidenced by the exclusion of actual and potential competitors, including Vesta, from the Prepaid Mobile Phone Payment Processing Market.

191.    Amdocs's predatory, anticompetitive, or exclusionary conduct, including misappropriation of trade secrets, exclusive contracts, bundled discounts, and predatory pricing, has no legitimate business justification but, instead, was undertaken with the specific intent to acquire and maintain monopoly power and foreclose competition in the Prepaid Mobile Phone Payment Processing Market.

192.    Amdocs has engaged in predatory pricing because it has provided MNO's prices for payment processing services that are below Amdocs's average variable cost, or, alternatively, above Amdocs's average variable cost but below its average total cost.

48-  FIRST AMENDED COMPLAINT

193.    Amdocs has provided discounts to at least one prepaid wireless MNO that purchased both billing platform and payment processing services as a bundle (i.e., MetroPCS).  This bundled discount was predatory or exclusionary because after allocating the entire discount to the purchase of payment processing services, Amdocs sold payment processing services below its average variable cost of producing them.

194.    If Amdocs is permitted to continue to provide predatory prices, and predatory bundled discounts, for payment processing services to MNO's, then it will succeed in eliminating its only meaningful rival in the Prepaid Mobile Phone Payment Processing Market.  After Amdocs has eliminated Vesta as a viable competitor, there is a dangerous probability that Amdocs will be able to recoup its investment in below-cost prices by charging supracompetitive prices for payment processing services.

195.    Amdocs's anticompetitive conduct in the Prepaid Mobile Phone Billing Platform Market has created the dangerous probability that Amdocs has monopolized, or will monopolize, the Prepaid Mobile Phone Payment Processing Market.

196.    Amdocs's conduct constitutes monopolization in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

197.    Amdocs's predatory, anticompetitive, and exclusionary conduct is a material and substantial cause of injury to Vesta.  As a direct and proximate result of the unlawful conduct of Amdocs in furtherance of the violations alleged, Vesta has been injured in its business and property, in an amount to be proven at trial and automatically trebled pursuant to 15 U.S.C. § 15.

198.    Vesta also is entitled to recover the cost of suit, including a reasonable attorney's fee, as provided by 15 U.S.C. § 15.

199.    Additionally, Vesta will suffer irreparable injury and loss of its business and property, for which there is no adequate remedy at law, unless the Court enjoins

49-  FIRST AMENDED COMPLAINT

**Perkins Coie** LLP
1120 N.W. Couch Street, Tenth Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

Amdocs from its unlawful conduct and violation of the antitrust laws.  Vesta is thus entitled to injunctive relief against Amdocs.

## FOURTH CLAIM FOR RELIEF
## ATTEMPTED MONOPOLIZATION OF THE MOBILE PHONE PAYMENT PROCESSING MARKET:  SHERMAN ACT SECTION 2

200.    Vesta repeats and realleges each of the allegations in the preceding paragraphs as if fully set forth herein.

201.    Amdocs possesses monopoly power in the Prepaid Mobile Phone Billing Platform Market.  Amdocs has enhanced and maintained that monopoly power by the use of exclusionary conduct in the Prepaid Mobile Phone Payment Processing Market.

202.    Amdocs has leveraged its monopoly power in the Prepaid Mobile Phone Billing Platform Market for the purpose and with the specific intent to acquire a monopoly in the Prepaid Mobile Phone Payment Processing Market.

203.    Amdocs's conduct has had a direct adverse effect on competition, as evidenced by the exclusion of actual and potential competitors, including Vesta, from the Prepaid Mobile Phone Payment Processing Market.

204.    Amdocs's predatory, anticompetitive, or exclusionary conduct, including misappropriation of trade secrets, exclusive contracts, bundled discounts, and predatory pricing, has no legitimate business justification but, instead, was undertaken with the specific intent to acquire and maintain monopoly power and foreclose competition in the Prepaid Mobile Phone Payment Processing Market.

205.    Amdocs has engaged in predatory pricing because it has provided MNO's prices for payment processing services that are below Amdocs's average variable cost, or, alternatively, above Amdocs's average variable cost but below its average total cost.

206.    Amdocs has provided discounts to at least one MNO that purchased both billing platform and payment processing services as a bundle (i.e., MetroPCS) that were

**Perkins Coie** LLP
1120 N.W. Couch Street, Tenth Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

predatory or exclusionary because after allocating the entire discount to the purchase of payment processing services, Amdocs sold payment processing services below its average variable cost of producing them.

