IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

VESTA CORPORATION,

                          Plaintiff,

      v.

AMDOCS MANAGEMENT
LIMITED and AMDOCS, INC.,

                       Defendants.

No. 3:14-cv-1142-HZ

OPINION & ORDER

Erick J. Haynie
Joanna T. Perini-Abbott
Stephen F. English
PERKINS COIE, LLP
1120 NW Couch Street, 10th Floor
Portland, OR 97209

Charles H. Samel
PERKINS COIE, LLP
1888 Century Park East, Suite 1700
Los Angeles, CA 90067

      Attorneys for Plaintiff

Bruce G. Vanyo
Yonaton M. Rosenzweig
Andrew G. Klevorn
Christina Lucen Costley
KATEEN MUCHIN ROSENMAN, LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067

Kristin J. Achterhof
KATEEN MUCHIN ROSENMAN, LLP
525 West Monroe Street
Chicago, IL 60661

Joshua L. Ross
Robert A. Shlachter
Timothy S. DeJong
STOLL STOLL BERNE LOKTING & SHLACHTER, PC
209 SW Oak Street, Fifth Floor
Portland, OR 97204

   Attorneys for Defendant Amdocs Management Limited

Bruce G. Vanyo
Yonaton M. Rosenzweig
Andrew G. Klevorn
Christina Lucen Costley
Jeffrey A. Finn
KATEEN MUCHIN ROSENMAN, LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067

Kristin J. Achterhof
KATEEN MUCHIN ROSENMAN, LLP
525 West Monroe Street
Chicago, IL 60661

Joshua L. Ross
Robert A. Shlachter
Timothy S. DeJong
STOLL STOLL BERNE LOKTING & SHLACHTER, PC
209 SW Oak Street, Fifth Floor
Portland, OR 97204

   Attorneys for Defendant Amdocs, Inc.

Plaintiff Vesta Corporation brings this action against Defendants Amdocs Management Limited and Amdocs, Inc. (collectively, "Defendants"). This Court previously granted Defendants' motion to dismiss Plaintiff's fraud claim and denied Defendants' motion to dismiss Plaintiff's claims of breach of contract and theft of trade secrets. Plaintiff amended its complaint to add antitrust claims of monopoly leveraging, attempted monopolization, and monopolization.

Defendants now move to dismiss Plaintiff's antitrust claims and to change or transfer venue. For the reasons that follow, the Court grants the motion to dismiss and denies the motion to transfer venue.

## BACKGROUND

Plaintiff is an electronic payments and fraud prevention technology company. First Am. Compl. ("FAC") Intro, ECF 52. Plaintiff is an Oregon corporation with its headquarters in Tigard, Oregon. Haynie Decl. Ex. 1, ECF 83-1. The vast majority of Plaintiff's employees, including nearly all of its technical team, are based in Oregon. Hassold Decl. ¶ 7, ECF 82. Plaintiff's technical, business, and financial documents are primarily stored in Oregon. Id.; Fieldhouse Decl. ¶ 9, ECF 81.

Defendants are multinational telephone billing software and services companies doing business in Oregon and around the globe. FAC Intro, ¶ 4. Defendants' Digital Services Team, which developed the payment processing solution for MetroPCS at issue in this case, is based in Seattle, Washington. Zabetski Decl. ¶ 3, ECF 70. The Digital Services Team developed the payment processing solution primarily in Seattle and in Pune, India. Id. Defendants' Business Solutions Software unit (the unit that worked with Plaintiff) is based in Richardson, Texas. Costley Decl. Ex. C, ECF 69-3.

Both Plaintiff and Defendants provide services to national and international mobile phone network operators (MNOs), sometimes called wireless service providers. FAC ¶¶ 9, 10. Payment solutions, such as those provided by Plaintiff; and billing platforms, such as those provided by Defendants; "are distinct in the MNO support services marketplace." Id. at ¶ 11. Payment solutions facilitate a MNO's receipt of payments from the end-users of mobile devices, whereas billing platforms maintain account status and account information for the MNO and its customers. Id. Until recently, Defendants were not providers of payment solutions. Id. at ¶ 12.

Because MNOs generally require both payment solutions and billing platforms to serve their customers, Plaintiff and Defendants collaborated with one another to integrate their services and platforms in order to appeal to their shared customer base. Id. at ¶¶ 13, 14. In 2006, Plaintiff and Defendant began collaborating with one another in connection with one of their shared MNO customers, Sprint. Id. at ¶ 13.

In 2009, Plaintiff and Defendants' relationship became more strategic in nature. Id. at ¶ 14. The parties began "working together to integrate their services and platforms to provide improved marketing opportunities for both parties and increased value to joint customers." Id. Plaintiff and Defendants shared detailed technical information with each other so that their platforms could communicate with each other "in a seamless and scalable fashion within the client's software and hardware environments." Id. at ¶ 15.

Plaintiff alleges that, beginning in 2006, Plaintiff and Defendants entered into a series of Non-Disclosure/Confidentiality Agreements (NDAs) to preserve confidentiality while sharing information in their effort to develop joint services and products. Id. at ¶¶ 15-21. On October 18, 2006, Plaintiff and Defendants signed a non-disclosure agreement (NDA) pursuant to which both parties agreed that any information exchanged would be kept confidential. Id. at ¶ 143. The NDA

included a choice-of-law clause stating that any disputes arising out of the contract would be adjudicated under New York law. Costley Decl. Ex. L, ECF 66-12.

In 2009, the parties executed an NDA to capture their understanding that "all of their meetings and discussions after June 24, 2009, would remain confidential and not be used or disclosed by the other party[.]" FAC ¶ 19. In addition, every time one of Defendants' employees visited Plaintiff's headquarters, the employee had to sign-in and agree that all of the information acquired while on the premises was confidential and proprietary to Plaintiff. Id. at ¶ 20 (describing the "Sign-In NDAs"). On March 31, 2010 and July 3, 2012, the parties executed additional NDAs. Id. at ¶ 16.

Plaintiff alleges that, from 2010 to 2012, the parties explored the possibility of Defendants acquiring Plaintiff. Id. at ¶¶ 24-27. In 2010, Defendants' employees made two trips to Plaintiff's headquarters and Plaintiff's Chief Executive Officer traveled to Tel Aviv to meet with Defendants' Chief Executive Officer. Id. at ¶¶ 25-27. However, at the Tel-Aviv meeting, Plaintiff learned that Defendants, in fact, had no interest in acquiring Plaintiff. Id. at ¶ 27.

Nevertheless, Plaintiff and Defendants continued to work together. In late April of 2010, MetroPCS, a large MNO now affiliated with T-Mobile, was using Defendants' billing platform, but its payment solution was "old and poorly implemented." Id. at ¶ 29. Defendants reached out to Plaintiff and proposed that the parties work together to pitch a payment solution proposal to MetroPCS. Id. The arrangement would be mutually beneficial because Plaintiff's payment solution would help stabilize and increase MetroPCS' customer base, which would in turn generate more income for Defendants. Id. at ¶ 30. Plaintiff's and Defendants' representatives met on numerous occasions to "prepare pitch materials and otherwise collaborate on the project." Id. ¶ 32.

In June 2010, the parties met at MetroPCS' office in Richardson, Texas. Zepeda Decl. ¶ 4, ECF 71. In August 2010, four of Plaintiff's executives met with Defendants in Richardson. Id. at ¶ 5. In September 2010, the parties had at least two meetings in Richardson to discuss the MetroPCS proposal. Id. at ¶¶ 7, 8. In November 2010, the parties had at least two meetings in Richardson—one with MetroPCS and one with each other to discuss the MetroPCS deal. Id. at ¶ 11.

In the course of jointly collaborating on marketing and the possibility of acquisition, Plaintiff provided business and technical information to Defendants via email and telephone from Oregon.[1] Plaintiff shared information with Defendants including "proprietary information about [Plaintiff's] payment solution" and "confidential and proprietary business and financial information." Id. at ¶ 17. Specifically, Plaintiff alleges that Defendants obtained two types of confidential information from Plaintiff: 1) "Solutions Methods," which include "detailed information about the architecture and design of the solutions, including proprietary payment routines, methodologies and processes"; and 2) "Risk Information," which includes detailed statistical information about "the prevalence of fraudulent payment transactions in the prepaid mobile device market place" and how Plaintiff "uses fraud data to price its payment solutions." Id. at ¶ 22, 51.

In 2012, the parties worked through a third-party investment banking firm to once again explore the possibility of acquisition. Id. ¶ 38. In July 2012, the parties met in New York. Id. at ¶ 42. However, the parties were unable to agree on the terms of an acquisition. Id. at ¶ 43. Plaintiff alleges that Defendants were not sincere in their stated interest in acquiring Plaintiff. Id. at ¶ 44.

---

[1] In addition to the MetroPCS pitch, in May of 2010, Plaintiff's vice-president for business development met in Oregon with the general manager for OpenMarket, an affiliate of Defendants. Behling Decl. ¶ 3, ECF 79; Haynie Decl. Ex. 3, ECF 83 . At this meeting, Plaintiff provided an overview of its payment processing solution. Behling Decl. ¶ 5, ECF 79.

