IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

VESTA CORPORATION,

        Plaintiff,

    v.

AMDOCS MANAGEMENT
LIMITED and AMDOCS, INC.,

        Defendants.

No. 3:14-cv-1142-HZ

OPINION & ORDER

Erick J. Haynie
Stephen English
Julia E. Markley
PERKINS COIE, LLP
1120 NW Couch Street, 10th Floor
Portland, OR 97209

    Attorneys for Plaintiff

Andrew G. Klevorn
Bruce G. Vanyo
Yonaton M. Rosenzweig
Jeffrey A. Finn
KATTEN MUCHIN ROSENMAN, LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067

Richard H. Zelichov
KATTEN MUCHIN ROSENMAN, LLP
525 West Monroe Street
Chicago, IL 60661

Joshua L. Ross
Robert A. Shlachter
Timothy S. DeJong
STOLL STOLL BERNE LOKTING & SHLACHTER, PC
209 SW Oak Street, Fifth Floor
Portland, OR 97204

      Attorneys for Defendants

HERNÁNDEZ, District Judge:

Defendants Amdocs Management Limited and Amdocs, Inc. bring this Motion to Exclude and Strike Plaintiff's Late Identified Alleged Trade Secrets [483]. For the reasons that follow, the Court grants in part Defendants' motion.

## BACKGROUND

Plaintiff Vesta, an electronic payments and fraud prevention technology company, has sued Defendants Amdocs Management Limited and Amdocs, Inc. (collectively, "Defendants"), telephone billing software and services companies, for breach of contract and misappropriation of trade secrets. Fourth Am. Compl. ("FAC") Intro., ECF 405. Beginning in 2006, the parties collaborated with one another to integrate their services and platforms in order to appeal to their shared customer base. *Id.* at ¶ 11. In 2009, the parties began working jointly to market their respective services. *Id.* at ¶ 12. Since 2010, Defendants have twice approached Plaintiff about the possibility of Defendants acquiring Plaintiff. *Id.*

The parties entered into a series of Non-disclosure/Confidentiality Agreements to preserve their confidentiality while sharing information in their effort to develop these joint services and products. *Id.* at ¶¶ 13–15. The first non-disclosure agreement was entered into in

2 – OPINION & ORDER

2006, and confidential information was exchanged in connection with joint projects for customers such as MetroPCS, Vodafone, T-Mobile, and Boost Mobile. *Id.* at ¶¶ 21–22.

Plaintiff alleges that Defendants breached these non-disclosure agreements and stole trade secrets that were shared in the course of this collaboration. Specifically, Plaintiff alleges that in the course of jointly collaborating on marketing and the possibility of the acquisition of Plaintiff by Defendants, Plaintiff shared "highly confidential and proprietary information," which Defendants used and relied upon "improperly to create, price and sell a competing product in order to increase its profits." *Id*. at Intro. Plaintiff alleges that Defendants "used [their] knowledge of Vesta's Confidential Solution Methods and Vesta's Confidential Risk Information to displace Vesta and take over payment processing services for all of Sprint's prepaid brands (Sprint, Boost Mobile, Virgin Mobile, and Assurance)." *Id.* at ¶ 64. As a result of Defendants' misappropriation and breach of contract, Plaintiff alleges it "suffered lost profits and royalties on various accounts, including MetroPCS, Sprint and T-Mobile." *Id.* at ¶¶ 79, 85, 95, 108.

Defendants' current motion revolves around an issue that is not unfamiliar to this Court: the definition of Plaintiff's trade secrets. Defendants have twice moved to compel a more particular disclosure of Plaintiff's trade secrets. Defs.' Mot. Prot. Order, ECF 141; Defs.' Mot. Evid'y Sanc., ECF 182. On both occasions, this Court has required Plaintiff to describe its trade secrets with reasonable particularity. Opinion & Order, November 30, 2015, ECF 141; Opinion & Order, April 1, 2016, ECF 219 ("April O&O"). On April 26, 2016, Plaintiff complied with the Court's order by supplementing its response with a "three-column, 22-page chart listing 19 categories of technical information, plus a description of its alleged trade secret methods, code or architecture within the categories." Defs.' Mot. Exclude & Strike Trade Secrets 5 ("Defs.' Mot."), ECF 483; Rosenzweig Decl. Ex. 5, ECF 484.

