IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON


VESTA CORPORATION,                              No. 3:14-cv-01142-HZ

                Plaintiff,               OPINION & ORDER

     v.

AMDOCS MANAGEMENT, LTD; and
AMDOCS, INC.,

                Defendants.

Stephen F. English
Erick J. Haynie
Julia E. Markley
PERKINS COIE
1120 NW Couch Street, Tenth Floor
Portland, OR 97209

      Attorneys for Plaintiff

Robert A. Shlachter
Joshua L. Ross
STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 SW Oak Street, Suite 500
Portland, OR 97204

Bruce G. Vanyo
Andrew G. Klevorn
Richard H. Zelichov
Christina L. Costley
Yonaton M. Rosenzweig
KATTEN MUCHIN ROSENMAN LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067

Attorneys for Defendants

HERNÁNDEZ, District Judge:

Plaintiff Vesta Corporation brings this action for theft of trade secrets and breach of

contract against Defendants Amdocs Management, Ltd., and Amdocs, Inc. Defendants move for

summary judgment or, in the alternative, partial summary judgment, on both of Plaintiff's

claims. Oral argument on Defendants' motion was held on June 25, 2018. The Court grants in

part and denies in part Defendants' Motion for Summary Judgment.[1]

## BACKGROUND

### I.      The Parties

Defendant Amdocs "is a publicly-traded company that provides software solutions to

mobile network operators ('MNOs')." Def. Mot. Summ. J ("Def. Mot.") 5 (citing Fourth Am.

Compl. ("FAC") ¶ 8; Zelichov Decl. Ex. 38 (Zepeda Dep.) at 98:7–10), ECF 574. Defendants

primarily provide billing systems for MNOs. Haynie Decl. Ex. 24 (Zepeda Dep.) 236:8–15, ECF

592. Defendants first entered the payments market in 2006 when they acquired a company called

Qpass and its digital payment solution Digital Commerce Manager ("DCM"). Zelichov Decl. Ex.

60, 47 (Pelegero Reb. Rept.) ¶ 193, ECF 576, 577, 579. According to Defendants, this product

---

[1] The Court reminds the parties that in rendering this decision it viewed evidence in the light
most favorable to the non-moving party. Except with regard to Plaintiff's compilation trade
secret and best practices scorecard, findings from Opinion should be limited to summary
judgment only and not relied on as dispositive findings for purposes of trial.

contained features including "bifurcated funds capture," auto-pay, APIs for digital goods sales, and a payment repository or "e-wallet." Zelichov Decl. Ex. 13 (Agte Dep.) at 23:18–24:15, 24:23–25:1, 86:23–87:10; Mangal Decl. ¶¶ 6, 7, ECF 582; Agte Decl. ¶¶ 30, 31, 35, ECF 578, Exs. B–C. Defendants allege that the product at issue here—Amdocs' Enterprise Payment Processing solution or "EPP"—was created based on their prior experience with DCM, its "offspring" Amdocs Mobile Payments or "AMP," and customer requirements. Zelichov Decl. Ex. 13 (Agte Dep.) 25:10–22, 32:23–34:15. In addition, Defendants provided a billing solution called "Ensemble" for the mobile prepaid market, Zelichov Decl. Ex. 28 (Mangal Dep.) at 160:13–16, which they also allege had auto-pay functionality and the ability to "manage the recharging (top-up) of balances through multiple payment methods and recharge channels," Zelichov Decl. Ex. 61 at 15.

Plaintiff Vesta "is a privately held electronic payments processing solutions provider headquartered in Portland, Oregon." Fieldhouse Decl. ¶ 3, ECF 593. It specializes in "prepaid 'top-up' payment solutions that manage customer payments to MNOs" where the MNO does not have immediate access to the consumer's credit card, including text-to-pay, auto-pay, interactive voice response, and internet websites. *Id.* at ¶ 4. Plaintiff's payment and management solution, Mobile Payments Platform or "MPP," both addresses the specific risks presented by anonymous prepaid wireless payments and includes other features such as customer authentication, wallet management, channel hosting, and order fulfillment. *Id.* at ¶ 5.

Beginning in 2009, the parties have, at various points, exchanged information to explore collaboration and acquisition. What follows is a brief discussion and timeline of the events that are central to this dispute. Additional facts that are relevant to the discussion are included in the analysis that follows.

## II.     2010 Acquisition Attempts

In 2009, the parties executed a Non-Disclosure Agreement (NDA) in order to exchange information and explore closer collaboration. Zelichov Decl. Ex. 59; Khare Decl. Ex. 4, ECF 597; FAC ¶ 14. In February of 2010, Amdocs initiated acquisition discussions. Fieldhouse Decl. ¶ 15. Plaintiff provided various documents to Defendants that pertained to its business plans and financial performance. Zelichov Decl. Ex. 6; Khare Decl. ¶ 24, Exs. 5, 7–27. Defendants ultimately did not acquire Plaintiff, Zelichov Decl. Exs. 70, 71, but Plaintiff alleges that, taken together, the information that was shared "explains, in detail, how Plaintiff made money with each major customer—its financial dynamic, pricing strategies, expense levels, and margins—all of which would be highly valuable in the hands of a company that wished to enter the top-up market and compete with Vesta," Pl. Opp'n Def. Mot. Summ. J. ("Pl. Opp'n") 5 (Abbey Decl. Ex. 1 at ¶ 19), ECF 590.

## III.    2010 & 2011 MetroPCS Collaborations

In 2010, the parties pursued collaboration on a joint proposal for MetroPCS. Zelichov Decl. Ex. 72 at 4; Markley Decl. Exs. 4, 5, ECF 607–608. Though Defendants were already the billing system for MetroPCS and provided certain payment services through DCM, Zelichov Decl. Ex. 13 (Agte Dep.) 28:3–9, Plaintiff brought to the table a top-up payment solution with fraud indemnification features, Zelichov Decl. Ex. 16 (Eldar Dep.) 72:11–73:3.

As the parties explored possible collaboration, Plaintiff provided Defendants with various documents describing its recommended approach and technical information. Hassold Decl. ¶¶ 17–31, ECF 600. It also conveyed some of this information orally in meetings and teleconferences. *Id.* This information included v0.2 of a Scope of Services paper sent by email to Defendants on August 17, 2010, Zelichov Decl. Ex. 75, and v0.7 of a Scope of Services Paper

sent by email on September 14, 2010, Zelichov Decl. Ex. 81. V0.7 of the paper included

information about its high-level architecture, sequence flow diagrams, text-to-pay, and bifurcated

funds capture. Zelichov Decl. Ex. 30 (Pelegero Dep.) 274:14–275:1.

In early September, MetroPCS gave both parties a list of requirements for its billing and

payment system and requested separate proposals from each. Zelichov Decl. Ex. 76, 78. Before a

call on September 9, 2010, Plaintiff provided Defendants with a list of topics to discuss based on

the requirements they had received from MetroPCS. Zelichov Decl. Ex. 79. Less than a minute

later, Defendants sent Plaintiff an initial draft of their "Payment Architecture" slides, which

would become the basis for Defendants' proposal in 2010 to MetroPCS. Zelichov Decl. Ex. 80.

Plaintiff alleges that it was never provided with the final proposal that was submitted to

MetroPCS but has since learned that Defendants portrayed themselves as the payment solution

provider. Markely Decl. Ex. 17; Pelegero Ex. 2 ¶¶ 154-158, ECF 598; Hassold Decl. ¶ 41, Ex.

13, ECF 600.

Meanwhile, on September 16, 2010, Plaintiff submitted its own proposal to MetroPCS,

which Defendants allege "included an even further expanded version of the scope of services and

Vesta's Pricing," to MetroPCS without an NDA in place. Def. Mot. 8 (citing Zelichov Decl. Ex.

82). Plaintiff informed MetroPCS that it "contemplated an integrated solution with . . . Amdocs"

but was open to working with other vendors. *Id*. Ultimately, MetroPCS contracted with Fiserv,

Shamos Decl. Ex. 1 ¶¶ 517–29, ECF 580; Zelichov Decl. Ex. 36 (Willcock Dep.) at 195:3–8, in

part because Plaintiff's price was "more than double the next bidder," Zelichov Decl. Exs. 84,

86.

A year later, Defendants notified Plaintiff that MetroPCS was unhappy with Fiserv. RZ

Ex. 88. Once again, the parties exchanged information, including the 2011 version of Plaintiff's

Scope of Services Paper. Zelichov Decl. Ex. 89. The parties also participated in a series of calls and meetings, during which Plaintiff claims it disclosed its technical information. Zelichov Decl. Exs. 90, 55.

**V.     2012 Acquisition Process**

In 2012, Plaintiff launched another sales process. FAC ¶ 37; Zelichov Decl. Ex. 18 (Fieldhouse 30(b)(6) Dep.) at 21:5–11. Plaintiff ultimately engaged with Credit Suisse, which valued Vesta at between $450 and $550 million, to assist in a potential sale. FAC ¶ 37; Zelichov Exs. 91, 92 at 4; *see also* Fieldhouse Decl. ¶ 21. On June 29, Credit Suisse notified Amdocs it was one of 33 potential buyers approved to participate in the auction process and at some point early on in the process authorized their review of material from the 2010 discussions. Zelichov Decl. Exs. 98, 99; *see* Zelichov Decl. Exs. 94, 12 (Abbey Dep.) 65:15–67:20,- 34 (Shmuel 30(b)(6) Dep.) 95:23–96:9.

As part of this process, the parties once again exchanged information. In mid-2012, Plaintiff circulated a "teaser" for 30 potential acquirers that included its revenue and Earnings Before Interest, Taxes, Depreciation and Amortization ("EBITDA") for 2010 and 2011, forecasted revenue and EBITDA for 2012, and other investment considerations. Zelichov Decl. Exs. 94–97. Though NDAs were not required to receive this document, Zelichov Decl. Ex. 17 (Fieldhouse Dep.) 107:18–22, on July 3, 2012, Defendants signed another NDA that protected Plaintiff's "evaluation material" received as part of the 2012 acquisition discussions, Zelichov Decl. Ex. 100; Khare Decl. Ex. 34; FAC ¶ 74. Plaintiff alleges that pursuant to this NDA, it provided Defendants with detailed confidential financial, business, and customer information both orally and in writing. Fieldhouse Decl. ¶ 24; Khare Decl. ¶ 26, Exs. 28–33. It also answered Defendants' expanded follow-up questions in writing and in a conference calls. Fieldhouse Decl.

¶¶ 26–27; Markley Decl. Ex. 10. Defendants' M&A team had a "high level" meeting with Plaintiff's executives, and Plaintiff provided a "preliminary discussions" presentation including limited business and financial information regarding Plaintiff. Zelichov Decl. Ex. 106; *id.* at Ex. 17 (Fieldhouse Dep.) 40:20–41:19, 42:9–14.

On August 9, 2012, Defendants' M&A team presented a valuation analysis to Defendants' executive management, and Defendants presented a nonbinding letter of intent to acquire Plaintiff. FAC ¶ 42; Zelichov Decl. Exs. 104, 105. They assessed a valuation range of $380 to 500 million. Zelichov Decl. Ex. 105 at 6. According to Plaintiff, Defendants' bid was "much lower" than others. Markley Decl. Ex. 14. On August 15, 2012, Credit Suisse told Defendants they were excluded from the second round of bidding, and Defendants did not participate in "true" due diligence or have access to Plaintiff's data room. Zelichov Decl. Ex. 106; Fieldhouse Decl. ¶ 3, ECF 138; Zelichov Decl. Ex. 6 at 16.