207.    If Amdocs is permitted to continue to provide predatory prices, and predatory bundled discounts, for payment processing services to MNO's, then it will succeed in eliminating its only meaningful rival in the Prepaid Mobile Phone Payment Processing Market.  After Amdocs has eliminated Vesta as a viable competitor, there is a dangerous probability that Amdocs will be able to recoup its investment in below-cost prices by charging supracompetitive prices for payment processing services.

208.    Amdocs's anticompetitive conduct has created the dangerous probability that Amdocs will monopolize the Prepaid Mobile Phone Payment Processing Market.

209.    Amdocs's conduct constitutes attempted monopolization of the Prepaid Mobile Phone Payment Processing Market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

210.    Amdocs's predatory, anticompetitive, and exclusionary conduct is a material and substantial cause of injury to Vesta.  As a direct and proximate result of the unlawful conduct of Amdocs in furtherance of the violations alleged, Vesta has been injured in its business and property, in an amount to be proven at trial and automatically trebled pursuant to 15 U.S.C. § 15.

211.    Vesta also is entitled to recover the cost of suit, including a reasonable attorney's fee, as provided by 15 U.S.C. § 15.

212.    Additionally, Vesta will suffer irreparable injury and loss of its business and property, for which there is no adequate remedy at law, unless the Court enjoins Amdocs from its unlawful conduct and violation of the antitrust laws.  Vesta is thus entitled to injunctive relief against Amdocs.

**Perkins Coie** LLP
1120 N.W. Couch Street, Tenth Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

**FIFTH CLAIM FOR RELIEF**
**MONOPOLIZATION OF THE MOBILE PHONE PAYMENT PROCESSING**
**MARKET:  SHERMAN ACT SECTION 2**

213.   Vesta repeats and realleges each of the allegations in the preceding paragraphs as if fully set forth herein.

214.   Amdocs possesses monopoly power in the Prepaid Mobile Phone Payment Processing Market.  Amdocs has acquired, enhanced, and maintained its monopoly power in the Prepaid Mobile Phone Payment Processing Market by the use of exclusionary conduct.

215.   Amdocs has leveraged its monopoly power in the Prepaid Mobile Phone Billing Platform Market for the purpose and with the specific intent to acquire a monopoly in the Prepaid Mobile Phone Payment Processing Market.

216.   Amdocs's conduct has had a direct adverse effect on competition, as evidenced by the exclusion of actual and potential competitors, including Vesta, from the Prepaid Mobile Phone Payment Processing Market.

217.   Amdocs's predatory, anticompetitive, or exclusionary conduct, including misappropriation of trade secrets, exclusive contracts, bundled discounts, and predatory pricing, has no legitimate business justification but, instead, was undertaken with the specific intent to acquire and maintain monopoly power and foreclose competition in the Prepaid Mobile Phone Payment Processing Market.

218.   Amdocs has engaged in predatory pricing because it has provided MNO's prices for payment processing services that are below Amdocs's average variable cost, or, alternatively, above Amdocs's average variable cost but below its average total cost.

219.   Amdocs has provided discounts to at least one MNO that purchased both billing platform and payment processing services as a bundle (i.e., MetroPCS) that were predatory or exclusionary because after allocating the entire discount to the purchase of

52-  FIRST AMENDED COMPLAINT

**Perkins Coie** LLP
1120 N.W. Couch Street, Tenth Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

35302-0026/LEGAL124938796.16

payment processing services, Amdocs sold payment processing services below its average variable cost of producing them.

220.    If Amdocs is permitted to continue to provide predatory prices, and predatory bundled discounts, for payment processing services to MNO's, then it will succeed in eliminating its only meaningful rival in the Prepaid Mobile Phone Payment Processing Market.  After Amdocs has eliminated Vesta as a viable competitor, there is a dangerous probability that Amdocs will be able to recoup its investment in below-cost prices by charging supracompetitive prices for payment processing services.

221.    Amdocs's conduct constitutes monopolization of the Prepaid Mobile Phone Payment Processing Market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

222.    Amdocs's predatory, anticompetitive, and exclusionary conduct is a material and substantial cause of injury to Vesta.  As a direct and proximate result of the unlawful conduct of Amdocs in furtherance of the violations alleged, Vesta has been injured in its business and property, in an amount to be proven at trial and automatically trebled pursuant to 15 U.S.C. § 15.

223.    Vesta also is entitled to recover the cost of suit, including a reasonable attorney's fee, as provided by 15 U.S.C. § 15.

224.    Additionally, Vesta will suffer irreparable injury and loss of its business and property, for which there is no adequate remedy at law, unless the Court enjoins Amdocs from its unlawful conduct and violation of the antitrust laws.  Vesta is thus entitled to injunctive relief against Amdocs.