While the initial pitch to MetroPCS was unsuccessful, the parties met again and pitched a proposal to MetroPCS in Richardson, Texas, in late 2011. Id. at ¶¶ 14, 16. However, MetroPCS chose not to contract with the parties.

Beginning in mid-2012 and continuing into 2013, Defendants met numerous times with MetroPCS representatives to discuss the possibility of Defendants independently developing a payment processing solution for MetroPCS. Zepeda Decl. ¶¶ 19-23, ECF 71. All of these meetings took place in Richardson, Texas. Zabetski Decl. ¶¶ 3, 6, ECF 70. No part of the planning or development took place in Oregon. Id. at ¶ 8.

Plaintiff alleges that Defendants used Plaintiff's proprietary information to create a "copycat payments solution" which Defendants sold to MetroPCS shortly after the parties' joint pitch to MetroPCS failed. Id. at ¶¶ 36, 45. According to Plaintiff, Defendants had never launched a payment solution and could not have done so on the timeline required or at the price bargained for by MetroPCS, without using "some significant portion of the confidential information provided to Defendants by Plaintiff in connection with the MetroPCS collaboration project." Id. ¶ at 37.

On or about April 28, 2014, Defendants hired away a key member of Plaintiff's executive sales staff. Id. at ¶ 53. Plaintiff alleges that this staff member possesses Confidential Risk Information that he will disclose to Defendants. Id. at ¶ 56.

Additional facts relevant to particular claims are discussed below.

## STANDARDS

### I.      Motion to Dismiss

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of the claims. Navarro v. Block, 250 F.3d 729, 732 (9th Cir. 2001). "All allegations of material

fact are taken as true and construed in the light most favorable to the nonmoving party." <u>Am. Family Ass'n, Inc. v. City & Cnty. of S.F.</u>, 277 F.3d 1114, 1120 (9th Cir. 2002). However, the court need not accept conclusory allegations as truthful. <u>See</u> <u>Warren v. Fox Family Worldwide, Inc.</u>, 328 F.3d 1136, 1139 (9th Cir. 2003) ("[W]e are not required to accept as true conclusory allegations which are contradicted by documents referred to in the complaint, and we do not necessarily assume the truth of legal conclusions merely because they are cast in the form of factual allegations.") (internal quotation marks, citation, and alterations omitted). Rather, to state a plausible claim for relief, the complaint "must contain sufficient allegations of underlying facts" to support its legal conclusions. <u>Starr v. Baca</u>, 652 F.3d 1202, 1216 (9th Cir. 2011).

A motion to dismiss under Rule 12(b)(6) will be granted if a plaintiff alleges the "grounds" of his "entitlement to relief" with nothing "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action[.]" <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007). "Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)[.]" <u>Id.</u> (citations and footnote omitted).

To survive a motion to dismiss, a complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face[,]" meaning "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). A complaint must contain "well-pleaded facts" which "permit the court to infer more than the mere possibility of misconduct[.]" <u>Id.</u> at 679.

## II.    Motion to Transfer Venue

A motion to transfer venue is governed by 28 U.S.C. § 1404(a), which provides that "[f]or the convenience of the parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where the action might have been brought[.]" The purpose of the 28 U.S.C. § 1404(a) is to "prevent the waste of time, energy and money and to protect litigants, witnesses, and the public against unnecessary inconvenience and expense." Van Dusen v. Barrack, 376 U.S. 612, 616 (1964) (internal citation and quotation marks omitted).

A motion to transfer lies within the broad discretion of the district court, and must be determined on a case-by-case basis. See Jones v. GNC Franchising, Inc., 211 F.3d 495, 498 (9th Cir. 2000). However, the burden is on the moving party to demonstrate that the balance of conveniences favoring the transfer is high. The defendant must make "a clear showing of facts which ... establish such oppression and vexation of a defendant as to be out of proportion to plaintiff's convenience, which may be shown to be slight or nonexistent." Dole Food Co. v. Watts, 303 F.3d 1104, 1118 (9th Cir. 2002).

## DISCUSSION

Plaintiff brings the following three antitrust claims against Defendants: (1) attempted monopolization of the mobile phone payment processing market; (2) monopolization of the mobile phone payment processing market; and (3) monopoly leveraging. The Court grants Defendants' motion to dismiss Plaintiff's antitrust claims because Plaintiff fails to adequately allege anticompetitive activity or antitrust injury.

Defendants also move to change or transfer venue. Based on considerations of convenience and fairness, the Court denies the motion.

## I.    Judicial Notice

Courts may take judicial notice of information "not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). Courts may take judicial notice of SEC filings, press releases, or contents of a website, when they are "matters of public record." See Lee v. City of Los Angeles, 250 F.3d 668, 688-89 (9th Cir. 2001); see also Nw. Pipe Co. v. RLI Ins. Co., No. 3:09-CV-01126-BR, 2014 WL 1406595, at *5 (D. Or. Apr. 10, 2014). When a court takes judicial notice of a public record, "it may do so not for the truth of the facts recited therein, but for the existence of the [record], which is not subject to reasonable dispute over its authenticity." Klein v. Freedom Strategic Partners, LLC, 595 F. Supp. 2d 1152, 1157 (D. Nev. 2009) (quoting Lee, 250 F.3d at 690)

Defendants submit seven documents, downloaded from the SEC's publicly available electronic data gathering and retrieval database; a printout from Plaintiff's website; five printouts from other companies' websites; two trade articles available on public websites; and several printouts from "Yahoo! Finance," profiling other companies. Costley Decl. Exs. A-O. Plaintiff does not object to the court taking notice of the existence of the records themselves and not of the truth of statements contained within them.

Plaintiff does not object to the court taking notice of the SEC filings for the existence of the records, which are not subject to reasonable dispute over its authenticity. See Vesta Corp. v. Amdocs Mgmt. Ltd., No. 3:14-CV-1142-HZ, 2015 WL 163384, at *3 (D. Or. Jan. 13, 2015); see also ScripsAmerica, Inc. v. Ironridge Global LLC, No. CV1403962MMMAGRX, 2015 WL 4747807, at *7 (C.D. Cal. Aug. 11, 2015) ("The court takes judicial notice of the SEC filings

only for their existence and contents, not for the truth of the information contained in them."). Accordingly, the Court concludes Exhibits A, C, E, G, I, K, and N are public filings, the existence of which the Court may take judicial notice.

Defendants ask the Court to take judicial notice of the fact that T-Mobile merged with MetroPCS in May 2013. Costley Decl. Ex. N., ECF 67. The Court takes judicial notice of the merger as it is a matter of public record and Plaintiff does not dispute its accuracy. See, e.g., Sidorenko v. Nat'l City Mortgage Co., No. 12-CV-05180-RBL, 2012 WL 3877749, at *1 (W.D. Wash. Sept. 6, 2012) (taking judicial notice of a merger that was a matter of public record).

Defendants ask the Court to take judicial notice of a page of Plaintiff's website, which contains certain statements regarding Plaintiff's payment processing services. Costley Decl. Ex. B, ECF 67. Plaintiff does not dispute the accuracy of its own website. Accordingly the Court takes judicial notice of this document. O'Toole v. Northrop Grumman Corp., 499 F.3d 1218, 1225 (10th Cir. 2007) (holding that a party's failure to dispute its own information on its website contributes to its indisputability).

As to the remaining documents, Defendants ask the Court to judicially notice website printouts and online articles in order to consider "whether there are other companies capable of providing payment processing solutions to mobile network operators" and whether Defendants have been able to maintain supracompetitive pricing against its customers. Defs.' Req. Judicial Notice 4, ECF 67. In essence, Defendants ask this Court to consider extrinsic evidence to resolve an issue of fact that is hotly disputed in this case and central to determining whether Plaintiff can state a claim. Such a request is improper.

In Lee v. City of Los Angeles, 250 F.3d 668, 688 (9th Cir. 2001), the Ninth Circuit explained that "factual challenges to a plaintiff's complaint have no bearing on the legal

sufficiency of the allegations under Rule 12(b)(6)." In <u>Lee</u>, the district court improperly considered extrinsic evidence on motion to dismiss arrestee's § 1983 action alleging that police officers identified him as fugitive without comparing his fingerprints and identifying characteristics to person named in fugitive warrant. <u>Id.</u> The district court stated that that the arrestee was an innocent person who attempted to pass himself off as escapee; however, neither the original nor amended complaint contained any allegation that the arrestee told anyone he was a fugitive. <u>Id.</u> The district court granted the defendants' motion to dismiss after it "assumed the existence of facts that favor defendants based on evidence outside plaintiffs' pleadings, took judicial notice of the truth of disputed factual matters, and did not construe plaintiffs' allegations in the light most favorable to plaintiffs." <u>Id.</u> at 688. Upon review, the Ninth Circuit Court of Appeals held that the district court erred by considering this extrinsic evidence in order to make a factual finding and inference that contradicted the allegations in the complaint.

Here, Defendants attempt to distinguish <u>Lee</u> because Plaintiff does not dispute the specific facts found on each of the websites, documents, and articles offered by Defendants. However, it is clear that Plaintiff disputes the inferences that Defendants ask this Court to draw based on those documents. And this Court must accept the factual allegations of Plaintiff's complaint as true and draw all reasonable inferences in Plaintiff's favor. <u>Id.</u> at 690. Accordingly, even if the Court accepted the facts in Defendants' submissions as true, the Court could not use those facts to draw inferences that contradict the reasonable inferences drawn from the facts alleged in Plaintiff's complaint. Therefore, the Court takes judicial notice of the remainder of Defendants' documents because they are contained in publicly available documents, but does not accept them for the truth of the matters asserted therein.