Fact discovery ended on June 6, 2017. Throughout the summer, the parties engaged in expert discovery, and on July 24 and 25, 2017, Plaintiff disclosed three expert reports that Defendants assert contain new trade secrets. Defs.' Mot. 7. Specifically at issue are portions of the expert reports of Rene Pelegero, George Edwards, and Stephen Kursh. Rosenzweig Decl. ¶ 20; Haynie Decl. Exs. F ("Edwards Report"), G ("Kursh Report"), M ("Pelegero Report"), ECF 505. Defendants challenge the experts' discussion of ten documents that allegedly constitute four new trade secrets:

> (1) 2010 emails regarding a joint pitch to MetroPCS;
> (2) The "Payments Architecture" slideshow;
> (3) Version 0.2 of the Vesta Scope of Services document; and
> (4) The 2008 API for Boost Mobile;

Defs.' Mot. 7.

Unable to resolve the issue informally, Rosenzweig Decl., Exs. 9, 10; Haynie Decl. ¶ 5, Defendants filed the present motion on September 11, 2017, seeking to exclude and strike this evidence. Oral argument was held on December 18, 2017.

## STANDARDS

Federal Rule of Civil Procedure 37 provides sanctions for "failure to make disclosures or to cooperate in discovery." Fed. R. Civ. P. 37. Under Rule 37(c), if a party fails to supplement their initial disclosures or responses, "the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. Pro. 37(c)(1). This functions as an "automatic sanction" against the failing party. *Id.* (1993 advisory committee note). To avoid sanctions, "the burden is on the party facing sanctions to show harmlessness." *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1107 (9th Cir. 2001). In the Ninth Circuit, exclusion sanctions may be imposed "in the absence of any willfulness, fault, or bad faith on the part of the dilatory party,

even where its imposition may render it difficult or impossible for that party to prove his or her case." *Bixby v. KBR Inc.*, 282 F.R.D. 521, 532 (D. Or. 2011) (citing *Yeti by Molly,* 259 F.3d at 1106). In lieu of or in addition to this sanction, the court "may order payment of the reasonable expenses, may inform the jury of the party's failure, and may impose other appropriate sanctions, including any of those listed in Rule 37(B)(2)(A)(i)-(iv)." Fed. R. Civ. P. 37(c)(1).

Under Rule 37(b), when a party "fails to obey an order to provide or permit discovery," the court may order sanctions including—but not limited to—"prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence." Fed. R. Civ. Pro. 37(b)(2)(A)(ii). These sanctions are within the discretion of the trial court. *Id.* ("If a party . . . fails to obey an order to provide or permit discovery . . . the court where the action is pending *may* issue further just orders." (emphasis added)); *see also Liew v. Breen*, 640 F.2d 1046, 1050 (9th Cir. 1981) ("Imposition of sanctions under Rule 37(b), and the selection of the particular sanction, are matters left to the discretion of the trial court.").

**DISCUSSION**

Defendants request that the Court exclude and strike Plaintiff's late identified trade secrets. Defendants assert that Plaintiff violated Rule 37 when it submitted the reports of experts Rene Pelegero, George Edwards, and Stephen Kursh on July 24 and 25, 2017. Defs.' Mot. 8, 11. Defendants argue that these reports identified new trade secrets not included in Plaintiff's interrogatory response and without requesting leave from the Court to supplement the response. *Id*. The new trade secrets are comprised of ten specific documents that, taken together, allegedly constitute four trade secrets: (1) 2010 emails regarding a joint pitch to MetroPCS, (2) the "Payments Architecture" slideshow, (3) Version 0.2 of the Vesta Scope of Services document, and (4) The 2008 API for Boost Mobile. Plaintiff responds by asserting that this evidence falls

within the scope of their existing Trade Secrets Nos. 1 and 8 as identified in Plaintiff's amended response to Defendants' Interrogatory 16. Pl.'s Resp. 10, ECF 504. Because Defendants had notice of these documents, Plaintiff alleges that it was under no obligation to supplement its response. *Id.* As discussed in more detail below, the Court is only deciding whether these documents are new trade secrets as used by Plaintiff's experts and, if so, whether Rule 37 sanctions are warranted at this time.