Ultimately, the acquisition process was unsuccessful, and Plaintiff began to seek debt financing to fund a tender offer or shareholder dividend. In doing so, it provided a debt solicitation memorandum (that Defendants emphasize was labeled "public version") to lenders, in many instances without an NDA in place. Zelichov Decl. Exs. 111, 112. According to Defendants, this document included a wide range of Plaintiff's financial and business information, including Plaintiff's revenue, growth, risk management, contract expiration dates, investment highlights, how it directed customers to lower cost channels, fraud rates, and transaction decline rates. *See id*. It also provided information to Moody's and Standard & Poor's, which disclosed some of Plaintiff's financial information for 2011 and 2012 as well as forecasted results for 2013. Zelichov Decl. Exs. 101–103. Ultimately, this debt solicitation process was also

unsuccessful, and Plaintiff obtained a loan from Bank of America to pay a multimillion dollar dividend to its shareholders. Zelichov Decl. Ex. 113.

## IV.    The Parties' Separate 2012 Pitches to MetroPCS

In early 2012, both parties again were informed of MetroPCS's dissatisfaction with Fiserv. Zelichov Decl. Exs. 114–15. Plaintiff pitched its payment solution to MetroPCS in May of 2012 without Defendants, Zelichov Decl. Exs. 116, 117 at 7, but MetroPCS ultimately declined because it did not want to pay for Plaintiff's fraud indemnification, Zelichov Decl. Ex. 118.

According to Defendants, they were approached by MetroPCS in July of 2012 about developing a replacement for Fiserv. Markley Decl. Ex. 5. As part of this process, Amdocs worked closely with MetroPCS to upgrade its existing payment functionality and ultimately develop EPP. Zelichov Decl. Ex. 120; Mangal Decl. ¶¶ 8-15, Exs. 1–3. MetroPCS provided Defendants with detailed functional and technical requirements that were allegedly used to develop EPP. Zelichov Decl. Ex. 120, 121; Mangal Decl. ¶¶ 8-13, Exs. 1–3.

On October 22, 2012, Defendants presented MetroPCS with a proposal for a payment platform. Zelichov Decl. Ex. 122. After negotiating a price, MetroPCS "greenlighted development" in December of 2012. Zelichov Decl. Ex. 124; Agte Decl. ¶ 42. Defendants' executive management met in November of 2012 and April of 2013 to discuss whether to move forward with the MetroPCS project. Zelichov Decl. Exs. 125, 126. Defendants contend that during this process, they did not consider anything that Plaintiff claims as proprietary or a trade secret. *See id.*

Before Defendants and MetroPCS executed a contract, MetroPCS sent "Business Requirement Documents" to Defendants detailing the specific features that it wanted in EPP.

Agte Decl. ¶¶ 43, 47; Mangal Decl. ¶¶ 22–24, Ex. 11. Defendant alleges they used these documents, which total over 500 pages, to build EPP. Agte Decl. ¶¶ 44–47, Ex. E; Mangal Decl. ¶¶ 22–24, Ex. 11. From October 2012 to January 2014, more than 400 of Defendants' employees spent hundreds of thousands of hours writing code for EPP. Agte Decl. ¶¶ 58–62, Exs. F, H. Defendants allege that it was built upon Amdocs' "legacy solutions" (DCM and AMP) by using engineers who had been developing payment solutions for years. Zelichov Decl. Ex. 118 at 4; Agte Decl. ¶¶ 7–35, Exs. B-D. EPP was launched at MetroPCS in January of 2014. FAC ¶ 44.

## VI. Defendants' Agreement with Sprint

Defendants also launched a payment solution at Sprint in April of 2015. FAC ¶ 63. Sprint was not interested in pursuing any work with Plaintiff because of its payment architecture and the added cost of fraud indemnification. Zelichov Decl. Exs. 132, 133 at 19. Defendants contend that they spent "253,000 hours developing EPP for Sprint using documents drafted by Sprint called system Design Specifications," Def. Mot. 14 (citing Agte Decl. ¶¶ 63–66, 69, Ex. I), and "performed over 200,000 hours of general payment solution related research and development spending a total of 700,000 hours on EPP," *id.* at ¶¶ 59–62, 69, Ex. G.

## SUMMARY JUDGMENT STANDARDS

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial responsibility of informing the court of the basis of its motion and identifying those portions of "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting former Fed. R. Civ. P. 56(c)).

Once the moving party meets its initial burden of demonstrating the absence of a genuine issue of material fact, the burden then shifts to the nonmoving party to present "specific facts" showing a "genuine issue for trial." *Fed. Trade Comm'n v. Stefanchik*, 559 F.3d 924, 927-28 (9th Cir. 2009) (internal quotation marks omitted). The nonmoving party must go beyond the pleadings and designate facts showing an issue for trial. *Bias v. Moynihan*, 508 F.3d 1212, 1218 (9th Cir. 2007) (citing *Celotex*, 477 U.S. at 324).

The substantive law governing a claim determines whether a fact is material. *Suever v. Connell*, 579 F.3d 1047, 1056 (9th Cir. 2009). The court draws inferences from the facts in the light most favorable to the nonmoving party. *Earl v. Nielsen Media Research, Inc.*, 658 F.3d 1108, 1112 (9th Cir. 2011). If the factual context makes the nonmoving party's claim as to the existence of a material issue of fact implausible, that party must come forward with more persuasive evidence to support his claim than would otherwise be necessary. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "Summary judgment is improper where divergent ultimate inferences may reasonably be drawn from the undisputed facts." *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d 1119, 1125 (9th Cir. 2014) (internal quotation marks omitted); *see also Int'l Union of Bricklayers & Allied Craftsman Local Union No. 20, AFL-CIO v. Martin Jaska, Inc.*, 752 F.2d 1401, 1405 (9th Cir. 1985) ("Even where the basic facts are stipulated, if the parties dispute what inferences should be drawn from them, summary judgment is improper.").

## DISCUSSION

Defendants move for either summary judgment on all of Plaintiff's claims or partial summary judgment on Plaintiff's individual trade secrets and breach of contract claims. Defendants generally contend that: (1) Plaintiff failed to keep its alleged trade secrets

confidential either by failing to comply with the terms of the NDAs or by disclosing them to

third parties without an NDA; (2) Plaintiff's information does not meet the statutory definition of

a trade secret because it is similar to publicly available information; and (3) Plaintiff fails to

provide evidence showing either breach of the NDAs or misappropriation. Both parties also

make various evidentiary objections. Because Plaintiff has failed to put forth any evidence

regarding its Best Practices Scorecard or compilation trade secret, the Court grants Defendants'

Motion for Partial Summary Judgment as to these alleged trade secrets. The Court otherwise

denies Defendants' motion.

## I.     Evidentiary Objections

Both parties move to strike evidence submitted in connection with this motion. The Court

addresses the relevant objections below. To the extent it has not relied on the objected-to

evidence, however, the Court declines to rule on the parties' objections.[2]

### A.     Plaintiff's Objections

Plaintiff objects to Exhibits 21 through 24 attached to the declaration of Saurabh Mangal,

Exhibits 2 and 6 attached to the declaration of Defendants' expert Michael Shamos, and Exhibits

101, 102, and 103 attached to the declaration of attorney Richard Zelichov. First, with regard to

Exhibits 21–24, Plaintiff argues that the exhibits as used amount to inadmissible hearsay. *See*

Fed. R. Evid. 801. Defendants cite these exhibits, which contain the label "confidential, property

of Sprint," to suggest that the documents were the property of Sprint. *See* Def. Mot. 38. The

---

[2] The parties will note that the Court has, in some instances, relied on evidence that was objected to but has not addressed the objections here. In those instances, the parties made very specific objections that were irrelevant to the Court's use of the particular evidence. For example, Defendants object to paragraphs 24 and 26 of Mr. Khare's declaration where Mr. Khare discusses what he believes was the value of the disclosed information. The Court cites these statements but only as evidence that the parties disclosed specific information, not for any assertion in its opinion to the value of the information disclosed.

Court, however, only cites this information to show that Defendants believed the information was from Sprint and did not know or have reason to know the information was acquired under circumstances giving rise to a duty to maintain its secrecy. *See* Or. Rev. Stat. § 646.461. The exhibits therefore are used to demonstrate notice or the effect on Defendants and do not constitute inadmissible hearsay.[3] *United States v. Bundy*, No. 2:16-CR-46-GMN-PAL, 2017 WL 4582263, at *1 (D. Nev. Oct. 13, 2017) ("[O]ut-of-court statements introduced to show the effect on the listener are not hearsay."); *Friedman v. Medjet Assistance, LLC*, No. CV 09-07585 MMM VBKX, 2010 WL 9081271, at *16 (C.D. Cal. Nov. 8, 2010) (citing Ninth Circuit case law and finding that "[c]ourts often admit out-of-court statements for the non-hearsay purpose of their effect on the listener").

Second, Plaintiff objects to Exhibit 2 of the declaration of Dr. Shamos on the grounds that it is an "attempt to use [Dr. Shamos] as a conduit for documents that are unauthenticated, hearsay, and in many cases . . . not attached to [Defendants'] summary judgment papers." Pl. Mot. Strike 2, ECF 606. Defendants respond that Dr. Shamos relies on authentic public documents and that the documents are not hearsay because they are offered to show evidence of publication rather than for their truth. The Court agrees with Defendants. Defendant relies on these documents to show that similar information was available in the public domain. It is immaterial whether the information contained within the documents is true. Plaintiff's objection is overruled.

Third, Plaintiff objects to Exhibits 101, 102, and 103—reports from Moody's and Standard & Poor's—attached to Mr. Zelichov's declaration and Exhibit 6 from Dr. Shamos's declaration arguing that Defendants failed to lay a proper foundation for these documents. Defendants respond that they have made a prima facie showing of authenticity. "Generally,

---

[3] Plaintiff also submits its own version of Exhibits 21 and 22 as Markley Decl. Ex. 64.

evidence will be admissible if sufficient proof has been introduced so that a reasonable juror could find in favor of authenticity or identification. In considering internet print-outs, courts have considered the distinctive characteristics of the website in determining whether a document is sufficiently authenticated," including, "distinctive . . . designs, dates of publication, page numbers, and web addresses." *Ciampi v. City of Palo Alto*, 790 F. Supp. 2d 1077, 1091 (N.D. Cal. 2011) (internal citations and quotations omitted). Here, Exhibits 101, 102, and 103 contain trade logos, 2012 publication dates, and 2017 print dates. Mr. Zelichov declares they are true and correct copies of the publications. Zelichov Decl. ¶¶ 102–104. Similarly, Dr. Shamos declares that Exhibit 6 is a true and correct copy and the document includes a trade logo and publication date. Shamos Decl. ¶ 27. The Court finds that Defendants have accordingly laid a proper foundation for these documents. Plaintiff's objection is overruled.

B.      Defendants' Objections

Defendants object to paragraphs in the declarations of Bruce Hassold and Sanjay Khare as improper lay opinion. Defendants also object to parts of the declarations of Rich Greene and Rocky Scales on the ground that they amount to sham declarations. Finally, Defendants object to Plaintiff's Exhibit 73 attached to the declaration of Julia Markley claiming it is inadmissible hearsay.

First, Defendants object to ¶ 41 of Mr. Hassold's declaration as improper lay or expert opinion and ¶¶ 29 and 34 of Mr. Khare's declaration because his assertions are speculative and not based on personal knowledge. Fed. R. Evid. 701. As Plaintiff notes, Mr. Hassold was a sales engineering manager involved in the 2010 and 2011 joint pitch processes and therefore has personal knowledge about the information disclosed during this time. Mr. Hassold's statement reviewing the contents of Defendants' presentation and comparing it with the information that he

personally disclosed to Defendants in his role as a sales engineering manager for Plaintiff

therefore does not constitute expert opinion. *See* Fed. R. Evid. 701 advisory committee note

(permitting lay testimony based on particularized knowledge by virtue of position in a business).