[COMPLAINT CONTINUES ONTO NEXT PAGE]

//

//


53-  FIRST AMENDED COMPLAINT

**Perkins Coie** LLP
1120 N.W. Couch Street, Tenth Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

## JURY DEMAND

225.    Vesta hereby demands a jury trial on all claims so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

1.    On its First Claim for Relief for breach of contract, for a judgment against Defendants, jointly and severally, in an amount no less than $270,340,752 and in such exact amount as will be proven at trial, plus pre-judgment interest at the statutory rate of 9% per annum;

2.    Additionally, on its First Claim for Relief for breach of contract, for a finding of intentional conduct and an award of Vesta's reasonable attorney fees, costs and disbursements on that basis pursuant to the terms of the 2012 NDA (¶ 4, page 4);

3.    On its Second Claim for Relief for trade secret misappropriation, for a judgment against Defendants, jointly and severally:  (a) in an amount no less than either $270,340,752 or a reasonable royalty, whichever is greater, and in such exact amount to be proven at trial; plus (b) in an additional amount for Defendants' unjust enrichment, in such exact amount to be proven at trial; plus (c) plus pre-judgment interest at the statutory rate of 9% per annum;

4.    Additionally, on its Second Claim for Relief for trade secret misappropriation, for an award of its attorney fees pursuant to ORS 646.467 or, alternatively, other applicable statute;

5.    On its Third, Fourth and Fifth Claims for Relief, for the following:

a.    For an adjudication that Amdocs violated Section 2 of the Sherman Act, 15 U.S.C. § 2;

b.    For a judgment in favor of Vesta and against Amdocs for three times the amount of damages sustained by Vesta, pre-judgment and post-judgment interest,

54-  FIRST AMENDED COMPLAINT

**Perkins Coie** LLP
1120 N.W. Couch Street, Tenth Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

together with the cost of the action, reasonable attorneys' fees and such other relief as

appropriate;

        c.    For an order of divestiture, rescission, structural changes, restrictions

on conduct, and any further actions needed to establish competitive conditions that would

have existed but for the Amdocs's anticompetitive conduct; and

        d.    Grant such other and further equitable or legal relief that the Court

finds just and proper to address and to prevent recurrence of Amdocs's unlawful conduct;

6.    For an award of its costs and disbursements; and

7.    For such other relief as the Court deems equitable and just.

DATED:  April 7, 2015

*s/ Stephen F. English*

**Stephen F. English**, OSB No. 730843
SEnglish@perkinscoie.com
**Erick J. Haynie**, OSB No. 982482
EHaynie@perkinscoie.com
**Joanna T. Perini-Abbott**, OSB No. 141394
JPeriniAbbott@perkinscoie.com
Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Telephone:  206.359.8000
Facsimile:  206.359.9000

Attorneys for Plaintiff

55-  FIRST AMENDED COMPLAINT

**Perkins Coie** LLP
1120 N.W. Couch Street, Tenth Floor
Portland, OR  97209-4128
Phone:  503.727.2000
Fax:  503.727.2222

1

## CERTIFICATE OF SERVICE

2    I hereby certify that I served the foregoing **FIRST AMENDED COMPLAINT** on the

3 following:

4     Robert Shlachter
      Joshua Ross

5     Stoll Stoll Berne Lokting & Shlachter PC
      209 SW Oak Street, Suite 500

6     Portland, Oregon 97204

7     Of Attorneys for Defendants

8 (except when served by fax), to be sent by the following indicated method or methods, on the

9 date set forth below:

10   ☐  by **mailing** in a sealed, first-class postage-prepaid envelope and
      deposited with the United States Postal Service at Portland, Oregon.

11   ☒  by **hand-delivery**.

12   ☐  by **email**.

13

14 DATED:  April 7, 2015     **PERKINS COIE** LLP

15          By:  *s/ Stephen F. English*
            Stephen F. English, OSB No. 730843

16            SEnglish@perkinscoie.com
            Erick J. Haynie, OSB No. 982482

17            EHaynie@perkinscoie.com
            Joanna T. Perini-Abbott, OSB No. 141394

18            JPeriniAbbott@perkinscoie.com
            1120 N.W. Couch Street, Tenth Floor

19            Portland, OR  97209-4128
            Telephone:  503.727.2000

20            Facsimile:  503.727.2222

21          Attorneys for Plaintiff Vesta Corporation

22

23

24

25

26

PAGE  1-  CERTIFICATE OF SERVICE

112843-0002/LEGAL124175504.2