II.     **Attempted Monopolization and Monopolization of the Mobile Phone Payment Processing Market—Claims 4 and 5**

Section 2 of the Sherman Act makes it unlawful to monopolize, attempt to monopolize, or combine or conspire to monopolize. 15 U.S.C. § 2. To state a claim for attempted monopolization, a plaintiff must allege: "(1) specific intent to control prices or destroy competition; (2) predatory or anticompetitive conduct to accomplish the monopolization; (3) dangerous probability of success; and (4) causal antitrust injury." SmileCare Dental Grp. v. Delta Dental Plan of California, Inc., 88 F.3d 780, 783 (9th Cir. 1996) (citation omitted). To state a claim for monopolization, a plaintiff must plead: "(1) possession of monopoly power in the relevant market; (2) willful acquisition or maintenance of that power; and (3) causal antitrust injury." Id. The requirements of the claims of attempted monopolization and monopolization are similar, "differing primarily in the requisite intent and the necessary level of monopoly power." Image Tech. Servs., Inc. v. Eastman Kodak Co., 125 F.3d 1195, 1202 (9th Cir. 1997). In addition, both claims require a showing of antitrust injury; in other words, "a plaintiff must prove that his loss flows from an anticompetitive aspect or effect of the defendant's behavior." Rebel Oil Co. v. Atl. Richfield Co., 51 F.3d 1421, 1433 (9th Cir. 1995).

Defendants contend that Plaintiff's attempted monopolization and monopolization claims fail because Plaintiff has not adequately pleaded the following required elements: (1) Defendants' market power within a relevant market; (2) anticompetitive conduct; and (3) antitrust injury. Defendants also argue that Plaintiff does not plead a dangerous probability of success, as required by the attempted monopolization claim.

The Court finds that Plaintiff adequately pleads market power within a relevant market. However, Plaintiff fails to adequately allege anticompetitive conduct. Accordingly, Plaintiff does

not allege antitrust injury. Therefore, the Court dismisses Plaintiff's attempted monopolization and monopolization claims.

**A.  Plaintiff adequately alleges market power within a relevant market.**

In order to state a valid claim under the Sherman Act, a plaintiff must allege that the defendant has market power within a "relevant market." Newcal Indus., Inc. v. Ikon Office Solution, 513 F.3d 1038, 1044 (9th Cir. 2008) That is, the plaintiff must allege both that a "relevant market" exists and that the defendant has power within that market. Id. Newcal makes clear that "[t]here is no requirement that these elements of the antitrust claim be pled with specificity." Id. at 1045.

i.  Relevant Market

The relevant market encompasses notions of geography as well as product use, quality, and description. Id. at n.4 ("Antitrust law requires allegation of both a product market and a geographic market."). The validity of the relevant market is typically a factual element rather than a legal element. Id. at 1045; see also In re Se. Milk Antitrust Litig., 739 F.3d 262, 282-83 (6th Cir.) cert. denied sub nom. Dean Foods Co. v. Food Lion, LLC, 135 S. Ct. 676 (2014) ("Multiple courts of appeal have held that market definition is a question of fact . . . Accordingly, that question is better left for a jury to decide.) (internal citations omitted).

Therefore, a complaint should be dismissed under Rule 12(b)(6) only where "the complaint's 'relevant market' definition is facially unsustainable." Id. Such a "facially unsustainable" relevant market definition may be found in cases where "the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in

plaintiff's favor." <u>Colonial Med. Group, Inc. v. Catholic Healthcare W.</u>, No. 09–2192 MMC, 2010 WL 2108123, at *3 (N.D. Cal. May 25, 2010) (quoting <u>Queen City Pizza, Inc. v. Domino's Pizza, Inc.</u>, 124 F.3d 430, 436 (3d Cir. 1997)).

Courts often employ the "hypothetical monopolist test" to determine the relevant market. The test is set forth in the U.S. Department of Justice and FTC's Horizontal Merger Guidelines. <u>See</u> U.S. Dep't of Justice & FTC Horizontal Merger Guidelines § 4.1.1 (2010)[2] [hereinafter Merger Guidelines]; <u>Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.</u>, 778 F.3d 775, 784 (9th Cir. 2015) (the hypothetical monopolist test is a "common method"). The test "is to find whether a hypothetical monopolist could impose a 'small but significant nontransitory increase in price' ('SSNIP') in the proposed market." <u>Saint Alphonsus Med. Ctr.-Nampa Inc.</u>, 778 F.3d at 784. The relevant geographic market is one in which "buyers ... respond to a SSNIP by purchasing regardless of the increase." <u>In re Se. Milk Antitrust Litig.</u>, 739 F.3d at 277–78. 2014). If enough consumers would respond to a SSNIP by purchasing the product from outside the geographic market, making the SSNIP unprofitable, then the proposed market definition is too narrow. See <u>Theme Promotions, Inc. v. News Am. Mktg. FSI</u>, 546 F.3d 991, 1002 (9th Cir. 2008).

Taking all the allegations in Plaintiff's complaint as true and granting all factual inferences in Plaintiff's favor, Plaintiff's "Prepaid Mobile Phone Payment Processing Market" (hereinafter, "Payment Processing Market") is not facially unsustainable. Plaintiff defines the Payment Processing Market as the market for "client-branded, e-commerce payment processing solutions that are purchased by prepaid wireless MNOs and which allow MNOs to receive and

---

[2] Although the Merger Guidelines are not binding on courts, they are often used as persuasive authority. <u>Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.</u>, 778 F.3d 775, 784 (9th Cir. 2015).

process payments for prepaid mobile phone and long distance telephone charges in the United

States." FAC ¶ 63. According to Plaintiff, the United States is the relevant geographic market

within which to analyze the effect of Defendants' conduct. Id. at ¶ 99. In addition, Plaintiff limits

the scope of the relevant market to those MNOs that outsource their payment processing

solutions to third-party providers such as Plaintiff, excluding those MNOs that provide some or

all of their prepaid mobile payment processing solutions themselves. Id. at ¶ 109.

Defendants argue that Plaintiff's definition of the relevant market is too narrow with

respect to its geographic scope and under-inclusive with respect to available suppliers.

Specifically, Defendants argue that the proper geographic scope includes the entire world, as

opposed to the United States, and that the scope of suppliers should include MNOs that "self-

supply" their payment processing solutions.

The relevant geographic market is the "area of effective competition where buyers can

turn for alternate sources of supply." Saint Alphonsus Med. Ctr.-Nampa Inc., 778 F.3d at 784

(quoting Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd., 924 F.2d 1484, 1490 (9th Cir.

1991). Put differently, "a market is the group of sellers or producers who have the actual or

potential ability to deprive each other of significant levels of business." Id. (quoting Rebel Oil,

51 F.3d at 1434).

As to the geographic scope of the relevant market, Defendants persuasively argue that the

market should include payment processing solutions for MNOs operating anywhere in the world.

However, their arguments turn on issues of fact inappropriate for resolution at this stage of the

litigation. For example, according to Defendants, there are several large foreign suppliers who

are capable of creating payment processing solutions for domestic use, and the MNOs are

powerful and sophisticated buyers who would turn to providers from around the world if faced

with an unjustified and inflated price for prepaid payment processing solutions in the United States. Accepting Defendants' argument would require disregarding the facts as pled in the complaint.

Plaintiff alleges that payment processing solutions designed for MNO use abroad are not considered substitutes for, or reasonably interchangeable with, solutions for the domestic business of MNOs. Id. ¶ 100-02. According to Plaintiff, payment processing solutions used in foreign markets are not sufficiently adaptable to the United States MNO market because usage, pricing, and other transaction terms in foreign markets are different from those in the prepaid wireless MNO market in the United States. Id. at ¶ 101. Plaintiff alleges that prepaid wireless MNOs operating in the United States request proposals and enter into contracts for services that specify the United States as the territory for which services will be provided. Id. at ¶ 99. Furthermore, Plaintiff alleges that prepaid wireless MNOs that operate in the United States do not solicit proposals that rely on systems designed for payment processing solutions in foreign markets. Id. at ¶ 100.

Taking Plaintiff's allegations as true, payment processing solutions for MNOs that are not operating in the United States are not close substitutes for, and not interchangeable with, payment processing solutions for MNOs operating in the United States. Notwithstanding Defendants' contention that MNOs could turn to payment processing suppliers from all over the world, the First Amended Complaint states that payment processing solutions used in foreign markets are not sufficiently adaptable to serve as a competitive constraint on payment processing solutions designed for prepaid wireless MNOs that operate in the United States. Id. at ¶ 101.

As discussed above, defining the relevant market is a fact-intensive inquiry. Unsurprisingly, the majority of the cases cited by Defendants resolved the issue of proper

geographic scope at summary judgment or at trial, not in a motion to dismiss. See, e.g., United States v. Oracle Corp., 331 F. Supp. 2d 1098, 1163 (N.D. Cal. 2005) (holding that the proper geographic market was global after a court trial that lasted several weeks and included extensive evidence and witness testimony); Saint Alphonsus Med. Ctr.-Nampa Inc., 778 F.3d at 784 (upholding the district court's summary judgment decision regarding the relevant geographic market because it was supported by the evidence in the record).