I.  **Plaintiff's Trade Secrets**

As a preliminary matter, the Court must determine whether this evidence constitutes new trade secrets or is instead additional evidence of the alleged misappropriation of Plaintiff's trade secrets. In its April, 1, 2016 Opinion and Order, the Court reiterated that "Plaintiff is required to identify the trade secrets it claims Defendants misappropriated with reasonable particularity before Defendants are required to produce their confidential information and trade secrets to Plaintiff in discovery." April O&O at 4. In doing so, the Court adopted the *BioD, LLC. v. Amnio Tech., LLC*, standard for reasonable particularity: "a description of the trade secrets at issue that is sufficient to (a) put a defendant on notice of the nature of the plaintiff's claims and (b) enable the defendant to determine the relevancy of any requested discovery concerning its trade secrets." *Id.* at 5 (quoting *BioD LLC v. Amnio Tech., LLC,* 2:13-cv-1670-HRH, 2014 WL 3864658, at *5 (D. Ariz. Aug. 6, 2014)). The Court went on to list additional policy reasons for requiring Plaintiff to define its trade secrets with reasonable particularity: defining the scope of discovery, preventing a "fishing expedition," and preventing needless exposure of trade secrets. *Id.* The reasonable particularity standard required Plaintiff to provide specific references to concrete documents and characteristics of its trade secrets. *Id*. at 5, 13. On April 26, 2016,

Plaintiff complied with the Court's order by supplementing its interrogatory responses with trade secrets defined with "reasonable particularity." Rosenzweig Decl. Ex. 5.

Particularly relevant to this analysis are Trade Secrets Nos. 1 and 8. Trade Secret No. 1 includes information covered in scope of services papers sent from Plaintiff to Defendants in the fall of 2010 and 2011. *Id.* at 12. Plaintiff specifically states that these white papers included a "narrative discussion and technical diagrams providing a roadmap of a pre-paid wireless payment solution for MetroPCS" including Auto-Pay, Text-to-Pay, a Central Payments Repository, and a diagram of the system architecture. *Id.* Plaintiff identified the following documents as containing evidence of this trade secret: a September 14, 2010 whitepaper, an August 25, 2011 whitepaper, and discussions about the whitepapers "with Amdocs in meetings and phone calls about the joint pitch in 2010 and 2011." *Id.* Trade Secret No. 8 relates to "Vesta's API Protocols for its Payment Solution." *Id.* at 23–25. Plaintiff specifically lists its "Boiler Plate" Billing Platform API, Tokenization API, Account Query and Account Credit APIs, the core APIs discussed in the September 24, 2010 Scope of Services Paper for MetroPCS, and the Recharge Web Service API for Virgin Mobile. *Id.* As discussed in greater detail below, the Court finds that the disputed documents—with the exception of the Boost Mobile (or "TOPS") API—do not constitute new trade secrets. Instead, they are used as evidence of the disclosure and misappropriation of Plaintiff's alleged trade secrets.

    A.  2010 Emails

Plaintiff contends that its expert, Mr. Pelegero, reviewed the 2010 emails between Plaintiff and Defendants "because they provided additional context about what Vesta was disclosing to Amdocs, when, and why." Pl.'s Resp. 17. Plaintiff also asserts that Mr. Pelegero's use of these documents was appropriate because "Trade Secret No. 1 expressly indicates that the

trade secrets were disclosed 'in meetings and phone calls associated with the Metro PCS joint pitch in 2010–2011.'" *Id.* at 17.

A review of Mr. Pelegero's report supports Plaintiff's argument that these documents were used to provide context for the communications made during the fall of 2010 when Plaintiff and Defendants were discussing their joint pitch to MetroPCS. Under the subheading "2010 disclosures," Mr. Pelegero describes the August 31, 2010, email as "recapping a call between Vesta and MetroPCS regarding the subject matters that MetroPCS wanted addressed in its payment solutions" such as a central payments repository and autopay. Pelegero Report ¶ 126. He describes the September 2, 2010, email as "mapping the contents to be included in the joint proposal to MetroPCS," including an explanation of the central repository, autopay, and text-to-pay. *Id.* at ¶ 126. Mr. Pelegero also cites these emails as evidence of Vesta's prior experience with topics included in Trade Secret No. 1. *Id.* at ¶ 127. Because Plaintiff stated in Interrogatory 16 that the components of Trade Secret No. 1—including autopay, text-to-pay, and the central payment repository—were discussed in meetings and phone calls associated with the MetroPCS pitch, emails summarizing these calls and Mr. Pelegero's use of them constitute additional evidence in support of Plaintiff's claim and fall within the scope of Trade Secret No. 1.