As to ¶ 29 of Mr. Khare's declaration, the Court finds that Mr. Khare's statements are based on

personal knowledge of what he observed and understood as part of the 2012 debt offering and is

supported by the attached exhibits. With regard to ¶ 34 of Mr. Khare's declaration, the Court

only relies on this statement for its assertion that the one-way H3G NDA may have been

misunderstood by Plaintiff. As Mr. Khare signed the NDA, his understanding of the Italian NDA

at the time of its signing is based on his own personal knowledge. Thus, Defendants' objections

are overruled.

Second, Defendants object to ¶¶ 5–6 of Mr. Greene's declaration and ¶ 7 of Mr. Scales's

Declarations on the ground that they are sham declarations. The Court disagrees. "[A] party

cannot create an issue of fact by an affidavit contradicting his prior deposition testimony."

*Yeager v. Bowlin*, 693 F.3d 1076, 1080 (9th Cir. 2012). The Ninth Circuit has cautioned that this

rule "should be applied with caution" and requires the "inconsistency between a party's

deposition testimony and subsequent affidavit [to] be clear and unambiguous." *Id.* (internal

citations and quotations omitted). During his deposition, Mr. Greene testified that he spent less

than an hour reviewing documents and that his response was not thorough. Markley Decl. Ex. 18

(Green Dep.) 85:1–22, 87:3–9, 99:9–100:9, ECF 626.  In his declaration he states that he spent

little time looking into the matter, had a brief discussion with a colleague, and reviewed a couple

of documents. Greene Decl. ¶¶ 5–6, ECF 599. These assertions are not inconsistent. Similarly, at

his deposition Mr. Scales testified that there was no NDA in place with MetroPCS. Zelichov

Decl. Ex. 31 (Scales Dep.) 91:18–21. In his declaration, he asserts that he "did not realize until

years later that Vesta could not locate a copy of any signed NDA with MetroPCS." Scales Decl. ¶ 7, ECF 601. These, too, are not clearly or unambiguously inconsistent. Defendants' objections are overruled.

Finally, Defendants object to Exhibit 73 attached to the declaration of Ms. Markley, arguing that it constitutes hearsay. The exhibit contains an email exchange between Defendants and MetroPCS, a third-party. Defendants object to Plaintiff's reliance on the statement by a MetroPCS employee that they "were not sure that AMP is the right solution anymore." Markley Decl. Ex. 73. The email is used, however, to show its effect on Defendants rather than to show that MetroPCS was truly unhappy with Defendants' previous payment product. *Friedman*, 2010 WL 9081271, at *16 (citing Ninth Circuit case law and finding that "[c]ourts often admit out-of-court statements for the non-hearsay purpose of their effect on the listener"). Defendants' objection is overruled.

## II.    Breach of Contract

Defendants argue that Plaintiff fails to establish breach of the 2009 and 2012 NDAs as to either its technical information (primarily disclosed during the 2010 and 2011 joint pitch process) or financial information (disclosed during the 2010 and 2012 acquisition attempts). Def. Mot. 15–18. New York Law governs Plaintiff's breach of contract claim. *See* Opinion & Order, ECF 42 at 7–8. To succeed on a breach of contract claim under New York Law, the plaintiff "must prove . . . : (i) the existence of a contract; (ii) the adequate performance of the contract by [the plaintiff]; (iii) the breach of the contract by [the defendant]; (iv) and damages." *24/7 Records, Inc. v. Sony Music Entm't, Inc.*, 429 F.3d 39, 41–42 (2d Cir. 2005).

///

///

A.  Breach of the 2009 Non-Disclosure Agreement

For the purposes of their motion, Defendants do not dispute "that the 2009 NDA is an 'umbrella' NDA that govern[ed] the parties' disclosures throughout the 2009-2010 acquisition discussions and the 2010-2011 MetroPCS joint pitch." Def. Mot. 16. The parties entered the 2009 NDA to exchange proprietary information while "evaluat[ing] the possibility of cooperating in providing *services* to *telecommunication services providers*." Zelichov Decl. Ex. 59 at 1 (emphasis in original). Proprietary information in the agreement is defined broadly to include documentation, trade-secrets, systems, methodology, know-how, marketing, and other commercial knowledge." *Id.* at 1.  Pursuant to the agreement, the receiving party agreed to hold the disclosing party's information in confidence, limit its distribution to employees on a need-to-know basis, and refrain from using the information for any purpose other than evaluating the possibility of cooperation, including the provision of services to third parties or the development of software for itself or third parties.  Zelichov Decl. Ex. 59 §§ 2–4. The disclosing party was to disclose its proprietary information in writing or other tangible electronic form marked proprietary and/or confidential. *Id.* at § 6. The confidentiality obligations of the receiving party did not apply, however, to "such Proprietary Information which":

(a) [Became] public domain without fault on the part of the receiving party;
(b) [Was] lawfully obtained from a source other than the disclosing party, free of any obligation to keep it confidential;
(c) [Was] previously known to the receiving party without an obligation to keep it confidential, as can be substantiated by written records.
(d) [Was] expressly released in writing from such obligations by the party that owns or has the rights to such Proprietary Information; or
(e) [Was] required to be disclosed pursuant to law . . . .

*Id.* at § 8(a)–(e).

In support of their motion, Defendants first contend that the 2009 NDA required Plaintiff to mark its information as confidential or proprietary and disclose it in written or tangible format in order to be protected by the 2009 NDA. Second, Defendants argue that Plaintiff fails to demonstrate any breach of the 2009 NDA by Defendants. The Court disagrees.

       i.     Terms of the 2009 Non-Disclosure Agreement

The parties first dispute whether the 2009 NDA requires the disclosing party to mark documents confidential and whether it applies to oral disclosures of allegedly confidential information. Under New York law, "agreements are construed in accord with the parties' intent[,]" and "[t]he best evidence of what parties to a written agreement intend is what they say in their writing." *Greenfield v. Philles Records, Inc.*, 98 N.Y.2d 562, 569 (2002) (internal citations and quotations omitted). "Thus, a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms." *Id*. "Extrinsic evidence of the parties' intent may be considered only if the agreement is ambiguous, which is an issue of law for the courts to decide." *Innophos, Inc. v. Rhodia, S.A.,* 10 N.Y.3d 25, 29 (2008) (quoting *Greenfield,* 98 N.Y.2d at 569).

"A contract is unambiguous if the language it uses has a definite and precise meaning, unattended by danger of misconception in the purport of the [agreement] itself, and concerning which there is no reasonable basis for a difference of opinion." *Greenfield*, 98 N.Y.2d at 569 (internal citations and quotations omitted; brackets in original). In other words, "if the agreement on its face is reasonably susceptible of only one meaning, a court is not free to alter the contract to reflect its personal notions of fairness and equity." *Id*. at 569–70. "To determine whether a writing is unambiguous, language should not be read in isolation because the contract must be considered as a whole." *Brad H. v. City of New York*, 17 N.Y.3d 180, 185 (2011).  But

"ambiguity is determined within the four corners of the document" and not by "extrinsic evidence that the parties intended a meaning different than that expressed in the agreement." *Id.* at 186.

According to Defendants, the 2009 NDA establishes two conditions for information to be protected by the NDA: "(1) the information must be 'proprietary;' and (2) 'in writing or other tangible electronic form that is marked proprietary and/or confidential.'" Def. Mot. 16; Zelichov Decl. Ex. 59 (2009 NDA) §§ 2, 6. Plaintiff, by contrast, argues that the NDA provides protection for both oral disclosures and unmarked documents. Pl. Opp'n 13. Plaintiff emphasizes that marking is not included in the definition of 'proprietary information" or the restriction on the use and maintenance of the proprietary information. *Id.* At worst, Plaintiff argues, the NDA is either ambiguous as to the consequences of the oral disclosures and unmarked documents or may have been modified through the parties' course of performance.

The Court agrees with Plaintiff that the agreement is ambiguous. On one hand, the agreement places obligations on the disclosing party to ensure that the party indicates what its proprietary information is:

> Disclosure of the disclosing party's Proprietary Information to the receiving party may only be made in writing or other tangible or electronic form that is marked as proprietary and/or confidential information of the disclosing party, or occur by demonstration of any product within the AMDOCS products.

*Id.* at § 6. Thus, to some extent, the contract creates an affirmative duty for the disclosing party to designate information confidential or proprietary. It also requires the disclosing party to disclose information in writing or tangible electronic format unless it involves the demonstration of Amdocs' products.

On the other hand, "marking" is not included in the definition of proprietary information. Instead, the NDA describes proprietary information as:

[v]aluable proprietary routines, computer programs, documentation, trade-secrets, systems, methodology, know-how, marketing, and other commercial knowledge, techniques, specifications, plans and other proprietary information associated with and forming part of its software system.

*Id.* at 1. The agreement further provides that:

[t]he receiving party agrees to hold in confidence the disclosing party's Proprietary Information and to refrain from copying, distributing, disseminating or otherwise disclosing such Proprietary Information to anyone, other than to those of its employees who have a need to know such Proprietary Information for purposes of the Project.

*Id.* at § 2. It also prohibits the receiving party from using proprietary information for any purpose other than the Project, including "the sale or licensing of any software systems, or the provision of any services, to any third parties" and "the development of any software system, for itself or third parties." *Id.* at §§ 3, 4(a)–(b). In other words, the contract broadly defines proprietary information and creates obligations on the part of the receiving party not to use or distribute proprietary information without any reference to confidential or proprietary markings. The contract also fails to provide language indicating what consequences the disclosing party faces for failing to mark information they believe to be confidential or proprietary. And while the contract clearly contemplates written disclosures by either party and demonstrative disclosures by Defendants, absent from the contract is any indication of the consequences for oral disclosures of proprietary information.

Defendants cite to various cases in support of their argument that the marking clause was a condition precedent to protection under the 2009 NDA. But these cases are distinguishable. For example, unlike in this case, the contract in *Convolve Inc. v. Compaq Computer Corp.* clearly provided consequences for a party's failure to comply with a marking provision: "[n]o party shall have any responsibility under this Agreement for any information which is not so marked in writing at the time of disclosure." *See* Fed. Cir. Case No. 12-1074, ECF 45-1; *see also Convolve*

*Inc. v. Compaq Computer Corp.*, 527 Fed. Appx. 910, 922 (Fed. Cir. 2013). In *Harry Miller Corp. v. Mancuso Chemicals Ltd.*, the contract created affirmative obligations on the receiving party to keep disclosures confidential. 469 F. Supp. 2d 303, 308, 322–23 (E.D. Pa. 2007). But the marking provision provided "[a]ll written disclosures of INFORMATION considered confidential by CARR CHEM, INC. shall bear the notation 'Confidential.'" *Id.* at 308. And unlike the contract in the present case, the contract did not contain a separate definition of "proprietary" information. *Id.* Instead, it broadly defined information as "all information drawings, specifications, data, know-how and all other communication, oral or written, disclosed or provided to RECPIENT…" *Id.* In *OEM-Tech v. Video Gaming Technologies, Inc.*, the contract defined confidential information as information the disclosing party "designate[d] as being confidential or which, under the circumstances, ought to be treated as confidential." Fourth Am. Compl. Ex. 1., *OEM-Tech v. Video Gaming Techs., Inc.*, 3:10-cv-04368-RS (N.D. Cal. Dec. 24, 2011), ECF 92-1; *see also OEM-Tech v. Video Gaming Techs, Inc.*, 2012 WL 12920087, at *3, *8 (N.D. Cal. July 31, 2012).  Thus, unlike in this case, the marking requirement was referenced in the definition of confidential information.