In those cases cited by Defendants that were resolved through a motion to dismiss, the alleged relevant market was so unsupported by facts as to be deficient on its face. See, e.g., Tanaka v. Univ. of S. California, 252 F.3d 1059, 1063 (9th Cir. 2001) (plaintiff 's conclusory assertions that the UCLA women's soccer program was "unique" and hence "not interchangeable with any other program in Los Angeles" was insufficient to identify an appropriately defined product market); Right Field Rooftops, LLC v. Chicago Baseball Holdings, LLC, No. 15 C 551, 2015 WL 1497821, at *8 (N.D. Ill. Apr. 2, 2015) (proposed relevant market of live Chicago Cubs baseball games "cannot stand" because it comprised a single brand product and there were no allegations that consumers were "locked in" to purchase a specific product or service); Int'l Equip. Trading, Ltd. v. AB SCIEX LLC, No. 13 C 1129, 2013 WL 4599903, at *4 (N.D. Ill. Aug. 29, 2013) (plaintiff failed to sufficiently allege a relevant market because there were no facts alleged "to support this narrow product market definition").

In this case, Plaintiff supports its allegation of the relevant market with supporting facts. Accordingly, while Defendant may be correct that, in this case, the proper geographic market is a global market, at this stage of the proceeding the Court finds that Plaintiff's allegations of a geographic market limited to the United States are sufficient.

The second consideration in defining a relevant market is identifying the proper product market. Here, Defendants challenge the scope of the suppliers to the payment processing market who are included in the relevant market. Plaintiff limits the market to third-party suppliers, such as Plaintiff and Defendants, who provide payment processing solutions to MNOs. Plaintiff excludes from the market MNOs who self-supply their payment processing systems. As a result, the only two suppliers that fit within Plaintiff's definition are Plaintiff and Defendants.

The product market must "encompass the product at issue as well as all economic substitutes for the product." Newcal, 513 F.3d at 1045. The "outer boundaries" of the product market are "determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." Id. (quoting Brown Shoe v. United States, 370 U.S. 294, 325 (1962)). Stated another way, a product market includes all goods that are reasonable substitutes, even though the products themselves are not entirely the same. Fed. Trade Comm'n v. Cardinal Health, Inc., 12 F. Supp. 2d 34, 46 (D.D.C. 1998); F.T.C. v. Staples, Inc., 970 F. Supp. 1066, 1074 (D.D.C. 1997) (stating the question as "whether two products can be used for the same purpose, and if so, whether and to what extent purchasers are willing to substitute one for the other"). The relevant market must include "the group or groups of sellers or producers who have actual or potential ability to deprive each other of significant levels of business." Thurman Industries, Inc. v. Pay 'N Pak Stores, Inc., 875 F.2d 1369, 1374 (9th Cir. 1989)).

Plaintiff alleges that a self-sourced payment processing solution is not reasonably interchangeable with a payment processing solution provided by a third-party vendor. Plaintiff alleges that a small but significant, non-transitory increase in price would not cause wireless prepaid MNOs that currently purchase their solutions from third-party vendors to switch to self-

sourcing. FAC ¶ 109. Plaintiff explains that a small increase in price would not be sufficient to offset the significantly higher costs of hiring IT personnel, purchasing hardware, developing the software to integrate the payment processing solution with the billing platform and many other IT systems, migrating data, and managing and maintaining the necessary infrastructure that would be required for an MNO to self-source its payment processing solution. Id.

Defendants point to Section 5.1 of the Merger Guidelines for the proposition that "firms that are vertically integrated—that is, those that self-supply an input or feature—should be included in the market." Defs.' Mot. 14. Defendants note that, as alleged by Plaintiff, four out of the six prepaid wireless MNOs in the United States currently self-supply their payment processing solution. FAC ¶ 78, 110[3]. According to Defendants, this fact alone proves that the remaining MNOs could and would self-supply in response to a hypothetical price increase from Defendants.

However, as Plaintiff argued at oral argument, the mere fact that four out of six MNOs currently self-supply, while persuasive, is not dispositive. As with the issue of the proper geographic market, the cases cited by Defendants are notable for the amount of evidence and testimony the courts considered before determining whether or not self-supplying consumers should be included in the relevant market. For example, in United States v. Sungard Data Systems, Inc., 172 F. Supp. 2d 172, (D.D.C. 2001), the court conducted a two-day trial before concluding that firms that establish their own internal computer disaster recovery system should be included within the relevant market of disaster recovery services. The court found that it was "clear from the record" that internal "hotsites" competed with the external shared hotsite

---

[3] The following MNOs self-supply and do not outsource their payment processing requirements: AT&T/Cricket, TracFone, U.S. Cellular, and Verizon. FAC ¶ 110. AT&T/GoPhone, Sprint, and T-Mobile/MetroPCS outsource their payment processing solutions. Id. at ¶ 107.

business. Id. at 187. In making this conclusion, the court considered internal company documents, statistics showing that the defendants were losing significant numbers of customers to internal solutions, and evidence that even more customers had threatened to switch to an internal solution. Id. at 188. Furthermore, the defendants submitted evidence to rebut the plaintiff's showing that a switch from an external to internal system would be prohibitive because of cost. Id. at 189.

Similarly, in Fed. Trade Commission v. Cardinal Health, Inc., 12 F. Supp. 2d 34, 38 (D.D.C. 1998), which both parties in this case rely on, the court considered the definition of the relevant market with respect to the wholesale distribution of prescription drugs. The issue was whether the wholesale drug market was composed of products and services provided by the wholesalers only or whether it also included distribution of prescription drugs by manufacturers, mail orders, and self-warehousing. Id. at 47. The court conducted a seven-week evidentiary hearing before concluding that, even though a significant portion of manufacturers and self-distributing retail chains could provide a substitute for the wholesalers' services, they were not properly included in the relevant market definition in light of the economic realities of the industry. Id. at 49. In addition, internal documents presented at trial revealed that the defendants themselves did not view the other forms of distribution to be viable competitors or substitutes. Id. at 49.

RealPage, Inc. v. Yardi Sys., Inc., 852 F. Supp. 2d 1215 (C.D. Cal. 2012) is particularly on point. The parties in RealPage were competitors in the real property management business. Id. at 1218. RealPage and Yardi were the only two competitors in the market for supplying vertically integrated cloud computing services for real property owners and managers. Id. at 1224. Real Page brought antitrust claims against Yardi and excluded from the relevant market

any "self-hosting of management software." Id. at 1218. The district court acknowledged that RealPage's market definition was "quite narrow"; however, the definition was not "facially unsustainable" because RealPage considered and rejected multiple conceivably interchangeable substitutes in "great factual detail." Id. at 1225. Notably, RealPage excluded self-hosting (similar to self-supply in this case) by using language very similar to what Plaintiff in the present case uses in the First Amended Complaint. Id. The district court denied the motion to dismiss the antitrust claims, explaining that the exclusion of "self-hosting of management software" did not render the relevant market inappropriate and that the resolution depended on issues of fact inappropriate for resolution at a motion to dismiss. Id.

As in RealPage, Plaintiff in this case considers and rejects the idea that a self-sourced payment processing solution is a reasonably interchangeable substitute in the Prepaid Mobile Phone Payment Processing Market. Ultimately, the parties' arguments turn on issues of fact. Therefore, at this stage, taking all of Plaintiff's factual allegations as true, self-supplying MNOs are properly excluded from the relevant market.

### ii.  Dominant share of the relevant market

In addition to defining the relevant market, Plaintiff must show that Defendants have market power within that market. Market power may be demonstrated through either of two types of proof. Rebel Oil, 51 F.3d at 1434. One type of proof is direct evidence of the injurious exercise of market power. Id. "The more common type of proof is circumstantial evidence pertaining to the structure of the market. To demonstrate market power circumstantially, a plaintiff must: (1) define the relevant market, (2) show that the defendant owns a dominant share of that market, and (3) show that there are significant barriers to entry and show that existing competitors lack the capacity to increase their output in the short run." Id. (citations omitted).

Assuming the relevant market is defined as Plaintiff has alleged, the only two competitors are Plaintiff and Defendants.[4] FAC ¶ 107. Based on the percentage of the prepaid wireless MNOs that are under contract with each supplier, Defendants supply payment processing solutions to 67% of the MNOs. Id. Alternatively, Plaintiff measures market share by identifying the percentage of subscribers whose payments are being processed by each supplier. Using that form of calculation, Defendants' share of the Payment Processing Market is "not less than 64.4%." Id. at ¶ 112. Under either form of calculation, Plaintiff alleges that Defendants control a sufficient amount of the market in order to demonstrate a dominant share of the market.