B. Payments Architecture Slideshow

Plaintiff asserts that Defendants "mischaracterize Mr. Pelegero's analysis of the 'Payments Architecture' Powerpoint slide deck." Pl.'s Resp. 14. Plaintiff states that Mr. Pelegero cites to these exhibits as evidence of later misuse of Plaintiff's Trade Secret No. 1 by Defendants' in a pitch to MetroPCS. *Id.* at 14–15.

Here, too, Mr. Pelegero's use of the slides supports Plaintiff's characterization of this evidence. This evidence is discussed in Section B of Mr. Pelegero's report, titled "instances of

use/misuse." Pelegero Report at 51. Each of the relevant exhibits is used by Mr. Pelegero to show that Defendants' proposal materials for MetroPCS and other customers reflect information disclosed to Defendants by Plaintiff. Mr. Pelegero starts by noting that the payments architecture or "pre-proposal slides" were put together after Defendants received documentation from Plaintiff and reflect what Defendants learned from Plaintiff during various disclosures in 2010. *Id.* at ¶ 151. He goes on to note in paragraph 152 of his report that the pre-proposal payments architecture slides also reflect revisions by Plaintiff that were adopted by Defendants, including the correction of information pertaining to text-to-pay and autopay. *Id.* at ¶ 152. He notes that these slides were later forwarded on to another Amdocs employee who worked on the 2012 MetroPCS pitch. *Id.* Similarly, in paragraph 154 he notes that a Vesta employee made revisions to another draft slide deck that were later adapted and used by Defendants. *Id.* at ¶ 154. In later paragraphs, Mr. Pelegero again notes that these slides were forwarded to other Amdocs employees and that the 2012 MetroPCS pitch contained information provided by Plaintiff in their 2010 collaboration with Defendants. *Id.* at ¶¶ 175, 183–188. He also finds that these slides "indicate[] that Eran Eldar, an employee of Defendants, obtained sufficient information from Vesta so as to become able to speak directly with Metro PCS about developing a trade solution." *Id.* at ¶ 153.

At no point does Mr. Pelegero appear to assert that these documents are trade secrets. Instead, he draws parallels between Plaintiff's Trade Secret No. 1, the 2010 disclosures of this secret, the contents of and revisions to the 2010 slides, and the contents of Defendants' 2012 proposal as evidence of misappropriation by Defendants. Accordingly, Mr. Pelegero uses these slides as evidence of Defendants' misuse, not as new trade secrets.

///

C. Version 0.2 of the Scope of Services Document

Plaintiff contends that Version 0.2 Scope of Services paper is an earlier version of the Version 0.7 Scope of Services document listed in its response to Interrogatory 16. Pl.'s Resp. 15. As an earlier version of the document, Plaintiff argues it is merely a different iteration or additional evidence of the same trade secret. *Id*. Version 0.2 was sent to Defendants as part of the 2010 joint pitch to MetroPCS and is dated August 16, 2010, less than a month before the creation of Version 0.7 (dated September 13, 2010). Haynie Decl. Exs. Q & X. The document appears to be key to Plaintiff's case because it was sent to Defendants before Mr. Eldar prepared his 2010 pitch for MetroPCS. Pl.'s Resp. 15–16.