　　　Here, it is unclear what import—if any—the absence of a marking has on the proprietary or confidential nature of a document. While there is a marking clause, the definition of proprietary information makes no references to markings and the contract otherwise creates affirmative confidentiality obligations with reference only to "proprietary information," regardless of whether that information has been so marked. Thus, whether the parties intended the marking clause to be a condition precedent to confidential treatment is unclear. In addition, though the contract clearly creates a preference for the written or tangible disclosure of confidential information, there is virtually no discussion of whether oral disclosures can be

considered confidential or proprietary. The Court therefore cannot say that no reasonable person in the parties' position would find that oral disclosures, especially those made in connection with a tangible or written disclosure, would not be treated as proprietary or confidential under the contract. Because there is more than one reasonable interpretation of the marking clause in the context of the contract as a whole, this issue is appropriate for resolution by the trier of fact.[4] *Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's, London, England,* 136 F.3d 82, 86 (2d Cir. 1998) (applying New York law and finding "if the court must resort to extrinsic evidence to ascertain the correct and intended meaning of a term, material questions of fact necessarily exist" and "the contract's meaning becomes an issue of fact precluding summary judgment"). Thus, to the extent that any of Defendants' arguments hinge on the lack of a confidentiality marking or oral disclosure, summary judgment is inappropriate.

### ii. Technical Information

Defendants also argue that Plaintiff has failed to establish breach of the 2009 NDA with regard to the alleged use of Plaintiff's technical information. First, Defendants contend that the information is not proprietary. Second, Defendants argue that Plaintiff has failed to establish breach with regard to the MetroPCS technical information. Third, Defendants argue that the 2009 NDA does not apply to the Sprint APIs.

### a. Whether the MetroPCS Information is Proprietary

Defendants argue that Plaintiff's information is not protected by the agreement because (1) Plaintiff's CTO—Rich Greene—admitted that the technical information described in Interrogatory 16 is not proprietary, (2) Plaintiff's experts agree that the information is not

---

[4] In the alternative, Plaintiff argues that the contract was modified. Pl. Opp'n 14–15. Because the Court finds the contract ambiguous, the Court need not reach this issue.

proprietary, and (3) the information was disclosed to third parties without an NDA.[5] Upon

review of the record, however, the Court finds that these arguments are not dispositive.

First, Plaintiff provides additional context for the admission by Mr. Greene. Defendants

cite to two July 2, 2013 emails from Mr. Greene where he states:

> Meetings were high level with the goal to produce the presentations for Metro
> rather than any detailed requirements sessions.
> ….
> I cannot find anything that was shared that would provide Amdocs direction on
> how to replicate our services. Most of the presentations are focused on Vesta
> overview, the channels/components in high level architecture diagrams and
> schedules/phasing. . . . I know that we had a few on-site visits and a number of
> calls but these were focused on who does what, not the "how" it would be
> implemented.

Zelichov Decl. Ex. 55. As Defendants point out, the email chain included eight documents,

including six pages of detailed notes summarizing the August 30, 2011 meeting. Def. Reply 18

(citing Zelichov Decl. Ex. 30 (Pelegero Decl.) 265:21–266:5; *id.* at Ex. 150). By contrast, in the

declaration provided by Plaintiff, Mr. Greene states that Defendants have mischaracterized his

emails. He clarifies that he was only referring to information shared in September of 2011, did

not spend any significant time looking into what was shared, and did not review the history of all

the documents shared by Plaintiff. Greene Decl. ¶¶ 5–9, ECF 599. Timestamps on the emails—

which suggest that Mr. Greene spent a few hours on this issue—and the initial email seeking

information from the 2011 meeting support his declaration. Zelichov Decl. Ex. 55. Mr. Greene's

declaration and the emails themselves, which provide additional context for Mr. Greene's

statement, demonstrate that this evidence is not dispositive as to whether the information

exchanged in 2010 and 2011 was proprietary.

---

[5] Defendants also contend that Plaintiff has failed to show that the information at issue complies
with the marking or written disclosure requirements of the NDA. Because Court has found that
the contract is ambiguous as to the marking requirement and oral disclosures it declines to
address this part of Defendants' argument.

Second, the testimony cited by Defendants to suggest that Plaintiff's experts admitted that the information was not proprietary is taken out of context and does not lend much support to Defendants' argument. At the citation provided, Rene Pelegero merely states that "the ability to do text-to-pay in the broadest sense is not a – proprietary or is not a trade secret." Zelichov Decl. Ex. 30 (Pelegero Dep.) 147:11–12. Mr. Pelegero then goes on to clarify that the way that Plaintiff does text-to-pay is a trade secret. *Id.* at 147:14–15. Thus, this testimony says little about whether the specified information, disclosed while the parties were discussing a collaboration for MetroPCS, constitutes proprietary information.

Finally, Defendants emphasize Plaintiff's disclosure of this information to third parties without an NDA. Plaintiff does not challenge Defendants' assertion that it disclosed technical information to MetroPCS without an NDA in 2012. Zelichov Decl. Exs. 141, 146; *id.* at Ex. 31 (Scales Dep.) 139:14–142:13 (Scales testifying that the information was disclosed without an NDA); Scales Decl. ¶¶ 6–7 (admitting that no NDA could be located and that it was a mistake and contrary to normal practices). But this disclosure to one third-party non-competitor does not necessarily waive the protections of the NDA. In relevant part, the NDA exempts information that (a) becomes part of the public domain or (b) was lawfully obtained from a source other than the disclosing party, free of any obligation to keep it confidential. Zelichov Decl. Ex. 59 § 8. Defendants have not shown that either (a) or (b) applies. Thus, the Court cannot say that any of this evidence shows that, as a matter of law, Plaintiff cannot support a claim for breach of contract because this information was not protected by the 2009 NDA.

### b. Breach of the 2009 NDA and the MetroPCS Information

Defendants also move for summary judgment on whether their alleged use of the MetroPCS information constitutes a breach of the 2009 NDA. Defendants argue Plaintiff has

failed to establish breach because "there is no evidence that Amdocs used Vesta's Technical Information to develop EPP nor did any of Vesta's experts testify to circumstantial evidence of use." Def. Mot. 17. According to Defendants, the only evidence Plaintiff proffers on this point is from Mr. Pelegero, who notes that after the 2011 pitch to MetroPCS an Amdocs employee forwarded to another employee non-confidential information that has not been identified as a trade secret in this case or alleged by Plaintiff to have been used by Amdocs when building its EPP solution. *Id.*

As is described in more detail later, Plaintiff has created a triable issue as to whether Defendants misused Plaintiff's information from the 2010 and 2011 joint pitches. *See infra* Discussion, Part III(A)(iii). For example, Plaintiff's expert Mr. Pelegero draws parallels between the disclosures made by Plaintiff to Defendant in 2010 and the information ultimately included in the joint slides and Defendants' proposal to MetroPCS, which attributed Plaintiff's functionality to Defendants. Pelegero Decl. Ex. 2 ¶¶ 150–52, 154, 158, 168; Hassold Decl. Ex. 13. Mr. Eldar again forwarded documents from the 2010 and 2011 processes in 2012 after receiving notice that MetroPCS was unsure of Defendants' AMP product. Pelegero Decl. Ex. 2 ¶¶ 174–177; Markley Decl. Exs. 60, 73, 79. Based on this information, Mr. Pelegero concludes that Defendants changed their architecture to mirror Plaintiff's solution and incorporate Plaintiff's alleged secrets. Pelegero Decl. Ex. 2 ¶¶ 210–218. In light of this evidence, a reasonable jury could conclude that Defendants used Plaintiff's proprietary information for a purpose other than evaluating the possibility of cooperation in breach of the 2009 NDA.

c. Breach of the 2009 NDA and the Sprint APIs

Defendants argue that Plaintiff cannot show breach of the 2009 NDA with regard to the Sprint APIs because the NDA "governs only disclosures made while 'evaluating the possibility

of cooperating' on a project for an MNO." Def. Mot. 17 (citing Zelichov Decl. Ex. 59 at 1). Defendants also contend that it received the Virgin Mobile API specifications and files from Sprint, not Plaintiff, and that Plaintiff admits that it disclosed these documents "in connection with the parties' dealings as co-vendors for Sprint, and not as part of any evaluation of cooperation." Def. Mot. 17 (citing Zelichov Decl. Ex. 33 (Shepherd Dep.) 86:23–87:12 (Describing the parties' relationship with each other and with Sprint)).

Viewing the evidence in the light most favorable to Plaintiff, a reasonable jury could conclude that the 2009 NDA protected these APIs and Defendants breached the NDA with their use of this information. The 2009 NDA applies to information disclosed in connection with "the Project," which broadly includes the evaluation of the possibility of cooperating in providing services to telecommunication service providers and the performance of any agreement relating to such cooperation. Zelichov Decl. Ex. 59 at 1.[6] Thus, contrary to Defendants' assertion, the 2009 NDA encompasses more than just the process of evaluating whether to cooperate on a project for an MNO.

Further, the Court cannot find that as a matter of law Defendants did not breach the 2009 NDA with the alleged use of the APIs. Plaintiff's experts—Steven Kursh and George Edwards— both note significant similarities between the Virgin Mobile API and the code developed for Sprint. *See infra* Discussion, Part III(A)(iii). Though some of it was not ultimately implemented, the evidence in the record suggests that Defendants may have used this information to guide them in their development of payment products for Sprint, a purpose not permitted by the 2009 NDA.

---

[6] Specifically, the NDA Provides that "COMPANY and AMDOCS wish to evaluate the possibility of cooperating in providing *services* to *telecommunication services providers*, and thereafter the parties may, if agreed between them, enter into an agreement relating to such cooperation (the evaluation process and performance of such agreement, if any, are hereinafter referred to as the 'Project')."

iii. Financial Information

Defendants argue that Plaintiff has no evidence Defendants breached the terms of the 2009 NDA with regard to Plaintiff's financial information.[7] Plaintiff alleges Defendants breached the 2009 NDA by not limiting the distribution of financial information obtained during the 2010 Process as required by Section 4 of the 2009 NDA and, instead, passed around the 2010 financial information in 2011 and early 2012 (prior to obtaining permission to use the 2010 materials) to "advance [their] own business interests." Pl. Opp'n 17. Defendants argue that, because they were given permission to use this information in connection with the 2012 acquisition, "absent evidence that [they] circulated specific proprietary information, marked as such, for purposes other than [the acquisition]" there is no issue of fact with regard to Section 4. *Id*. at 8–9.

Not only has Plaintiff demonstrated that a reasonable jury could conclude that Defendants misused Plaintiff's confidential financial information after the end of the 2012 acquisition process (as discussed in more detail below), but Plaintiff has also cited evidence demonstrating that Defendants used this information prior to July of 2012, when they appear to have been given permission to refer back to the 2010 information during the 2012 acquisition process.[8] In March of 2012, emails between Defendants' employees demonstrate that they were sending and searching for presentations and information from early 2010 that discuss Plaintiff's BPO Model, overview of their technology, and Defendants' business case. Markley Decl. Ex. 7. In May of

---

[7] To the extent that Defendants argue Plaintiff cannot show breach with regard to the 2010 information because it disclosed this information "very broadly," Def. Mot. 18, the Court addresses these arguments below, *see infra* Discussion, Part II(B)(i).

[8] Plaintiff also cites to evidence that a manager in the corporate development team sent an email to three of Defendants' employees with 2010 materials on the same day that the 2012 NDA was executed. *See* Abbey Decl. Ex. 1 ¶¶ 24, 76. However, as Mr. Abbey admits, "Amdocs's use of the 2010 materials [was] appropriate after that point in time for the sole purpose of evaluating whether or not to acquire Vesta in 2012." *Id.* at ¶ 76 n.120. Thus, this evidence does not support Plaintiff's claim.