According to Defendants, Plaintiff's market share estimates are inaccurate because they do not account for the May 2013 merger between T-Mobile and MetroPCS, which resulted in MetroPCS becoming T-Mobile. FAC ¶¶ 29, 79(3), 107. Following this merger, T-Mobile began to consolidate vendors and requested proposals to provide a unified payment processing solution, including for the prior prepaid MetroPCS subscribers. Id. at ¶ 133. Plaintiff won the request for proposal and thus Plaintiff will ultimately take over the MetroPCS business share that Plaintiff currently attributes to Defendants. Id. ¶¶ 133, 135. Therefore, Defendants contend that the share of the market occupied by MetroPCS, 23.4%, that Plaintiff assigns to Defendants should be assigned to Plaintiff. Defendants argue that Plaintiff actually holds an additional 23.4% of the market and Defendants hold 23.4% less, which would reduce Defendants' market share to less than 50%. Defendants argue that, as a matter of law, they cannot be deemed to have market power if their share of the market is less than 50%. Defendants also argue that, once this Court

---

[4] The following brands use either Plaintiff or Defendants for their payment processing services: (1) AT&T/GoPhone; (2) Sprint Prepaid; (3) Sprint/boostmobile; (4) Sprint/Virgin mobile; (5) T-Mobile; and (6) T-Mobile/MetroPCS. FAC ¶ 107.

includes MNOs that self-supply in the relevant market, then Defendants' share of the market will decrease substantially.

The Court is troubled by the potentially misleading nature of Plaintiff's calculation of market share, if indeed Plaintiff knows that it is in the process of taking over the MetroPCS share of the market.[5] However, the Court is also required to view the facts as alleged in the complaint as true and, therefore, accept Plaintiff's allegation that Defendants control either 64.4% or 67% of the market. Courts generally require a 65% market share for a monopolization claim, see Image Technical Servs., 125 F.3d at 1206, and at least a 30% market share to state a claim for attempted monopolization, see Rebel Oil, 51 F.3d at 1439. Accordingly, the Court finds that Plaintiff sufficiently alleges market share.

      iii.   Barriers to entry

The final factor Plaintiff must plead to show market power is "entry barriers and the capacity of existing competitors to expand output." Rebel Oil, 51 F.3d at 1439. Even if Plaintiff succeeds in showing a substantial or dominant market share, it must show that "new rivals are barred from entering the market and show that existing competitors lack the capacity to expand their output to challenge the predator's high price." Id. "Entry barriers are additional long-run costs that were not incurred by incumbent firms but must be incurred by new entrants, or factors in the market that deter entry while permitting incumbent firms to earn monopoly returns." Id. (internal quotations and citations omitted). "The main sources of entry barriers are: (1) legal license requirements; (2) control of an essential or superior resource; (3) entrenched buyer

---

[5] At oral argument, Plaintiff's counsel argued that there were all kinds of market facts and customer relationships that could change between the filing of the complaint and trial. Because Defendants currently have the contract for MetroPCS payment processing, Plaintiff's counsel argued that the First Amended Complaint was accurate and must be assessed as pleaded.

preferences for established brands; (4) capital market evaluations imposing higher capital costs on new entrants; and, in some situations, (5) economies of scale." Id.

Plaintiff alleges the following barriers would face firms considering entry into the Payment Processing Market: the entrenched buyer preferences for industry-specific experience and technical expertise, the fact that solutions from generic or adjacent markets are not readily adaptable for use by MNOs, the sunk costs required for a new entrant to acquire the requisite assets and know-how, the limited number of potential customers, and the use of multi-year contracts, which result in infrequent demand, and high switching costs. FAC ¶¶ 95-97, 103-106, 118-20, 139.

Defendants argue that none of these factors support the conclusion that Defendants are either on the cusp of obtaining market power or already possess it. Defendants argue that because Plaintiff alleges that Defendants were able to enter into the sale of prepaid mobile phone payment processing solutions in the United States quickly and effectively, Plaintiff has shown a lack of barriers to entry. Defendants also argue that customers could vertically integrate (or self-supply), which is another form of entry or expansion. Finally, Defendants argue that because Plaintiff remains a competitor who is able to increase its output in the short term if Defendants attempted to raise prices, Plaintiff's claim fails.

The Court is not persuaded by Defendants' arguments. First, according to Plaintiff, the reason that Defendants were able to enter the market so quickly and efficiently is because they stole trade secrets from Plaintiff. Therefore, Defendants' entry cannot be used as proof of ease of entry into the market. Second, the argument regarding self-supply argument is addressed above. Finally, Plaintiff alleges that it will not be able to continue to compete with Defendant in the future, because of Defendants' conduct. Defendants' arguments contradict the factual allegations

in Plaintiff's First Amended Complaint, which must be taken as true. Plaintiff adequately alleges

barriers to entry. Accordingly, Plaintiff's allegations of relevant market and market power within

that market are sufficient to withstand the motion to dismiss.

**B.  Plaintiff fails to adequately allege anticompetitive conduct.**

Nevertheless, Plaintiff's monopolization and attempted monopolization claims fail

because Plaintiff fails to allege anticompetitive conduct undertaken to obtain or maintain such

power. See Kaiser Found. Health Plan, Inc. v. Abbott Labs., Inc., 552 F.3d 1033, 1043 (9th Cir.

2009) (citing United States v. Grinnell Corp., 384 U.S. 563, 570-71 (1966)). Plaintiff alleges that

Defendants' anticompetitive conduct consists of predatory pricing and bundled discounts. For the

following reasons, Plaintiff's allegations fail.

      i.  Predatory Pricing

The Ninth Circuit has explained how predatory pricing works:

> Predatory pricing occurs in two stages. In the first stage, or "price war" period, the
> defendant sets prices below its marginal cost hoping to eliminate rivals and increase its
> share of the market. During this phase, the predator, and any rival compelled to challenge
> the predatory price, will suffer losses. Though rivals may suffer financial losses or be
> eliminated as a result of the below-cost pricing, injury to rivals at this stage of the
> predatory scheme is of no concern to the antitrust laws. Only by adopting a long-run
> strategy is a predator able to injure consumer welfare. A long-run strategy requires the
> predator to drive rivals from the market, or discipline them sufficiently so that they do not
> act as competitors normally should. If the predator reaches this long-run goal, it enters the
> second stage, the "recoupment" period. It then can collect the fruits of the predatory
> scheme by charging supracompetitive prices—prices above competitive levels. The
> predator's hope is that the excess profits will allow it to recoup the losses suffered during
> the price war.

Rebel Oil, 51 F.3d at 1433-34 (internal citations omitted).

In order to state a claim for predatory pricing under § 2 of the Sherman Act, a plaintiff

must show (1) that the prices complained of are below an appropriate measure of the defendant's

costs, and (2) that the defendant has a dangerous probability of recouping its investment in

below-cost prices. <u>Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.</u>, 509 U.S. 209, 222-24 (1993). The Supreme Court has explained that "only below-cost prices should suffice . . . we have rejected elsewhere the notion that above-cost prices that are below general market levels or the costs of a firm's competitors inflict injury to competition cognizable under the antitrust laws." <u>Id.</u> at 223.

Plaintiff alleges that Defendants engaged in predatory pricing by offering a payment processing solution to T-Mobile that would have resulted in Defendants providing payment processing services to T-Mobile below Defendants' "average variable costs." FAC ¶ 134. In order to compete with Defendants and obtain the T-Mobile contract, Plaintiff agreed to match Defendants' bid. <u>Id.</u> at ¶ 135. However, Plaintiff alleges that it cannot sustainably continue to match Defendants' pricing and that if Defendants continue to submit bids "at or below its costs for prepaid wireless MNO payment processing services, [Plaintiff] will no longer be a viable competitor." <u>Id.</u> at ¶ 36. Furthermore, the First Amended Complaint alleges that, "on information and belief," Defendants are providing payment processing services to MetroPCS and Sprint at prices that are "below its average variable costs." <u>Id.</u> at ¶¶ 127, 131, 134.

Neither the Supreme Court nor this Circuit has concluded what is the appropriate measure of cost in a predatory pricing case. <u>Rebel Oil</u>, 146 F.3d at 1092. However, "[i]t is generally agreed that "the relation between the cost of producing a product and the price charged for it is the criterion for determining whether the price is predatory." <u>Id.</u> (citation omitted). The issue presented here is whether Plaintiff can use its own costs to calculate the "appropriate measure of the defendant's costs." <u>See</u> <u>Brooke Grp. Ltd.</u>, 509 U.S. at 222-24.

Plaintiff alleges that Defendants engaged in predatory pricing in order to exclude Plaintiff from providing payment processing services to three MNOs—MetroPCS, Sprint, and T-Mobile.

FAC ¶¶ 125-137. Plaintiff contends that it is reasonable for it to infer knowledge of Defendants' costs based on knowledge of its own costs and knowledge about Defendants' costs learned while preparing the unsuccessful joint bid for MetroPCS. Id. at ¶¶ 127 131, 134. In addition, Plaintiff contends that Defendants' costs must include the imputed costs of "lawfully acquiring the know-how to build the payment processing solutions that [Defendants] stole from [Plaintiff]" during the preparation of the MetroPCS joint bid. Id.

Plaintiff's allegations of Defendants' costs are entirely speculative. The Court does not find it reasonable to infer the amount of Defendants' costs based on Plaintiff's costs, given the undisputed facts that the payment processing systems are not identical and are highly customized for each customer. See FAC ¶¶ 93-99.