At the hearing, a point of contention between the parties was the location of the "e-wallet" or central payments repository. Hearing Transcript, Dec. 18, 2017, ECF 542 ("Hr'g Tr."). In its interrogatory response, Plaintiff described Version 0.7 of the Scope of Services document as discussing "how the payments platform will interface with the Centralized Payments Repository (which was envisioned to be an Amdocs-hosted database…)." Rosenzweig Decl. Ex. 5 at 12. Plaintiff also listed a third scope of services paper from August 25, 2011, in the description of this trade secret, which according to Plaintiff places the e-wallet in the payment solution rather than the billing solution.[1] Pl.'s Sur-Reply 6, ECF 540. But Defendants emphasize that the location of the e-wallet was specifically described by Plaintiff in their trade secret as hosted by Defendants—the billing platform—rather than the payment platform. Defs.' Resp. Sur-Reply 8, ECF 543. Based on this description, the Defendants contend that the location of the e-wallet in Version 0.2 of the Scope of Services document, which is hosted by Vesta or the

---

[1] The parties appear to dispute whether the 2011 Scope of Services document actually places the e-wallet in the payment solution. Defendants allege that the 2011 paper "does not depict the 'wallet' at all." Defs.' Resp. Sur-Reply 8, ECF 543. Plaintiff alleges that the 2011 version "indicat[ed] that the 'wallet' should be hosted by Vesta's payment solution, not Amdoc's billing solution." Pl.'s Sur-Reply, ECF 540. Mr. Pelegero also appears to suggest that the 2011 document places the e-wallet in the payment solution. Pelegero Report ¶ 184.

10 – OPINION & ORDER

payment platform, directly conflicts with the description of Plaintiff's trade secret. Hr'g Tr. 69:1–22. Defendants suggest that Plaintiff is attempting to use this version of the paper to claim that the placement of the wallet with the payment platform is a trade secret. Hr'g. Tr. 69:1–3.

Here, again, Mr. Pelegero's use of the evidence generally supports Plaintiff's contention that this is not a new trade secret. Mr. Pelegero characterizes Version 0.2 as an earlier version of the scope of services paper. Pelegero Report ¶ 116. He notes that it describes mobile web payments, autopay, text-to-pay, and includes a sequence flow diagram. *Id.* at ¶ 117. Both autopay and text-to-pay services are listed in the description of Trade Secret No. 1. Rosenzweig Decl. Ex. 5 at 12. Mr. Pelegero also later characterizes Version 0.7 as "expand[ing] on the previous version of the Scope of Services document" with a narrative and additional context for the autopay and text-to-pay functions and a detailed sequence flow diagram. Pelegero Report at ¶ 129.

Mr. Pelegero does state that the Version 0.2 Scope of Services paper contained an e-wallet component, though he does not discuss the location of the e-wallet with regard to this specific document. *Id.* at ¶ 127. Plaintiff admits that the location of the e-wallet in Version 0.2 is in the payment solution, Pl.'s Resp. 16, but it emphasizes that this is consistent with the 2011 Scope of Services Paper, which is included in the interrogatory response. Pl.'s Sur-Reply 6. Mr. Pelegero does ultimately find that Defendants misappropriated Plaintiff's information in proposing that the e-wallet should be located it in the payment solution as opposed to the billing solution. Pelegero Report ¶¶ 166, 216, 217, 218. But it is unclear whether Mr. Pelegero attributes this to Version 0.2 of the Scope of Services paper or the 2011 Scope of Services document. *Compare Id.* at ¶ 184 (citing the 2011 paper and finding that Defendants "opted to place [the e-wallet] as part of the Payments solution, just as in Vesta's product and proposed solution for

MetroPCS") *with* ¶ 215 (noting that the location of the e-wallet was changed after receipt of 2010 and 2011 proposal materials).

The record, thus, generally supports Plaintiff's contention that Version 0.2—as a prior version of the Version 0.7 scope of services document and reflective of the information contained in the 2011 document—is additional evidence and does not identify "what the trade secret is." Hr'g Tr. 96:9–11. Version 0.2 of the Scope of Services paper does not appear to include any additional or new information other than what is already included in the interrogatory, nor does it appear that it is being used by Mr. Pelegero to find that Defendants misappropriated any information not already contained in Trade Secret No. 1. Accordingly, the Court finds that Version 0.2 of the Scope of Services document is not a new trade secret. Rather, it is additional evidence of the disclosure of the information included in Trade Secret No. 1.