2012, Amdocs' employees also discussed a presentation regarding Plaintiff in advance of the Credit Suisse process. Markley Decl. Exs. 8, 11 (May follow-up email with information on alternatives to Plaintiff).  On May 28, 2012, Zur Yahalom—Amdocs' Vice President of Business—appears to have answered questions by email about Plaintiff based on his prior knowledge. Markley Ex. 12. In the same email exchange, Roy Shmuel—Amdocs' Director of Corporate Development—discussed Plaintiff's revenue information. *Id.* On February 23, 2012, Mr. Shmuel also sent information about the 2010 acquisition process to a co-worker while acknowledging that the information was sensitive and should not be shared. Markley Decl. Ex. 9. There are additional emails from this period that reference the 2010 information that recognize it is sensitive confidential material. Markley Decl. Exs. 46, 47; *see also* Abbey Decl. Ex. 1 ¶ 24, ECF 594. Given the timing of these communications and the information contained within these documents, a reasonable jury could conclude that Defendants improperly used Plaintiff's financial information from the 2010 acquisition discussions in breach of the 2009 NDA.[9]

///

///

///

///

---

[9] For the first time in their Reply, Defendants also argue that Plaintiff failed to establish damages with regard to the alleged use of the financial materials as required by New York law. *See LNC Investments, Inc. v. First Fidelity Bank, N.A. New Jersey*, 173 F.3d 454, 465 (2d Cir. 1999) ("Under New York law, in fact, the failure to prove damages is fatal to a plaintiff's breach of contract cause of action." (internal citations and quotations omitted)). The Court notes that, assuming Defendants breached the 2009 NDA by distributing and referring to Plaintiff's evaluation materials in 2011 and early 2012, there is little evidence that these breaches caused damage to Plaintiff as Defendants were ultimately granted permission to refer to the 2010 information months later during the 2012 acquisition process. However, because the 2012 NDA did not supersede the 2009 NDA, FAC ¶ 40, later use of the materials after the 2012 acquisition process could constitute breach under the 2009 NDA. In addition, Plaintiff has had no opportunity to respond to this issue because Defendants brought it up for the first time in Reply. The Court, accordingly, declines to grant summary judgment on this basis.

B.     Breach of the 2012 Non-Disclosure Agreement

Defendants also contend that Plaintiff fails to establish breach of the 2012 NDA with regard to Plaintiff's financial information or "evaluation material." Def. Mot. 18.[10] The parties entered the 2012 NDA to exchange business and financial information while considering a possible merger or acquisition. Zelichov Decl. Ex. 100. The agreement did not cover any information (1) generally available to the public, (2) within the receiving party's possession prior to it being furnished by the disclosing party without any known confidentiality obligations, (3) "available . . . on a nonconfidential basis from a source other than the disclosing party," or (4) independently developed by the receiving party without reference to the evaluation material. *Id.* at 1–2. The agreement provided that the receiving party could only use the information "for the purpose of evaluating a possible negotiated transaction between the parties," and it required that the exchanged evaluation material be kept confidential.  *Id.* at 2.  It further provided that "the terms of [the] letter agreement shall not be construed to limit a Party's right to develop independently or acquire products without use of the Evaluation Material." *Id.* at 3

i.     Breach

Defendants first suggest that Plaintiff cannot show breach of the 2012 NDA. Plaintiff responds by arguing that Defendants' executives "requested and shared 'Evaluation Material' whenever it advanced Amdocs' business interests," specifically by sharing it with employees who were working on the "build versus buy" analysis. *See* Pl. Opp'n 16; Abbey Decl. Ex. 1 ¶¶ 21–24; Markley Decl. Ex. 18.

---

[10] Defendants also argue that Plaintiff inappropriately relies on propensity evidence to establish an issue of fact. Def. Mot. 18. The Court disagrees. Plaintiff instead cites circumstantial evidence from which a jury could conclude that Defendants used this information to compete with Plaintiff in breach of the terms of the NDA.

Viewing the evidence in the light most favorable to Plaintiff, the Court finds that a reasonable jury could conclude that Defendants breached the 2012 NDA by using Plaintiff's information for reasons unrelated to the possible acquisition of Plaintiff. Defendants disseminated Plaintiff's information widely during the 2012 acquisition process, including with those who were later involved in building a competing product for MetroPCS. *See e.g.* Markley Decl. Ex. 18 (August 2, 2012 email noting that Manuel Zepeda "could be really helpful on [the 2012 acquisition process] given he manages MetroPCS . . . . WDYT about wall crossing him for that one?" and could "help on the work . . . potentially building a solution for Metro"). Plaintiff's expert Marc Abbey cites various instances during the M&A process where individuals involved in building a platform for MetroPCS obtained evaluation material. *See e.g.* Abbey Decl. Ex. 1 ¶¶ 86, 91–93, 94–95, 97. Plaintiff also points to two instances where information from the acquisition process was forwarded by Defendants after the 2012 acquisition process concluded. First, in response to a November 2012 email asking whether Defendants could grow their business by "stealing share" from Plaintiff, Defendants distributed a slideshow produced during the acquisition process. [11] Markley Decl. Ex. 39; *see also* Abbey Decl. Ex. 1 ¶ 116. Second, in March of 2013, Yona Ovadia—a key player in the MetroPCS build analysis—asked for and received a memo summarizing the process along with a copy of the letter of intent presentation to Amdocs management from August 9, 2012. Markley Decl. Ex. 23. The fact that some of this information was circulated among Defendants' employees after the acquisition period ended and a few of the major actors in the "build" analysis were privy to this information at the very least

---

[11] Defendants in their Reply suggest that Plaintiff does not assert breach with regard to this specific document. The document in question is a PowerPoint containing M&A information similar to the evaluation material identified as Yong Decl. Ex. 112. There are a considerable number of slides missing in this version that contain granular information, and the missing slides all appear to have been labeled confidential. *Compare* Yong Decl. Ex. 112 *with* Markely Decl. Ex. 39. The remaining slides, however, do appear to contain some material relevant to the 2012 acquisition process. *See* Markley Decl. Ex. 39.

creates an issue of fact as to whether this information was used for reasons other than possible

acquisition in breach of the NDA. Accordingly, summary judgment is not warranted on this

issue. [12]

    ii.  Public Disclosure

   Defendants contend that Plaintiff cannot dispute that it disclosed its financial information

broadly—thus rendering the NDAs inapplicable to this information—by (1) sharing updated

information with Amdocs and 30 other potential acquirers before the parties had signed NDAs,

(2) sharing it in a "public version" of a debt memorandum and a "public" lenders presentation in

2012, and (3) providing financial information to S&P's and Moody's for publication. Def. Mot.

18 (citing Zelichov Decl. Exs. 95–97, 111, 101–03).

   With regard to Moody's and S&P's, Plaintiff notes that the information that was

published was high-level, not the granular information that Plaintiff alleges as part of its claim.

Pl. Opp'n 22. Further, in both contexts Plaintiff was able to ensure that confidential information

was not included in these reports. *See* Khare Decl. Exs. 35–36 (provision in Moody's and S&P's

engagement documents prohibited disclosure of confidential information), 37–40 (emails

between Moody's and S&P regarding removing confidential information). *Compare* Khare Decl.

Ex. 40 *with* Zelichov Decl. Ex. 102 (demonstrating modifications to reports). As to its lender

presentation, Plaintiff argues that the "public label" is misleading, Haynie Decl. Ex 4 (Doliner

Dep. 167:2–5), as it was (1) marked confidential, (2) subject to an engagement agreement with a

---

[12] Defendants also note that the NDA did not prohibit them from conducting their own
"independent" buy analysis. *See* Zelichov Decl. Ex. 100 at 3–4 ("Accordingly, nothing in this
letter agreement will prohibit a Party or its Representatives from developing or having developed
for itself or for any third parties products, concepts, systems or techniques that are similar to or
compete with products, concepts, systems or techniques contemplated by, or embodied in, the
Evaluation Material, provided that such Party does not violate any of its obligations under this
letter agreement in connection with such a development."). The Court notes, however, that it did
prohibit Defendants from conducting such an analysis using the information subject to the NDA.

confidentiality provision, and (3) restricted to potential lenders that were pre-registered with Credit Suisse, Khare Decl. ¶ 29, Exs. 41–42 (CIM includes confidentiality notice); Markley Decl. Ex. 62 (Credit Suisse marked pages as confidential). And there is contradictory evidence as to whether the teaser was sent to parties in confidence. *Compare* Markley Decl. Ex. 62 (teaser labeled confidential) *with* Zelichov Decl. Exs. 95–97(emails sending teaser without NDA and promising additional information upon receipt of NDA). Accordingly, the Court finds that Plaintiff has demonstrated that there is a genuine dispute of material fact as to whether the information was publicly disclosed such that it was no longer protected by the terms of the 2012 NDA.

## III. Trade Secrets

Defendants contend that Plaintiff cannot prove any of the elements of a claim for trade secret misappropriation. "To establish a claim under the [Oregon Uniform Trade Secrets Act], a plaintiff must demonstrate that (1) the subject of the claim qualifies as a statutory trade secret; (2) the plaintiff employed reasonable measures to maintain the secrecy of its trade secrets; and (3) the conduct of the defendants constitutes statutory misappropriation."[13] *Acrymed, Inc. v. Convatec*, 317 F. Supp. 2d 1204, 1218 (D. Or. 2004) (citing *Western Medical Consultants, Inc. v. Johnson*, 835 F. Supp. 554 (D. Or. 1993)). The statute defines "trade secret" as "information . . . that derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Or. Rev. Stat ("ORS") § 646.461(4). Misappropriation includes the improper acquisition, disclosure, and use of a trade secret, including the "use of a trade secret of another without express or

---

[13] Neither party disputes the application of Oregon law to Plaintiff's trade secret claims.

implied consent by a person who, at the time of disclosure or use, knew or had reasons to know that the knowledge of the trade secret was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use." ORS 646.461(2)(d).

A.    Technical Trade Secrets

Defendants argue that Plaintiff cannot establish misappropriation of its technical trade secrets.[14] Eight technical trade secrets and the compilation trade secret remain in this case: (1) Scope of Services; (4) Best Practices Scorecard; (5) High-Level Architecture; (6) four of seven Sequence Flow Diagrams; (7) Text-to-Pay; (8) the Sprint APIs; (11) Bifurcated Funds Capture; and (13) Recurring and Positioned Fraud Assessments. Zelichov Decl. Ex. 57. Plaintiff did not address either the Best Practices Scorecard or compilation trade secret in its briefing or at oral argument. In the absence of any evidence of misappropriation of these secrets, the Court grants Defendants partial summary judgment as to both. The Court finds, however, that summary judgment is inappropriate as to the rest of Plaintiff's alleged secrets as a reasonable jury could conclude, from the evidence provided, that they were misappropriated by Defendants.

///

///

_____

[14] Defendants also argue that Plaintiff is attempting to expand the scope of its trade secrets by alleging that its secrets are "why" rather than "how" a particular feature or combination of features is performed. Def. Mot. 24. In the absence of the word "why" in Plaintiff's interrogatory responses, Defendants contend that this "reframing" of Plaintiff's trade secrets violates the Court's prior orders requiring Plaintiff to allege its secrets with reasonable particularity. *Id.* The Court disagrees and declines to view Plaintiff's alleged secrets so narrowly, particularly when Plaintiff's interrogatory response references information disclosed in meetings.

      Further, because the Court has concluded that the 2009 NDA is ambiguous as to whether it protects oral disclosures—particularly those made in connection with tangible or written disclosures—the fact that any of the technical trade secret information was disclosed orally in said meetings is not dispositive. *See Leatt Corp. v. Innovative Safety Tech., LLC*, No. 09-CV-1301-IEG(POR), 2010 WL 1526382, at *6 (S.D. Cal. Apr. 15, 2010) ("[T]o the extent some of the disclosures were not preceded by a confidentiality agreement, those disclosures appear to have been made only on an 'as needed' basis, which is also sufficient to demonstrate reasonable efforts of insuring secrecy.").

i.        Reasonable Efforts to Maintain Secrecy

With regard to nearly all of Plaintiff's technical trade secrets, Defendants argue that Plaintiff has failed to demonstrate it took reasonable efforts to maintain their secrecy. The question here is whether the trade secret was "the subject of efforts that are reasonable under the circumstances to maintain its secrecy." ORS 646.461(4)(b). In this district, the court has found "[a]bsolute secrecy is not a prerequisite for trade secret protection; the precautions taken need only be reasonable," and "confidential disclosures to employees, licensees, and other will not destroy the secrecy necessary for protection as a trade secret." *Amvac Chem. Corp. v. Termilind, Ltd.*, No. CIV. 96-1580-HA, 1999 WL 1279664, at *7 (D. Or. Aug. 3, 1999) (citing Restatement (Third) of Unfair Competition, § 39, notes to Comment f) ("Whether the nature and extent of the disclosures to business associates which occurred in this case amount to a failure to take reasonable precautions is a jury question."); *see also Rockwell Graphic Sys., Inc. v. DEV Indus.*, 925 F.2d 174, 180 (7th Cir. 1991) ("[W]hat is reasonable is itself a fact for purposes of Rule 56 of the civil rules.").