A recent case from the Second Circuit Court of Appeals is instructive. See Affinity LLC v. GfK Mediamark Research & Intelligence, LLC, 547 F. App'x 54, 56 (2d Cir. 2013). In Affinity, an advertising consultant, Affinity, filed suit against a competitor, GfK Mediamark, alleging predatory pricing and monopolization. The Second Circuit affirmed the district court's holding that Affinity did not plausibly allege that GfK Mediamark priced below an appropriate measure of costs, because:

> "Affinity references its own costs in an attempt to allege that GfK MRI priced below an "appropriate measure of [ ] costs." As the district court pointed out, however, such an allegation is "entirely conclusory and unavailing," because GfK MRI's "experience in the industry ... spann[ed] decades beyond Plaintiffs," and Affinity makes no allegations in the amended complaint to "undercut the obvious inference that Defendant realized efficiencies in developing, marketing, and delivering its services due to its size." Affinity, therefore, has provided no basis to infer reasonably either that GfK MRI has the same cost structure as Affinity or suffered losses on its pricing schemes.

(citation omitted). As in Affinity, this Court finds that Plaintiff has provided no basis to reasonably infer that Defendants would incur the same costs as Plaintiff in creating a payment processing system.

28 – OPINION & ORDER

Plaintiff also appears to argue that merely alleging that Defendants priced their product below their costs is sufficient to avoid a Rule 12(b)(6) dismissal. However, the cases cited by Plaintiff in support of this proposition are distinguishable. For example, in <u>Solyndra Residual Trust, by & through Neilson v. Suntech Power Holdings Co.</u>, 62 F. Supp. 3d 1027 (N.D. Cal. 2014), a domestic solar panel manufacturer (Solyndra) alleged that various China-based solar panel manufacturers engaged in predatory pricing to drive domestic manufacturers out of business by selling their Chinese-made panels at below-market prices in the United States. <u>Id.</u> at 1033. Solyndra alleged that the defendants used an annual international forum to communicate with one another and reach agreements to fix and lower prices. <u>Id.</u> at 1037. According to Solyndra, after each forum, prices charged by the defendants dropped, notwithstanding rising demand for solar panels. <u>Id.</u> at 1036-37. For example, after the second forum, the defendants lowered their prices by 40%. <u>Id.</u> at 1037. After the third forum, the defendants' prices fell 18%. <u>Id.</u> Following the fourth forum, prices dropped another 20%, shocking "even seasoned industry analysts, who had predicted price reductions of only 5% per year." <u>Id.</u> These allegations are far more concrete than the present case, where Plaintiff offers no allegation of Defendants cutting costs by any particular amount or percentage.

Similarly, in another case cited by Plaintiff, <u>Growers 1-7 v. Ocean Spray Cranberries, Inc.</u>, No. CIV.A. 12-12016-RWZ, 2014 WL 1764533, at *6 (D. Mass. May 2, 2014), the plaintiffs showed a sharp drop in price that restricted competition. The plaintiffs alleged facts demonstrating that the defendants' auction to sell the plaintiffs' products was fixed in a way that harmed the plaintiffs. <u>Id.</u>

In another case, <u>Syncsort Inc. v. Innovative Routines Int'l, Inc.</u>, No. CIV. 04-3623 (WHW), 2005 WL 1076043, at *5 (D.N.J. May 6, 2005), the court concluded that a defendant had sufficiently pled a predatory pricing counterclaim based on the following allegation:

> On information and belief, Syncsort has sold its UNIX software product below Syncsort's costs to produce the product in order to entice consumers to purchase the Syncsort UNIX software product.... Syncsort has induced consumers who were negotiating to purchase IRI's UNIX software product to reveal to Syncsort IRI's pricing and quotation information so that Syncsort could undersell IRI with that consumer. [O]n at least one occasion, in order to eliminate IRI as a competitor with respect to a particular customer that had made a tentative agreement with IRI, Syncsort offered to provide to the customer a free copy of Syncsort's product and to pay off any debt the customer might have had to IRI with respect to the customer's tentative agreement with IRI.

While the defendant did not specifically allege an amount by which Syncsort sold its product below costs, the fact that Syncsort offered to provide a free copy of its product and pay off any customer debt clearly suggests that Syncsort was offering its product below its costs.

While the above cases do not support Plaintiff's arguments, the Court acknowledges that Plaintiff does cite two cases in which the courts denied a motion to dismiss a predatory pricing claim even though the plaintiff's allegations regarding the defendant's costs were conclusory. In <u>Jensen Enterprises Inc. v. Oldcastle, Inc.</u>, No. C 06-00247 SI, 2006 WL 2583681, at *7 (N.D. Cal. Sept. 7, 2006), the plaintiff sufficiently alleged predatory pricing by contending that the defendant was charging "uneconomically low" prices, because the court determined that "uneconomically low" could be equated with "below-cost." And in <u>Barr Labs., Inc. v. Abbott Labs.</u>, No. CIV. 85-4764 (AET), 1988 WL 42339, at *3 (D.N.J. May 3, 1988), the court determined that the plaintiff was entitled to conduct discovery in order to prove its allegation that the defendant had engaged in below-cost pricing.

Nevertheless, the Court is unpersuaded by these two district court cases that are not controlling and were issued prior to the Supreme Court's ruling in <u>Bell Atlantic Corp. v.</u>

Twombly, 550 U.S. 544 (2007), which warned courts of the expensive nature of antitrust discovery and warned against allowing a case to proceed when there is no reasonable likelihood that the plaintiff can construct a claim from the events alleged in the complaint. Accordingly, the Court finds the more recent decision of the Second Circuit in Affinity as well as numerous district court cases more persuasive.

Furthermore, Plaintiff does not adequately make any allegation regarding Defendants' prices. Plaintiff alleges that Defendants priced its billing platform and payment processing solutions as an "integrated bundle" to MetroPCS and Sprint. Id. at ¶¶ 126, 130. Plaintiff alleges that Defendants created a "copycat" payment processing solution and, therefore, it is reasonable to rely in party on Plaintiff's knowledge of its own costs and its ability to disaggregate the portion attributable to fraud protection, a feature that Defendants do not offer. Yet, Plaintiff offers no support for this allegation and the Court finds no reason to infer that Plaintiff is able to determine the disaggregated cost of Defendants' payment processing solution.

In sum, the First Amended Complaint lacks factual support for the inference that Defendants priced their payment processing solutions below their own costs. Plaintiff does not identify any figures or estimates of Defendants' costs, nor does Plaintiff demonstrate that Defendants would have suffered any losses on their pricing schemes. Plaintiff does not justify why its own costs are an appropriate measure of Defendants', considering that they offer different products. Nor does Plaintiff explain why the price of Defendants' MetroPCS bid is appropriate to use in determining whether Defendants' bids to Sprint and T-Mobile are below its average variable cost. Even if, as Plaintiff alleges, Defendants created a "copycat" payment processing solution, Plaintiff provides no support for the inference that Defendants would incur the same costs as Plaintiff in creating this solution. Notably, Defendants' product does not offer a

comparable level of fraud detection as Plaintiff's. This alone could lead to a significant cost difference, yet Plaintiff does not address this point. The arguments that the costs must have been the same as Plaintiff's are conclusory and unavailing. In the absence of plausible allegations regarding Defendants' costs or prices, Plaintiff fails to state a predatory pricing claim.

          ii.  Bundled Discounts

Plaintiff also alleges that Defendants engaged in anti-competitive conduct by offering bundled discounts that were predatory or exclusionary. As to bundled discounts, the Ninth Circuit has held that:

> To prove that a bundled discount was exclusionary or predatory for the purposes of a monopolization or attempted monopolization claim under § 2 of the Sherman Act, the plaintiff must establish that, after allocating the discount given by the defendant on the entire bundle of products to the competitive product or products, the defendant sold the competitive product or products below its average variable cost of producing them.

Cascade Health Solutions v. PeaceHealth, 515 F.3d 883, 910 (9th Cir. 2008). The Supreme Court has instructed that, because of the benefits that flow to consumers from discounted prices, price cutting is a practice the antitrust laws aim to promote. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 594 (1986) ("[C]utting prices in order to increase business often is the very essence of competition."). "Consistent with that principle, [courts] should not be too quick to condemn price-reducing bundled discounts as anticompetitive, lest we end up with a rule that discourages legitimate price competition. Cascade Health Solutions, 515 F.3d at 896.

Here, Plaintiff alleges that Defendants sold a billing platform and a payment processing solution to MetroPCS and Sprint as a bundle with a below-cost discount, which had the anticompetitive effect of excluding Plaintiff from the Payment Processing Market. FAC ¶¶ 126-27, 130-32. Plaintiff alleges that "after allocating the entire discount to the purchase of payment

processing services, [Defendants] sold payment processing services below its average variable cost of producing them." FAC ¶ 132.

Plaintiff's bundled pricing allegation fails for two reasons. First, as to MetroPCS, Defendants had already sold MetroPCS a billing platform and there is no allegation that Defendants discounted the pricing for its billing platform when it sold the payment processing system to MetroPCS. Therefore, there is no allegation of actual "bundling" of products for sale to MetroPCS.[6] Second, and most importantly, Plaintiff's claims as to costs are the same as those used in the predatory pricing allegation, which the Court already addressed above.