    D.  2008 API for Boost Mobile

Plaintiff argues that the 2008 API for Boost Mobile falls within the scope of Trade Secret No. 8: "Vesta's API Protocols for its Payment Solution" because it is a "protocol for Vesta's payment solution." *Id.* at 21–22. Within this secret, Plaintiff specifically lists the Recharge Web Service API for Virgin Mobile that was created in July of 2012. Rosenzweig Decl. Ex. 5 at 25. Plaintiff, notably, does not include the Recharge Request API for Boost Mobile from 2008 in its response. The 2008 Boost Mobile API was disclosed, Plaintiff alleges, two years prior to the MetroPCS collaboration "in connection with the parties' joint relationship with Sprint" and used later by Defendants in preparing their own API for Sprint. Pl.'s Resp. 8. Citing the report of Dr. Edwards, Plaintiff also suggests that because of all the similarities between these APIs, the Boost Mobile API is effectively a prior iteration of the Virgin Mobile API. Pl.'s Sur-Reply 3 (citing Kursh Repot ¶¶ 94–95); *see also* Hr'g Tr. 103:13–17.

In its complaint, Plaintiff alleges that it shared confidential and technical information in connection with their work for Boost Mobile. FAC ¶¶ 21–22. Plaintiff also alleges that Defendants misused its confidential information to displace Plaintiff with customers such as Sprint and its brands, including Boost Mobile, Virgin Mobile, and Assurance. FAC ¶¶ 21–22, 61−64. The Boost Mobile API—allegedly disclosed to Defendants during the early years of their collaboration—therefore appears to fall within the scope of Plaintiff's pleadings. Pl.'s Sur-Reply 1–2.

But the Boost Mobile API is not within the scope of Trade Secret No. 8. As noted above, Plaintiff did not specifically list this API in its interrogatory response. While both APIs share some similarities, the 2008 Boost Mobile API and 2012 Virgin Mobile API appear to be two separate APIs. Kursh Report ¶ 94 (noting "minor changes made by Vesta between the 2008 and 2012 recharge specifications"). The Boost Mobile API specifies a "recharge request" API, which prompts the Vesta system to carry out an automated payment transaction when it receives the "Recharge Request message" from Boost Mobile. Edwards Report ¶ 84; Kursh Report ¶ 66. The Virgin Mobile API "describes a web service API for making payments on prepaid mobile accounts" and provides ways in which Virgin Mobile interacts with Vesta's Payment system. Edwards Report ¶ 88; Kursh Report ¶¶ 77–78. Though Dr. Kursh and Dr. Edwards appear to compare the recharge functions in both APIs to the same data type used in the Amdocs software, Dr. Edwards ultimately finds—and Dr. Kursh agrees—that Defendants' recharge software is virtually identical to the Boost Mobile API and only very similar to the recharge specification in the Virgin Mobile API. Edwards Report ¶ 92; Kursh Report ¶ 95. The Virgin Mobile API also appears to include a broader range of functions and APIs. *See* Edwards Report ¶¶ 88, 94 (discussing the similarities between Defendants' web service for Sprint and the Virgin Mobile

API); Hr'g Tr. 103:16–17 (Plaintiff's counsel stated that the Virgin Mobile API contains a series of APIs.). This analysis suggests that these are two substantively different APIs that Defendants allegedly misappropriated

The Court required Plaintiff on multiple occasions to provide specific references to documents and characteristics of trade secrets—not generic categories of information—in order to satisfy the reasonable particularity standard. April O&O at 5, 13. Permitting Plaintiff to include this API because it falls within the category of Trade Secret No. 8 as a "payment protocol" would contradict this Court's order. Accordingly, as used by the Plaintiff's experts the 2008 Boost Mobile API constitutes an additional trade secret.

## II. Rule 37 Sanctions

Defendants allege that Plaintiff's evidence related to these new trade secrets should be excluded under Rule 37(b) and (c). Defs.' Mot. 8, 11. First, Defendants contend that Plaintiff violated Rule 26(e) when it failed to supplement its responses to Interrogatory 16 to include this evidence. *Id.* at 11. But the Court finds that Rule 37(c) sanctions are inappropriate here as Plaintiff had no obligation to supplement its responses. Rule 26(e) only requires a party to supplement its responses if that information has not otherwise been made known to the opposing party during discovery. Fed. R. Civ. P. 26(e)(1)(A); *Compare Kapche v. Holder,* 677 F.3d 454, 468–69 (D.C. Cir. 2012) (affirming the district court's decision to allow a witness to testify where the witness was not disclosed in initial disclosures but his identity was made known in document discovery and deposition) *with Apple, Inc. v. Samsung Electronics Co., Ltd.*, No. 11-CV-01846-LHK, 2012 WL 3155574, at *5 (N.D. Cal. Aug. 2, 2012) (where evidence was buried in a disclosure of thousands of pages of documents it is insufficient to make known to the opposing party).