First, the parties dispute the extent to which compliance with the terms of an NDA and disclosure to third-parties without one is dispositive. Defendants cite cases suggesting that non-compliance with the terms of an NDA is a death knell for trade secret claims. *See Marketel Inter., Inc. v. Priceline.com, Inc.*, 36 Fed. Appx. 423, 425 (Fed. Cir. 2002) (citing *Union Pacific R.R. v. Mower*, 219 F.3d 1069, 1076 (9th Cir. 2000)) (Citing a case applying Oregon law, the Federal Circuit found that where there is an NDA the "written non-disclosure agreement supplants any implied duty of confidentiality that may have existed between the parties"); *see also Convolve*, 527 Fed. Appx. at 925 (finding "the 'circumstances' giving rise to a duty to maintain the secrecy of the disclosed information is dictated by the terms of the NDA" and that

by "not follow[ing] the procedures set forth in the NDA to protect the shared information," the defendant's duty to maintain secrecy never arose as to information that was not sent in compliance with the NDA). By contrast, Plaintiff cites cases from this circuit and elsewhere finding that the existence of and compliance with an NDA are just two of many factors that go into determining whether Plaintiff's efforts were reasonable. *See PQ Labs, Inc. v. Yang Qi*, No. 12-0450 CW, 2014 WL 334453, at *4 (N.D. Cal. Jan. 29, 2014) (finding that the plaintiff's failure to comply with a marking requirement was non-dispositive because the plaintiff had "presented evidence that it used other means to notify its employees and agents that its technological and customer information was confidential"); *see also Diomed, Inc. v. Vascular Sols., Inc.*, 417 F. Supp. 2d 137, 144 (D. Mass 2006) ("While defendants are correct that [plaintiff's] failure to comply with the NDA is *relevant* to a determination of trade secret status, it is not dispositive, since courts consider other factors as well."). The cited case law therefore is unclear about the extent to which compliance with an NDA is required to succeed on a claim for trade secret misappropriation. This is especially true in this case, where the NDA that is central to many of Defendants' arguments is ambiguous.

Further, as Plaintiff notes, disclosure to a third-party without a confidentiality agreement does not necessarily foreclose a finding that a plaintiff has taken reasonable measures to maintain the secrecy of the alleged trade secret. *See Hilderman v. Enea TekSci, Inc.*, 551 F. Supp. 2d 1183, 1201 (S.D. Cal. 2008) (allowing a claim to proceed to trial where the plaintiff may only have had confidentiality agreements with select customers and employees but may have taken other precautions to keep this information secret); *Amvac*, 1999 WL 1279664, at *7 (finding reasonableness an appropriate question for the jury where the plaintiff "may have given copies of the analytical method to its suppliers when the respective secrecy agreements were not

technically in force at the time"). *But see Big Vision Private Ltd. v. E.I. DuPont De Nemours & Co.*, 1 F. Supp. 3d 224, 268 (S.D.N.Y. 2014) (finding that the plaintiff had not taken substantial measures to protect the information where there was no evidence that it took steps to "ensure the confidentiality of the information it disclosed to third parties"); *Gemisys Corp. v. Phoenix Am., Inc.*, 186 F.R.D. 551, 561 (N.D. Cal. 1999) ("Gemisys' attempt to restrict its own employees' access to PMIS is not enough to counter the fact that Gemisys disclosed its allegedly trade secret material to Phoenix and others of its licensees without imposing a duty of confidentiality upon them or their employees."). Thus, to the extent that the secrets were disclosed without markings or without a confidentiality agreement to Defendants and other potential customers, such facts are not dispositive in the context of this case.

In addition, Plaintiff has cited other evidence that demonstrates it took reasonable efforts to maintain the secrecy of this information. Many of the documents at issue were disclosed at some point without a confidentiality designation or NDA. Zelichov Decl. Ex. 145 (v.02); Yong Decl. Exs. 145 (v0.7), 146 (v.2011), ECF 584–586; *see also* Zelichov Decl. Exs. 146–147. But at the time Plaintiff disclosed most of its technical information, the parties had already executed the 2009 NDA. Plaintiff also had various institutional practices in place to protect its confidential information. It regularly enters NDAs, and Plaintiff trains its employees to avoid disclosure before there is an NDA in place. Khare Decl. ¶¶ 5–16; Scales Decl. ¶ 2; Hassold Decl. ¶ 14; Haynie Decl. Ex 34 (Scales Dep.) 57:13–21, 62:4–20; 63:1–18, 113:12–16. Plaintiff admits that there are instances in the record where information was disclosed without an NDA but contends that these were an aberration and include a mistaken disclosure to a non-competitor and, in the case of a one-way Italian NDA, a misunderstanding. Khare Decl. ¶ 34; Scales Decl. ¶¶ 6–7. Similarly, the article and paper cited by Defendants in support of their argument that Plaintiff

disclosed some of this information to the public speak in general terms about the prepaid top-up

market, with a few notes on strategies to improve user experience, and the bifurcated funds

capture process. Def. Mot. 35; Shamos Decl. Ex. 6; *See Morley v. Square, Inc.,* No. 4:10CV2243

SNLJ, 2016 WL 1615676, at *13 (E.D. Mo. Apr. 22, 2016) (finding a question of fact as to

whether information published on the internet shows that the plaintiff's invention was known

outside his business).

Though the secrecy of the APIs is more complicated because they were disclosed outside

of the MetroPCS process, Zelichov Decl. Ex. 33 at 86:23–87:12, and were given to IBM (a

Sprint co-vendor) without an NDA, Yong Decl. Ex. 162; Zelichov Decl. Ex. 22 (Hopper 30(b)(6)

Dep.) 62:23–63:16, 65:10–18, there is still evidence from which a jury could conclude that

Plaintiff took reasonable efforts to maintain the secrecy of its APIs. The APIs were initially

disclosed in 2012 when the parties worked together as co-vendors for Sprint. Zelichov Decl. Ex.

33 (Shepherd Dep.) 86:23–87:12; *id.* at Ex. 155 (email from June 2012); Hassold Decl. Ex. 14

(email from July 2012). The document was marked as confidential. Hassold Decl. Ex. 14 at 3.

Witnesses also testified that it was private and not public. Hassold Decl. ¶ 42 (Virgin Mobile

API is a private set); Haynie Decl. Ex. 8 (Greene Dep.) 49:16–18 (distinguishing between public

and private APIs); *Id.* at Ex. 12 (Hopper 30(b)(6) Dep.) 144:8–24 (noting only its PaySafe API is

in the public domain). Accordingly, whether Plaintiff took reasonable efforts to maintain the

secrecy of its technical information is an issue best left for the trier of fact.

       ii.      Statutory Definition of a Trade Secret

Defendants argue that Plaintiff has failed to establish the additional statutory

requirements for trade secret protection: (1) identification of confidential information and (2)

independent economic value. Def. Mot. 20.  In order to qualify as a trade secret under Oregon's

UTSA, the secret must "derive[] independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use. . . ." ORS 646.461(4)(a). "The definition set forth in the statute itself therefore necessarily implies that whether information is or is not a trade secret is a question of fact." *Kaib's Roving R.PH. Agency, Inc. v. Smith*, 237 Or. App. 96, 103 (2010) (finding an issue of fact where both parties submitted affidavits attesting to the specialized or common nature of the claimed trade secrets). "In many cases, the existence of a trade secret is not obvious; it requires an ad hoc evaluation of all the surrounding circumstances. For this reason, the question of whether certain information is a trade secret ordinarily is best resolved by a fact finder after full presentation of evidence from each side." *Id.* (citing *Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*, 342 F.3d 714, 723 (7th Cir. 2003)). Upon review of the evidence in this case, the Court finds that determination of this element of Plaintiff's trade secret claim requires resolving disputed issues of material fact and is therefore inappropriate for summary judgment.

First, it is unclear from the evidence in the record the extent to which this information is too "high-level" or "generally known to the public or to other persons who can obtain economic value from its disclosure or use." Defendants' expert, Michael Shamos, provides evidence of similarities between some of the functions and features of Plaintiff's trade secrets and other products on the market. *See e.g.* Shamos Decl. Ex. 2 at 2 (noting e-wallets in other payment solutions), 62–63 (noting other companies with text-to-pay and the same MNO initiated syntax as Plaintiff); 85 (bifurcated funds capture with Visa/Mastercard); 56–57 (similar sequence flow diagram from First Data), 90 (similar fraud sequencing from PayPal). But, as Plaintiff's expert Mr. Pelegero notes, this analysis is "granular" and emphasizes the individual components instead of the value of the materials as a whole. Pelegero Decl. Ex. 3 at ¶¶ 266–68; *see also* Haynie

Decl. Ex. 19 (Shamos Dep.) 105:7–12 (Dr. Shamos admitting he has not "found any one prior art reference that discloses everything in the outbound text-to-pay section of Vesta's text-to-pay trade secret disclosure."). In other words, determining whether similarities between this public information and Plaintiff's payment platform strips it of its trade secret status is an issue of fact appropriate for trial. *See Art of Living Found v. Does*, No. 10-CV-05022-LHK, 2011 WL 2441898, at *12 (N.D. Cal. June 5, 2011) (noting that "secrecy . . . requires a fact-intensive-analysis" in finding that [p]ublication . . . does not necessary destroy the secret if the publication is sufficiently obscure or transient or otherwise limited so that it does not become generally known to the relevant people."); *Kaib's*, 237 Or. App. at 104 (finding a dispute of fact where the plaintiff submitted affidavits attesting to the amount of time needed to compile similar data and the defendants had an affidavit stating that much of the plaintiff's information was common knowledge in the industry or could be readily obtained); *Cf. Ajuba Int'l, LLC v. Saharia,* No. 2:11-CV-12936, 2014 WL 3420524, at *9 (E.D. Mich. July 14, 2014) ("Plaintiffs failed to explain and provide any evidence as to how its trade secrets are different from similar programs or information used in the industry, thereby providing [it] with a competitive advantage.").

In addition, the cited statements of Plaintiff's expert and CTO, when viewed in context, are not dispositive. For example, while Mr. Pelegero does admit that the "idea of" bifurcated funds transfer is not a trade secret, Zelichov Decl. Ex. 30 (Pelegero Dep.) 148:8–14, 153:7–1, such a statement says little about whether Plaintiff's particular method is a trade secret or generally known by others, *see e.g.* Pelegero Decl. Ex. 3 ¶¶ 212–13 (noting that Defendants' DCM two phase purchase system is different because of the context in which it is used, which permitted days between authorization and capture). In addition, Mr. Pelegero indicated that much of the information disclosed in the Scope of Services paper goes beyond what a customer could

view on his or her screen and includes back-end processing needed to accomplish particular results. *See* Pelegero Decl. Ex. 2 ¶¶ 117–20 (presents the steps to be performed to accomplish each function and the various options for implementing subfunctions), ¶ 130 (identifying network and platform requirements, future enhancements based on know-how, and how certain components would work), ¶ 134 (noting overall system flows, actor relationships, and APIs used to interface with the billing platform).