### C. Plaintiff fails to adequately allege an antitrust injury.

Antitrust injury "is an element of all antitrust suits." Rebel Oil, 51 F.3d at 1433. Accordingly, the lack of antitrust injury serves as an independent basis for dismissal. LiveUniverse, Inc. v. MySpace, Inc., 304 F. App'x 554, 557 (9th Cir. 2008).

To assert a claim under § 2 of the Sherman Act, a plaintiff must have suffered an "antitrust injury," meaning an injury "of the type the antitrust laws were intended to prevent and that flows from that which makes the defendant's acts unlawful." Brunswick Corp v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977). Plaintiff "must prove that [its] loss flows from an anticompetitive aspect or effect of the defendant's behavior, since it is inimical to the antitrust laws to award damages for losses stemming from acts that do not hurt competition." Rebel Oil Co., 51 F.3d at 1433 (9th Cir. 1995) (citing Atlantic Richfield Co., 495 U.S. at 334); see also, Metro Indus., Inc. v. Sammi Corp., 82 F.3d 839, 847 (9th Cir. 1996) ("a plaintiff must allege 'antitrust injury,' that is, that the agreement at issue actually caused injury to competition within

---

[6] Defendants argue that the same argument applies to the Sprint sale. However, the FAC is more ambiguous as to Sprint. Taking the facts as alleged by Plaintiff, the Court finds that they do state that the two products were bundled for sale to Sprint. See FAC ¶¶ 82, 86, 107, 111, 130.

a market, beyond its impact on the plaintiff."). As discussed above, Plaintiff fails to show that Defendants engaged in anticompetitive conduct. Accordingly, Plaintiff has not suffered an antitrust injury resulting from Defendants' anticompetitive behavior. Therefore, Plaintiff's claims fail.

## III.    Monopoly Leveraging—Claim 3

Plaintiff brings an independent claim for monopoly leveraging in violation of the Sherman Act § 2. Plaintiff alleges that Defendants leveraged their monopoly power in the Prepaid Mobile Phone Billing Platform Market for the purpose and with the specific intent to acquire a monopoly in the Prepaid Mobile Phone Payment Processing Market. FAC ¶ 188. Plaintiff further alleges that Defendants have acquired, or are attempting to acquire, a monopoly in the Prepaid Mobile Phone Payment Processing Market, in order to enhance and maintain their monopoly in the Prepaid Mobile Phone Billing Platform Market. Id. at ¶ 189.

Monopoly leveraging constitutes the use of monopoly power in one market to acquire, or attempt to acquire, monopoly power in a related product market. Image Technical Servs., 125 F.3d at 1208. "Monopoly leveraging is just one of a number of ways that a monopolist can permissibly benefit from its position. This does not mean, however, that such conduct is anticompetitive." Alaska Airlines, Inc. v. United Airlines, Inc., 948 F.2d 536, 548 (9th Cir. 1991). The Supreme Court has established that a claim for monopoly leveraging "presupposes anticompetitive conduct." Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP, 540 U.S. 398, 415 n.4 (2004). That is, there must be some other conduct that is actionable for Plaintiff's claim to be cognizable. See Alaska Airlines, 958 F.2d at 549.

The parties dispute whether monopoly leveraging can be pled as a stand-alone claim, or whether it must be incorporated into a claim for monopolization or attempted monopolization.

See, e.g., Jensen Enterprises Inc. v. Oldcastle, Inc., No. C 06-00247 SI, 2006 WL 2583681, at *6

(N.D. Cal. Sept. 7, 2006) (holding that monopoly leveraging can only be pled as part of a

monopolization or attempted monopolization claim) (citing Alaska Airlines, 948 F.2d at 546);

Stein v. Pac. Bell, 173 F. Supp. 2d 975, 983 (N.D. Cal. 2001) aff'd in part, vacated in part,

remanded, 172 F. App'x 192 (9th Cir. 2006) ("If there is a dangerous probability that a monopoly

will be created by leveraging conduct, then the conduct will be reached under the doctrine of

attempted monopoly.") (citation omitted).

 The Court finds it unnecessary to resolve this dispute. Plaintiff's monopoly leveraging

claim fails for the same reasons as Plaintiff's other antitrust claims fail—Plaintiff fails to allege

anticompetitive conduct. Accordingly, Plaintiff's monopoly leveraging claim is dismissed.

## IV. Motion to Transfer Venue

 Plaintiff originally filed this action in Oregon state court on June 30, 2014 and

Defendants removed the case to this Court on July 17, 2014. On January 13, 2015, this Court

granted Defendants' motion to dismiss Plaintiff's fraud claim and denied Defendants' motion to

dismiss Plaintiff's claims of trade secret misappropriation and breach of contract. Instead of

amending the fraud claim, Plaintiff alleged three new antitrust claims in an amended complaint.

Defendants moved to dismiss the antitrust claims on May 18, 2015. Two days later, on May 20,

2015, Defendants filed the present motion to transfer, explaining that "[Plaintiff's] new causes of

action compel a change of venue." Defs.' Mot. Transfer 1, ECF 68.

 Courts employ a two-step analysis when determining whether transfer is proper. First, a

court must ask "whether the transferee district was one in which the action might have been

brought by the plaintiff." Hoffman v. Blaski, 363 U.S. 335, 343–44 (1960). Second, if the

moving party has made this threshold showing, courts may consider "individualized, case-by-

case consideration[s] of convenience and fairness." <u>Stewart Org., Inc. v. Ricoh Corp.</u>, 487 U.S. 22, 29 (1988). In addition to considering the convenience of the parties and the witnesses, the court may consider, in "the interest of justice," a number of factors including the plaintiff's choice of forum, the location where the relevant agreements were negotiated and executed, the state that is most familiar with the governing law, the respective parties' contacts with the forum, the contacts relating to the plaintiff's cause of action in the chosen forum, the differences in the costs of litigation in the two forums, the availability of compulsory process to compel attendance of unwilling non-party witnesses, the ease of access to sources of proof, and the relevant public policy of the forum state, if any. <u>Jones</u>, 211 F.3d at 498-99.

**A.    Venue is proper in the Northern District of Texas.**

Plaintiff does not dispute that the Northern District of Texas is a permissible forum. Defendants do business in the Northern District of Texas, rendering venue proper in that district. 28 U.S.C. § 1391(b)(1), (c)(3); <u>see also</u> 15 USC §22 (an antitrust suit against a corporation may be brought in any district where the defendant transacts business). Accordingly, the decision whether to grant Defendants' motion to transfer is based on this Court's considerations of convenience and fairness.

**B.    The balance of the convenience and fairness factors weigh against transfer.**

Defendants argue that Plaintiff's addition of antitrust claims compels a change of venue. Defs.' Mot. Transfer 1, ECF 68. However, as discussed above, the Court dismisses Plaintiff's antitrust claims. The two claims that remain in this case, trade secret misappropriation and breach of contract, are the same claims that Plaintiff has brought since the beginning of this action in June of 2014. Defendants removed the case to this Court in July 2014. Therefore,

Defendants' argument as to why a change of venue is suddenly necessary is not persuasive. Nevertheless, the Court considers the factors of convenience and fairness.

i.   Convenience of the witnesses

The parties' primary dispute centers on whether Oregon or Northern Texas is more convenient for witnesses. Convenience of witnesses is often the most important factor in determining whether or not to transfer a case. Partney Const., Inc. v. Ducks Unlimited, Inc., No. CIV. 08-574-SU, 2008 WL 4838849, at *3 (D. Or. Nov. 3, 2008) (citation omitted). The "convenience of the witnesses" factor takes into account the convenience to both party and non-party witnesses; however, courts give more consideration to non-party witnesses, as opposed to witnesses who are employees of a party to the litigation. Id. The court considers not only the number of witnesses located in the respective districts, but also the nature and quality of their testimony, as it relates to the issues in the case. Id.

Defendants present three types of witnesses they intend to call at trial. First, certain MetroPCS employees are key witnesses regarding whether or not Defendants schemed to exclude Plaintiff from the MetroPCS account. Second, employees of MNOs that Plaintiff alleges would be harmed by Defendants' anticompetitive acts will be necessary to testify, as they are supposed beneficiaries of Plaintiff's antitrust action. Third, several of Defendants' own current and former employees are expected to testify. Defendants argue that, if the case remains in Oregon, a substantial risk exists that many crucial witnesses would decline to travel to Oregon. Defendants argue that they would be unable to compel out-of-state witnesses' attendance under Rule 45 and thus would be deprived of any opportunity to present these witnesses at trial.

Plaintiff presents two kinds of witnesses it intends to call at trial—several former employees and several current employees. As discussed above, the role of the Court is not

merely to tally the number of witnesses, but rather to evaluate the materiality of the testimony the witnesses may provide. See Herbert Ltd. P'ship v. Elec. Arts Inc., 325 F. Supp. 2d 282, 286 (S.D.N.Y. 2004). Former employees are not true "non-parties" for purposes of venue analysis, because "they are more likely willing to attend trial than other non-party witnesses." Pecorino v. Vutec Corp., 934 F. Supp. 2d 422, 437 (E.D.N.Y. 2012) (citing Pilevesky v. Suntrust Bank, No. 10 Civ. 2290, 2010 WL 4879006, at *3 (E.D.N.Y. Nov. 22, 2010) (recognizing former employees as non-party witnesses); Praxair, Inc. v. Morrison Knudsen Corp., No. 00 Civ. 892, 2001 WL 118585, at *4 (W.D.N.Y. Feb. 6, 2001) ("former employees are more likely to willingly attend than are non-party witnesses"). Nonetheless, "the convenience of party-witnesses is still relevant and thus not wholly insignificant." Pilevesky, 2010 WL 4879006, at *3.