Here, Defendants were put on notice of this evidence during discovery. Mr. Eldar discussed the contents and use of Version 0.2 of the Scope of Services document when questioned by Plaintiff's counsel at his depositions on June 1, 2017. Haynie Decl., Exs. D (Eldar 30(b)(6) Dep. 35:10–38:25) & H (Eldar Dep. 68:9–71:1, 78:22-81:16, 84:16–86:12). Mr. Eldar acknowledged both that Version 0.2 was an early version of the scope of services white paper and that he received it prior to creating the payment architecture slideshow. Eldar Dep. 79:2–24. When questioned by defense counsel at his September 26, 2016, deposition, Bruce Hassold (a Vesta employee) also indicated that there were multiple versions of the scope of services paper. Haynie Decl., Ex. C (Hassold 30(b)(6) Dep. 110:14–112:11). Similarly, the 2008 Boost Mobile API was discussed in the June 5, 2017, deposition of Eric Hopper, Vesta's chief technology officer. Haynie Decl., Ex. A (Hopper 30(b)(6) Dep. 157:2–159:10, 203:10–205:5). Counsel for the Defendants asked Mr. Hopper about the 2008 Boost Mobile API. Hopper 30(b)(6) Dep. 203:10–205:5. In response to defense counsel's question about what trade secret is contained in the 2008 Boost Mobile API, Mr. Hopper responded "the recharge request method for trade secret 8." *Id.* at 204:9–12. Mr. Eldar also discussed in his deposition emails from September 2, 2010, Eldar Dep. 71:2–72:17, and both email exchanges from August and September of 2010 appear to have been submitted as exhibits at Mr. Eldar's deposition. *See* Pelegero Report ¶ 126 (citing Eldar Exs. 281, 283). The Payments Architecture Slides were produced by Defendants in the course of discovery, Haynie Decl. ¶ 20, and at his deposition, Mr. Eldar discussed emails from September 9, 2010, concerning the Payments Architecture Slideshow and its creation. Eldar Dep. 72:21–78:21.

Second, Defendants argue that Rule 37(b) sanctions are warranted because Plaintiff violated the Court's April 1, 2016 Order by failing to seek leave to amend its responses to

include these additional secrets. Defs.' Mot. 8. There, the Court held that "absent a future showing of good cause, Plaintiff's next submission will constitute a binding representation of its trade secrets." April O&O at 13. As discussed above, the Court agrees with Plaintiff that much of the evidence in question does not contain any new trade secrets. Rule 37(b) sanctions are therefore inappropriate in regard to Version 0.2 of the Scope of Services paper, the Payments Architecture materials, and the 2010 emails.

However, the Boost Mobile API falls outside the scope of Interrogatory 16, and Plaintiff has not sought to amend its list of trade secrets to include it. "Imposition of sanctions under Rule 37(b), and the selection of the particular sanction, are matters left to the discretion of the trial court." *Liew,* 640 F.2d at 1050. In the Court's view, the question is whether this evidence has an evidentiary value independent of its use as a new trade secret. If it does, then the appropriate course of action is to provide a limiting instruction rather than precluding Plaintiff from offering the evidence altogether. If not, then the evidence and the corresponding portions of the expert reports should be stricken.

The Court finds that the Boost Mobile API as used constitutes a different trade secret from that currently alleged. The portions of the expert reports of Dr. Kursh and Dr. Edwards discussing the Boost Mobile API are, therefore, stricken from the reports pursuant to Rule 37(b) and may not be used to support a claim that the Boost Mobile API was a misappropriated trade secret.

///

///

///

///

## CONCLUSION

The Court GRANTS in part Defendants' Motion to Exclude and Strike Plaintiff's Late Identified Alleged Technical Trade Secrets [483].

IT IS SO ORDERED.

Dated this \_\_\_\_12\_\_\_\_ day of February, 2018

*Marco Hernández*
MARCO A. HERNÁNDEZ
United States District Judge

17 – OPINION & ORDER