Similarly, though Mr. Pelegero stated "anyone with payments knowledge could easily create something that looks like" Plaintiff's sequence flow diagrams, Zelichov Decl. Ex. 30 (Pelegero Dep.) 242:11–24, he also noted differences between its sequence flow diagrams and those of other systems, Pelegero Ex. 3 at ¶¶ 193–201, 207, 274, 292–294; Zelichov Decl. Ex. 30 (Pelegero Dep.) 242:25 (noting that Plaintiff's diagrams contain "even much more detail"). And while noting that the idea of a pre- and post-authorization fraud checks was not a trade secret, Mr. Pelegero also stated that the reason for its use as part of Plaintiff's payment system was a trade secret and that he was not aware of any pre- or post-paid mobile phone companies performing such function. Zelichov Decl. Ex. 30 (Pelegero Dep.) 182:23–183:7, 188:6–189:22. Defendants also emphasize Mr. Pelegro's testimony that he could have drawn "something . . . close" to Plaintiff's architectural diagrams "without any . . . material from Vesta." *Id.* at 217:24–218:23. Though the ease with which Mr. Pelegero could replicate something *similar*—but not identical—to Plaintiff's trade secrets may be a factor in determining whether Plaintiff's secrets are generally known to the public or others in the industry, it is not dispositive. In the same vein, the email from Mr. Greene—Plaintiff's former CTO—does not definitively confirm that the secrets alleged were "high-level." *Compare* Zelichov Decl. Ex. 55 ("I know that we had a few on-site visits and a number of calls but these were focused on who does what, not the 'how' it

would be implemented.") *with* Greene Decl. ¶¶ 5–9 (stating that he was only referring to information shared in September of 2011, did not spend any significant time looking into what was shared, and did not review the history of all the documents shared by Plaintiff). When viewed in the light most favorable to Plaintiff, the Court cannot conclude that as a matter of law Plaintiff's alleged secrets are so generic or otherwise known to the public such that they are ineligible for statutory trade secret protection.

Second, Defendants' brief argument that Plaintiff has failed to show its secrets have independent economic value is too narrow. Defendants focus on the fact that the secrets were not listed as an asset when it sought a loan or part of its IP when negotiating a sale. Zelichov Decl. Exs. 142 at 31, 35 (listing trademarks and patents); *id.* at 168 at 26–35 (listing patents, trademarks, domain names, IP filings, and proprietary software). But a trade secret has independent economic value where it "gives one who uses it an advantage over competitors who do not know of or use the trade secret." *Religious Tech. Ctr. v. Wollersheim*, 796 F.2d 1076, 1090–91 (9th Cir. 1986) (applying California's UTSA and noting that elsewhere independent economic value had been defined as "competitive advantage" and did not require that the trade secret be the "only one in the market."); *Cf. North Star Media, LLC v. Winogradsky-Sobel*, CV 11-466 PSG (CWx), 2011 WL 13220157, at *10–11 (C.D. Cal. May 23, 2011) (finding a username and password had no independent value because their value depended on the value of information they protected). Here, Plaintiff's experts opine that the secrets provide such a competitive advantage. *See e.g.* Pelegero Decl. Ex. 2 ¶ 104 (opining that Plaintiff's information was valuable because it provided Defendants with an end-to-end understanding for how to operate a payments solution, including factors and considerations that were "counterintuitive" or "discovered by trial and error. . . after several years of being a Payments Solution provider").

Accordingly, the Court declines to find on summary judgment that Plaintiff's secrets do not "derive independent economic value from not being generally known to the public or other persons who can obtain economic value from its disclosure or use." *See* ORS 646.461(4).

### iii.  Misappropriation

As to the third issue, Defendants argue that Plaintiff fails to establish misappropriation. Def. Mot. 22. "Possession" or "internal discussion" of Plaintiff's trade secrets, according to Defendants, is not enough: Plaintiff "must point to evidence plausibly establishing that Amdocs used or disclosed a trade secret with knowledge it was 'acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use' or 'derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use.'" *Id.*  Defendants also note that their EPP product lacks Plaintiff's key fraud indemnification features and those other features that it shares are "so basic that nearly every payment platform in the world, including Amdocs' legacy solutions, also have them." *Id.* at 23.

"Misappropriation" under Oregon law includes "use of a trade secret of another without express or implied consent by a person, who at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use." ORS 646.461(2)(d)(B). "[M]ere possession of a trade secret or mere internal discussion within the company of a trade secret" is not enough to demonstrate use under the UTSA. *O2 Micro Intern. Ltd. v. Monolithic Power Systems, Inc.*, 399 F. Supp. 2d 1064, 1072 (N.D. Cal. 2005). But "internal experimentation with trade secret information not resulting in a market product" as well as "[e]mploying the confidential information in manufacturing, production, research or development, marketing goods that

embody the trade secret, or soliciting customers through the use of trade secret information, all constitute use." *Id.* (citing *PMC, Inc. v. Kadisha*, 78 Cal. App. 4th 1368, 1383 (2000)).

As described above, a reasonable jury could conclude that Defendants acquired the technical information from the 2010 and 2011 joint pitch process under circumstances giving rise to a duty to maintain its secrecy or limit its use. Further, though Defendants cite evidence that they built EPP pursuant to specifications from MetroPCS, there is evidence that Defendants improperly referenced Plaintiff's information while pursuing MetroPCS.

In 2010 and 2011, for example, Plaintiff sent documentation to, edited slides for, and discussed its technical information with Eran Eldar, Amdocs' Solution Architect and Customer Business Executive. Hassold Decl. ¶¶ 18–35; Pelegero Decl. Ex. 2 ¶¶ 150–52. Plaintiff's expert, Mr. Pelegero, notes that the information sent to Mr. Eldar was ultimately included in Defendants' presentation, Pelegero Decl. Ex. 2 ¶¶ 167–168, as well as the proposal submitted to MetroPCS by Defendants, *id.* at Ex. 2 at ¶¶ 154-158; Hassold Decl. Ex. 13. This proposal attributed Plaintiff's functionality to Defendants. *Id.* There is also evidence that during this time Defendants were looking to find "other payment vendors that [could] bid with [them] against Vesta." Markley Decl. Ex. 63.

In 2012, Defendants again approached MetroPCS. Defendants were notified MetroPCS had concerns about Defendants' AMP product. Pelegero Decl. Ex. 2 ¶ 174; Markley Decl. Ex. 73 (email from Metro: "[w]e are not sure that AMP is the right solution anymore, given that it will not act as a[n] aggregator for each content provider"). Five days later, Mr. Eldar emailed the 2010 proposal and slide deck that allegedly contains Mr. Hassold's corrections to colleagues. Markley Decl. Ex. 60; Pelegero Decl. Ex. 2 ¶ 175. Recipients of the email, in requesting the word version, asked if the diagram involving Plaintiff was "compatible to replace all existing

Fiserv functionality[.]" Markley Decl. Ex. 79 at 2; Pelegero Decl. Ex. 2 ¶ 177. Mr. Eldar

subsequently forwarded additional documentation from 2011. *Id.* Plaintiff's expert concludes

that, based on this information from Mr. Eldar, Defendants changed their proposed product to

mirror Plaintiff's payment solution. Pelegero Decl. Ex. 2 ¶¶ 210–218. He also opines that

Defendants' solution incorporated significant information from the Scope of Services papers,

including Plaintiff's wallet configuration. *Id.* at Ex. 2 ¶¶ 217–18.

      In addition, there is some evidence of similarities between Defendants' product and

Plaintiff's alleged trade secrets. For example, though the sequence flow diagrams do not appear

to include all the steps in Defendants' EPP, Zelichov Decl. Ex. 14 (Edwards Dep.) 42:6–55:23;

61:18–97:20, 87:23–93:9, 102:22–106:21; Edwards Decl. Ex. 2 ¶ 67, ECF 596 (finding APS

implements "some" of the steps of the sequence flow diagrams), there is evidence that they were

similar, *see* Edwards Dep. Ex. 2 ¶¶ 67–68 (noting, for example, that "most" of the steps

performed initially by Vesta were implemented by APS and that APS implemented interactions

and steps in "nearly the same sequence depicted in the sequence flow diagrams"). The parties

also present dueling expert reports on whether the source of some of Defendants' functionality

was its preexisting AMP or DCM products, third parties, or information shared by Plaintiff

during the 2010 and 2011 joint pitch. *Compare* Shamos Decl. Ex. 1 ¶¶ 170, 172–78 (noting

similar functionality in DCM and AMP), Agte Decl. ¶¶ 44, 64 (describing Business Requirement

Documents from Sprint and MetroPCS), *and* Mangal Decl. Ex. 11 (MetroPCS Business

Requirement Document) *with* Edwards Decl. ¶¶ 123, 132 ("My analysis determined that APS

implements the recurring and positioned fraud assessments" of Trade Secret 13.), *id.* at ¶¶ 108–

118 (finding EPP implements the bifurcated funds capture of Trade Secret 11), *and* Pelegero

Decl. Ex. 3 ¶¶ 211–213, 278–80 (noting differences between DCM and Plaintiff's platform).

Accordingly, viewing this evidence in the light most favorable to Plaintiff a reasonable jury could find that Defendants misappropriated the 2010 and 2011 information.

A reasonable jury could also conclude that Defendants misappropriated Plaintiff's APIs. Though Defendants contend they received this information from Sprint in 2014, Mangal Decl. Exs. 21–24; Zelichov Decl. Ex. 22 (Hopper 30(b)(6) Dep.) 33:13–34:10, 40:16–42:1, Plaintiffs note that the document contains references to Vesta and is a near copy of Plaintiff's Virgin Mobile API set, which Plaintiff sent to Sprint and Defendants in July of 2012. Kursh Decl. Ex. 6, ECF 603; Markley Decl. Ex. 64; Edwards Decl. Ex. 2 ¶ 96 (noting "many of the data type descriptions and programmer comments reference Vesta directly"). Thus, Plaintiff argues, Defendants should have known that the files contained its confidential information. There is, accordingly, a dispute of fact as to whether this information was received by Defendants under a known duty to limit its use.

Plaintiff also cites evidence demonstrating misuse. Defendants referenced Plaintiff's APIs in 2013, a year before they received documentation from Sprint. Suribabu Ganni, an Amdocs employee, forwarded them to other employees. Kursh Decl. ¶ 26, Ex 5; Hasen Decl. Ex. 1, ECF 605. Mr. Mangal, a solution architect responsible for integrating EPP for Sprint, testified at his deposition that he may have reviewed the materials from Mr. Ganni to understand what functionality Plaintiff was providing, how to interface with Sprint, and to determine the scope of the project. Haynie Decl. Ex. 15 (Mangal Dep.) 114:9–117:21; 118:4–23, 127:4–129:9. Plaintiff's experts also opined that there is some evidence that these APIs were used by Defendants. According to Dr. Edwards and Dr. Kursh, Plaintiff's Recharge API was very similar to Defendants' prepaidRechargePaymentRequest data type. Kursh Decl. ¶¶ 25–29; Edwards Decl. Ex. 2 ¶¶ 90–92. Though some of the relevant APIs were not ultimately implemented by

Defendants, Plaintiff's experts opine that these APIs appear in the "adapter layer" code of EPP may serve as a reference point for Defendants in resolving dependencies that would have made their EPP incompatible with the Sprint system. Haynie Decl. Ex. 5 (Emmerich Dep 82:2–84:25); Kursh Decl. ¶¶ 30–31, Ex. 4 ¶ 26; Edwards Decl. Ex. 2 ¶¶ 94–98, 102-03; *id.* at ¶ 98 (as an example, "Payment ManagementWebService is a copy of very close derivative of the Vesta API Spec for Virgin Mobile" and "similarities between the two could not have occurred by accident or coincidence"). Given these similarities and the manner in which the APIs were used, there is evidence that Defendants misused information that was otherwise disclosed by Plaintiff under circumstances giving rise to a duty on Defendants' part to maintain its secrecy or limit its use.