Because this Court dismisses Plaintiff's antitrust claims, the Court assumes that Defendants will no longer need to call witnesses from MNOs to testify regarding the harm from Defendants' alleged anticompetitive conduct. Therefore, the Court does not consider those proposed witnesses in its analysis below.

The parties disagree about the location of some of the witnesses. Based on all of the parties' submissions, the Court understands Plaintiff's potential witnesses to be as follows: four current employees who live in Portland, five former employees who live in Portland, and one former employee who lives in Seattle. Assuming the facts as presented by Plaintiff are true, Defendants intend to present the testimony of four non-party witnesses who live in Texas, two former employees who live in Texas, three current employees who live in Texas, and several other witnesses who live neither in Texas nor in Oregon. Even recognizing the weight given to non-party witnesses, the Court does not find that this factor weighs heavily in either party's favor.

ii.    Convenience of the parties

A plaintiff's choice of forum is generally accorded great weight. Lou v. Belzberg, 834 F.2d 730, 739 (9th Cir. 1987). A defendant must make a strong showing of inconvenience to upset a plaintiff's choice of forum. Creative Tech., Ltd. v. Aztech Sys, 61 F.3d 696, 703 (9th Cir. 1995); see also Decker Coal Co. v. Commonwealth Edison Co., 805 F.2d 834, 843 (9th Cir. 1986) (explaining that a court should give the plaintiff's choice of forum great deference unless the defendant can show that other factors of convenience clearly outweigh the plaintiff's choice). However, a plaintiff's choice of forum may receive less weight "if the operative facts did not occur within the forum of original selection and that forum has no particular interest in the parties or the subject matter." Partney Const., 2008 WL 4838849, at *2 (citing Pacific Car & Foundry Co. v. Pence, 403 F.2d 949, 954 (9th Cir. 1968).

Defendants argue that this is an action without a significant connection between the current forum and material facts. Defendants argue, therefore, that the deference typically given to a plaintiff's choice of forum does not apply in this case.

Admittedly, most of the key acts relevant to Plaintiff's claims did not occur in Oregon. With the exception of two meetings, all of the in-person exchange of documents and information between the parties occurred either in Texas or in other locations. All of the meetings between Defendants and MetroPCS regarding the development of a payment solution for MetroPCS occurred in Texas. The development of Defendants' payment processing solution occurred in Seattle and India. At least some of the MNOs have significant corporate operations in Texas, whereas none of them are based in Oregon.

Several cases provide guidance to this Court's decision. In Ventress v. Japan Airlines, 486 F.3d 1111 (9th Cir. 2007), a flight engineer and a commercial pilot sued Japan Airlines and

other entities in California, bringing claims related to their employment with the airline. The

Ninth Circuit upheld the California district court's decision to transfer the case to Hawaii

because the flights at issue in the case operated in Thailand, Hawaii and Japan; the plaintiffs both

resided in Hawaii while employed; all communication between plaintiffs and the airline during

their employment took place in Hawaii; the termination decision was made in Hawaii; most

potential witnesses resided in Hawaii and Japan; and most of the documentary evidence,

including the personnel files, were located in Hawaii. Id. at 1118-19.

In Partney Const., Inc. v. Ducks Unlimited, Inc., No. CIV. 08-574-SU, 2008 WL

4838849 (D. Or. Nov. 3, 2008), the district court transferred a breach of contract dispute to

Nevada from Oregon because the plaintiff's residence was the only connection to Oregon. All of

the conduct giving rise to the claims occurred at a job site in Nevada and Nevada law was likely

to govern the contractual dispute. Id. at *2. Furthermore, the court was persuaded by the

convenience of the forum for the witnesses and the fact that the state of Nevada and its residents

would have a greater interest in the resolution of a dispute involving a project to rehabilitate

Nevada's wetlands. Id. at *5.

In Lou v. Belzberg, 834 F.2d 730 (9th Cir. 1987), the Ninth Circuit transferred a

shareholder derivative suit from the Central District of California to the Southern District of New

York. The Court first noted that, when an individual brings a derivative suit or represents a class,

the named plaintiff's choice of forum is given less weight. Id. at 739. Furthermore, the Court

concluded that the stock purchase agreement was negotiated and executed in New York, the

majority of witnesses lived in New York, all of the defendants were subject to personal

jurisdiction in New York, and the costs of litigation would be drastically reduced if the case were

heard in New York. Id.

Here, while many of the important meetings between Plaintiff and Defendants took place in Texas, this case has much more of a connection to Plaintiff's chosen forum than the facts demonstrated in <u>Ventress</u>, <u>Partney Construction</u>, and <u>Lou</u>. In this case, Plaintiff's headquarters and largest technical operations reside in Oregon. Two meetings between the parties occurred in Oregon. Fieldhouse Decl. ¶ 3, ECF 81. Throughout the MetroPCS collaboration and the acquisition discussions, Plaintiff provided business and technical information to Defendants from Oregon via telephone and email. Hassold Decl. ¶ 5, ECF 82. Plaintiff's trade secrets continue to be located in Oregon. Fieldhouse Decl. ¶ 9, ECF 81; Hassold Decl. ¶ 7. Defendants accessed Plaintiff's servers in Oregon to obtain documents during the second acquisition attempt. Fieldhouse Decl. ¶ 8, ECF 81. In sum, Plaintiff is entitled to deference as to its choice of venue, even though Defendants have some persuasive arguments regarding the lack of connection between the operative facts of this case and Oregon.

      iii.    Other factors "in the interest of justice"

Neither party makes an extensive argument regarding the ease of access to the evidence. Defendants argue that any presentations that were prepared in connection with the parties' joint pitches to MetroPCS and any instructions from MetroPCS to Defendants regarding the development of an independent payment processing solution are likely located in Texas. Plaintiff counters that any documents and information that were presented at meetings, even if those meetings took place in Texas, would reside with the parties who presented at the meeting. In addition, Plaintiff argues that, because Defendants appear to acknowledge that the design and development of Defendants' payment processing solution took place in Seattle, it is reasonable to assume that there is evidence in Seattle. The Court concludes that the evidence is likely located in multiple locations; accordingly, this factor is neutral.

As to the familiarity of each forum with the applicable law, the law governing any potential antitrust claims is federal and, therefore, the Court can presume all federal courts have equal familiarity with the applicable law. The law governing the breach of contract claim is subject to the parties' choice of law provision, which designates New York as the applicable law. And while the parties vigorously argue about which state law applies to the trade secret misappropriation claim, both Texas and Oregon have adopted the Uniform Trade Secrets Act ("UTSA") and thus the laws of both states are likely to yield the same results.[7] In sum, the Court finds that this factor is neutral.

Defendants argue that Texas has a greater local interest in the controversy because a significant number of prepaid mobile phone payment processing solutions either have significant operations in Texas or were once headquartered there. Plaintiff disputes this characterization of Richardson, Texas as a center of MNO operations. Furthermore, Plaintiff argues that this case involves an Oregon plaintiff, whereas Defendants are not incorporated in Texas nor do they have their principal place of business in Texas. Because the antitrust claims are dismissed, Defendants' primary argument on this factor is not persuasive. Accordingly, this factor weighs in favor of Plaintiff.

Neither party makes any argument regarding the relative court congestion and time of trial in each forum. However, Plaintiff does point out that this case has been in this Court for

---

[7] This Court concluded in a previous Opinion & Order that Oregon law applied to the trade secret claim. See Opinion & Order, January 13, 2015, p. 17 (ECF 42). At that stage in this action, Defendants did not dispute that Oregon law applied, but they stated that if Plaintiff "is given leave to amend, and identifies the location of the alleged misappropriation, [Defendants] may assert that the law of that state or nation governs." Defs.' Mot. to Dismiss 17, n. 11. While Plaintiff did amend its complaint to add the antitrust claims, Defendants do not point to any new information regarding the location of the alleged misappropriation that would justify a new argument from Defendants as to which state law applies.

almost a year and the Court has already familiarized itself with the issues of the case and has set a global case schedule in the case. This factor weighs in favor of Plaintiff.

**C.    The motion to transfer is denied.**

After considering the factors regarding the convenience of the parties and witnesses and the interest of justice, the Court concludes that Defendants have not made a strong enough showing to warrant transferring the venue from Plaintiff's chosen forum.

## CONCLUSION

Defendants' motion to dismiss [65] Plaintiff's antitrust claims is granted. Defendants' request for judicial notice [67] is granted in part and denied in part. Defendants' motion to change or transfer venue [68] is denied. The case schedule proposed by the parties and adopted in this Court's Scheduling Order [62] on May 15, 2015, remains in place.

IT IS SO ORDERED.

Dated this _____3_____ day of ____September____, 2015.

_____
MARCO A. HERNÁNDEZ
United States District Judge

43 – OPINION & ORDER