B.    Financial Trade Secrets

Defendants also argue that Plaintiff has failed to establish a claim for trade secret misappropriation with regard to its financial information. Plaintiff's financial trade secrets are identified in its Response to Defendants' Interrogatory No. 15, Zelichov Decl. Ex. 6 at 10, and are summarized by Plaintiff's expert Marc Abbey to include the following: Financial Information, including Financial Statements and Supporting Schedules, Gross Margin Report, Financial Statements by Geography, Product/Offering Level Financial Statements, Fraud Loss Levels, Reserves and Reserves by Client, Decline Rates and Ticketing Rates, and Headcounts and Staff Cost by Function, Abbey Decl. Ex. 1 ¶ 33(a); Customer Data, including Customer Level Financial and Performance Data, Customer Pricing Level and Structure, and Customer Financial Business Case, *id.* at ¶ 33(b); and Data Illustrating Vesta's Strategic Intent, including Market Analysis, Financial Forecasts, and Pipeline Data, *id.* at ¶ 33(c).

///

///

i.    Definition of Trade Secrets

As a preliminary matter, Defendants argue that Plaintiff expanded the scope of its financial trade secrets through Abbey's expert report. Def. Mot. 41–42 (citing Yong Decl. ¶ 2, Ex. A). Allegedly, in this report Plaintiff abandoned a majority of the documents identified in Interrogatory 15 and added 121 new documents such that Plaintiff's financial trade secrets encompass 144 documents, 2,000 printed pages, and 13 subcategories of information. *Id.* Plaintiff responds that every document cited in the Abbey report was identified in Interrogatory 15. Pl. Opp'n 21 (Markley Decl. Ex. A). These allegedly new documents are either (1) duplicates or near duplicates of previously identified documents or (2) evidence of improper distribution and use of trade secrets, which it was neither required to identify in Interrogatory 15 or could not have identified because it had not received any discovery from Defendants at the time of its response. *Id*.

The Court agrees with Plaintiff. The basis for Defendants' argument appears to primarily focus on the differences between the Bates numbers of the documents specifically identified in Interrogatory 15 and the expert report rather than a comparison of the substance of the exhibits and the description in the Interrogatory response. For example, the allegedly "new" documents, Yong Decl. Exs. 24–29, are duplicates of previously disclosed documents, *id*. at Exs. 2–7. Similarly, Exhibit 20 is titled "Headcount Summary," which appears to have been included in the response to Interrogatory 15: "As part of the 2012 acquisition diligence process, Amdocs was further provided with a 'High Level Org. Chart,' a 'Headcount Summary,' a 'Real Estate Summary,' a 'Legal Entities Diagram,' and a detailed financial breakdown entitled 'Viruoso_Q2 Financial update_v7.31.2012.' *See* Zelichov Decl. Ex. 6 at 18 (Interrogatory 15). Accordingly,

the Court finds that the documents cited by Abbey were reasonably identified in Interrogatory 15 and Plaintiff has not expanded their trade secrets.

        ii.        Efforts to Maintain Secrecy

Defendants contend that Plaintiff did not adequately maintain the confidentiality of its financial trade secrets. Specifically, Defendants point to the availability of much of this information from other industry sources, the obviousness of this information, and the public disclosure of financial information to lenders, S&P's and Moody's, and other third parties. Plaintiff responds by citing to its various procedures and protocols in place both for protecting this particular information and for protecting its confidential information more generally.

From the evidence cited by Plaintiff, a reasonable jury could find that it took reasonable efforts to maintain the secrecy of this information. First, Plaintiff had security protocols that required entering into NDAs with new employees and visitors. It had strict control over physical access to information within the building. Access to servers was limited by username and password. Digital and hardcopy information was compartmentalized by department and security level. And, as a matter of policy, NDAs were used when information was disclosed to third parties. *See* Khare Decl. ¶¶ 5–16; *see also* Scales Decl. ¶ 2; Hassold Decl. ¶ 14; Haynie Decl. Ex. 24 (Scales Dep.) 57:13–21, 62:4–30, 63:1–18, 113:12–16.

Second, to the extent that this information was disclosed to third parties as part of fundraising efforts in 2012, Plaintiff took steps to ensure that this information would be held in confidence. Plaintiff labeled information confidential, executed NDAs, and generally disclosed information pursuant to those NDAs. *Compare* Khare Decl. ¶ 29, Ex. 42 (lender presentation labeled confidential) *and* Markley Decl. Ex. 62 (teaser labeled confidential) *with* Zelichov Decl. Exs. 95–97 (emails sending teaser without NDA and promising additional information upon

receipt of NDA). Plaintiff worked with S&P and Moody's to ensure that confidential

information was not included in public documents. *See* Khare Decl. Exs. 35–36 (provision in

Moody's and S&P's engagement documents prohibited disclosure of confidential information);

*id.* at Exs. 37–40 (emails between Moody's and S&P regarding removing confidential

information). *Compare* Khare Decl. Ex. 40 *with* Zelichov Ex. 102 (reflecting modifications to

the report). Accordingly, whether Plaintiff made reasonable efforts to protect the secrecy of this

information is a question best left for the jury.

        iii.     Misappropriation

     At the end of its response, Plaintiff broadly asserts that—as evidence of

misappropriation—Defendants would not have entered the market but for their misuse of

Plaintiff's information.[15] The use of trade secret information in deciding whether to enter the

market can be a cognizable harm. *See Vesta Corp. v. Amdocs Mgmt Ltd.,* 80 F. Supp. 3d 1152,

1161 (D. Or. 2015) (finding sufficient at the motion to dismiss stage that Plaintiff alleged that

Defendants relied on Plaintiff's data to decide whether to enter the market); *O2 Micro Int'l Ltd.,*

399 F. Supp. 2d at 1075 ("The jury reasonably could have concluded that although [the

defendant] did not affirmatively use this trade secret in its product, . . . it did use this information

as part of research and development in deciding not to enter a market in which it stood no chance

of profiting."). *Cf. Jamison v. Olin Corporation-Winchester Division*, Nos. 03-1036-KI, 04-31-

KI, 04-76-KI, 2005 WL 7213837, at *5–6 (D. Or. Oct. 4, 2005) (confidential information as

---

[15] Plaintiff also suggests that Defendants' 2012 acquisition attempt was mere pretext for
obtaining additional financial and business information for Plaintiff, but the evidence it cites
does not—even taken in the light most favorable to Plaintiff—support such an inference.
Markley Decl. Ex. 61 (June 2012 email amongst Amdocs employees requesting updates on
Plaintiff and noting that "it is not trivial to ask questions which are not related to our joint
business opportunities with creating suspicion"), 72 (June 2012 email with information in
anticipation of possible partnership); Fieldhouse Decl. ¶ 22 (noting that Plaintiff had no interest
in including Amdocs in process until Defendants stated they were serious about the purchase);
Markley Decl. Ex. 14 (noting relatively low offer and exclusion from process).

motivation for the defendant's own further testing and development is not sufficient to constitute misuse). "Plaintiffs alleging trade secret misappropriation may prove such misappropriation by circumstantial as well as direct evidence. Circumstantial evidence is particularly appropriate in trade secret cases." *UniRAM Tech, Inc. v. Taiwan Semiconductor Mfg. Co.*, 617 F. Supp. 2d 938, 944 (N.D. Cal. 2007) (internal citations and quotations omitted).

First, Plaintiff notes that Defendants had been averse to entering this market in the past. Defendants previously rejected opportunities to enter the top-up prepaid market, Fieldhouse Decl. ¶ 9 (2008 opportunity); Markley Decl. Ex. 66 (2010 Opportunity); *id.* at Ex. 14 (2012 Opportunity), and disparaged it as a "niche market" of little value to Defendants, Markley Decl. Exs. 66, 83, 38 at 58. Defendants viewed competing with Plaintiff—who had competing solutions, a customer base, and skills that Defendants did not have—as "daunting." Pl. Opp'n 42; Haynie Decl. Ex. 29 at 175; Markley Decl. Exs. 83, 47 at 9, 16. And in the July 2012 build workshop Defendants concluded that they could not build a competing product. Markley Decl. Ex. 1; Abbey Decl. Ex. 1 ¶ 84.

Second, Plaintiff cites evidence showing that key proponents of building a competing product had access to both build and buy information. Yona Ovadia—part of executive management—was unhappy with the suggestion that they could not build a competing product. Markley Decl. Ex. 13. Mr. Ovadia had access to evaluation material, Markley Decl. Exs. 68–69, 11, 59, 36, when he was already part of a team to evaluate building EPP for Metro, Markley Decl. Ex. 18; Haynie Decl. Ex. 36 ¶ 21. Yani Blanca also had access to the evaluation material, Markley Decl. Ex. 10, led a build workshop, Haynie Decl. Ex. 22 (Yahalom Dep.) 140:18–24, was involved at some point in the discussion on whether to build a product for MetroPCS, Markley Decl. Ex. 15, and travelled to Metro to discuss a payments product to replace Fiserv,

Haynie Decl. Ex. 24 (Zepeda Dep.) 161:1–16. Manuel Zepeda was also given access to evaluation material in early August to help Mr. Ovadia determine whether to develop a solution for Metro. Markley Decl. Ex. 18. In other words, some decision makers and other players were involved in both processes at the same time.

Third, Plaintiff cites evidence showing a temporal connection between the rejection of Defendants' bid and its decision to enter the market. In August, after the end of the 2012 acquisition process, CEO Eli Gelman directed Mr. Ovadia and Mr. Schwartz to continue their efforts to develop a product for MetroPCS. Markley Decl. Exs. 15, 14. Roy Shmuel—the executive heading the M&A process with Credit Suisse—was directed to assist. Markley Decl. Ex. 70. Defendants also asked for more time to consider raising their bid even though Shmuel had already been transitioned onto the EPP project. Markley Decl. Ex. 15. Ultimately, CEO Gelman supported Mr. Ovadia and Mr. Zepeda in developing a payment platform and entering the market. Haynie Decl. Ex. 24 (Zepeda Dep.) 200:15–201:2; Markley Decl. Ex. 21.

Fourth, Plaintiff provides evidence that Defendants referred to Plaintiff's evaluation materials after the acquisition process was over. On November 19, 2012, Mr. Shmuel sent slides from the 2012 process in response to an email asking whether stealing Plaintiff's market share could make their business viable. Markley Decl. Ex. 39. Defendants delegated review of the evaluation material to subordinate employees to answer this question, Markley Decl. Ex. 39, before presenting it to the executive management, Haynie Decl. Ex 3 (Connors 30(b)(6) Dep.) 14:14–23; 16:19–17:10, 18:15–22; *id.* at Ex. 24 (Zepeda Dep.) 245:10–14, 246;15–247:1. Mr. Gelman authorized Mr. Zepeda to move forward with Metro PCS project in November of 2012. Haynie Decl. Ex. 24 (Zepeda Dep.) 235:10–15; 238:20–239:17. And Mr. Ovaida requested and was given M&A information in 2013 while individuals within Amdocs still had concerns over

building EPP. Markley Decl. Exs. 23 (March 13 email with slides from August 9, 2012), 42 (March 25 email from other Amdocs employees expressing concern about the MetroPCS project). Executive management formally approved of the project in April of 2013. Haynie Decl. Ex. 2 (Bricker Dep) 90:17–25. Based on this evidence, the Court finds that a reasonable jury could conclude that Defendants were not merely motivated by but used Plaintiff's information to determine whether to enter the payments space.

## CONCLUSION

Defendants' Motion for Summary Judgment is GRANTED in part. The Court dismisses Plaintiff's claims for trade secret misappropriation as they relate to its Best Practices Scorecard and compilation trade secret.

IT IS SO ORDERED.

Dated this ____12____ day of ____Sept._____, 2018.

_____
MARCO A. HERNÁNDEZ
United States District Judge